# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CARTER PAGE,

*Plaintiff-Appellant,*

v.

JAMES B. COMEY; ANDREW MCCABE; KEVIN CLINESMITH;
PETER STRZOK; LISA PAGE; JOE PIENTKA, III; STEPHEN SOMMA;
BRIAN J. AUTEN; UNITED STATES DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF INVESTIGATION; UNITED STATES OF AMERICA;
JOHN DOE 1-10; JANE DOE 1-10,

*Defendants-Appellees.*

Appeal from the U.S. District Court for the District of Columbia
Civil Case No. 1:20-cv-03460-DLF; Hon. Dabney L. Friedrich

## BRIEF OF APPELLANT CARTER PAGE

GENE C. SCHAERR
 *Counsel of Record*
ERIK S. JAFFE
BRIAN J. FIELD
ANNIKA BOONE BARKDULL
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Plaintiff-Appellant*

OCTOBER 31, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1) the undersigned counsel of record for Plaintiff-Appellant, Carter W. Page, hereby provides the following information:

### I.      Parties, Intervenors, and *Amici* Appearing Below

The parties who appeared before the U.S. District Court for the District of Columbia were:

1.      Carter W. Page, *Plaintiff*; and

2.      James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Joe Pientka III, Stephen Somma, Brian J. Auten, United States Department of Justice, Federal Bureau of Investigation, United States of America, John Does 1-10, and Jane Does 1-10, *Defendants*.

There were no intervenors in the district court. No *amici* appeared in the district court.

### II.     Parties, Intervenors, and *Amici* Appearing in this Court in the Matter

The parties who have appeared before the U.S. Court of Appeals for the District of Columbia Circuit in this matter are:

1. Carter W. Page, *Plaintiff-Appellant*; and

2. James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Joe Pientka III, Stephen Somma, Brian J. Auten, United States Department of Justice, Federal Bureau of Investigation, United States of America, John Does 1-10, and Jane Does 1-10, *Defendants-Appellees*.

There are no intervenors or *amici* appearing in this matter.

### III. Ruling Under Review

The ruling under review is the September 1, 2022 Final Order of the Honorable Dabney L. Friedrich of the U.S. District Court for the District of Columbia granting Defendants' motions to dismiss. The Final Order is unpublished and can be found at *Page v. Comey*, No. 1:20-cv-03460-DLF, (D.D.C. Sept. 1, 2022), Dkt. 114. The Memorandum Opinion, Dkt. 115, accompanying the Final Order can be found at *Page v. Comey*, 628 F. Supp. 3d 103 (D.D.C. 2022). The Order and Memorandum Opinion ("Op.") will be reprinted in the Deferred Joint Appendix ("JA") due to be filed February 28, 2024.

## IV. Related Cases

There are no other cases related to the case on review. The case on review has not previously been before this Court or any other court.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................................................................................i

TABLE OF AUTHORITIES....................................................vii

GLOSSARY .........................................................................xv

INTRODUCTION..................................................................1

JURISDICTION ....................................................................5

ISSUES.................................................................................5

STATUTORY AND REGULATORY PROVISIONS.................6

STATEMENT ........................................................................6

    A.    Plaintiff-Appellant Dr. Carter Page............................6

    B.    Operation Crossfire Hurricane....................................7

    C.    The FISA Warrants ....................................................11

        1.    The Initial FISA Application............................11

        2.    The First Renewal Application ........................15

        3.    The Second Renewal Application .....................17

        4.    The Third Renewal Application .......................19

    D.    The Media Leaks .......................................................21

    E.    The *Horowitz Report*................................................22

    F.    District Court Proceedings .........................................23

SUMMARY OF ARGUMENT ..............................................26

STANDARD OF REVIEW....................................................35

ARGUMENT ........................................................................ 36

I.   Dr. Page Sufficiently Alleged that All Individual Defendants "Engage[d] in" Unauthorized Electronic Surveillance in Violation of Section 1809(a)(1). ........................ 36

    A.   The phrase "engages in" as used in § 1809(a)(1) easily includes the Individual Defendants' meaningful participation in procuring FISA authorization and in receiving the information obtained thereby. ............................................................ 37

    B.   Even under the district court's erroneously narrow interpretation of "engage[]," each Defendant is also liable under Section 1809(a)(1) by virtue of having personally "acqui[red]" FISA information ........................ 52

    C.   Limiting FISA's private cause of action to agents who physically conduct unauthorized electronic surveillance would vitiate FISA's purpose of curbing abuses of civil liberties by the executive branch. ............................................................................ 57

II.   Dr. Page Adequately Pleaded that Defendants Disclosed and Used Information Obtained from Unauthorized Electronic Surveillance in Violation of Section 1809(a)(2). .................................................................. 61

    A.   The Complaint amply alleges that all Individual Defendants "used" FISA-acquired information on Dr. Page in violation of § 1809(a)(2), either in procuring surveillance reauthorization or in strategic investigative communications. .......................... 62

    B.   Dr. Page has stated a plausible claim that Defendants Strzok and Lisa Page knowingly disclosed information obtained from electronic surveillance in violation of FISA. ...................................... 75

III. The District Court Erred in Dismissing Page's Claims under the PATRIOT Act for "Unlawful Use" and "Disclosure" of Information Acquired from Electronic Surveillance. ...............................................................78

    A. Using FISA-acquired information to deliberately mislead a court into granting surveillance authorization constitutes "use" of that information for an "unlawful purpose" in violation of the PATRIOT Act. ...................................................................79

    B. Dr. Page adequately pleaded that FISA-acquired information was "used" for the "unlawful purpose" of misleading the FISC to receive FISA authorization. ..................................................................82

CONCLUSION ..........................................................................87

CERTIFICATE OF COMPLIANCE .........................................89

ANTI-VIRUS CERTIFICATION .............................................89

# TABLE OF AUTHORITIES

**Cases**

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
  525 F.3d 8 (D.C. Cir. 2008) ...................................................... 85

*Alderman v. United States*,
  394 U.S. 165 (1969) ................................................................. 50

*Al-Haramain Islamic Found., Inc. v. Obama*,
  705 F.3d 845 (9th Cir. 2012) .................................................. 78

*Am. Nat'l Ins. Co. v. FDIC*,
  642 F.3d 1137 (D.C. Cir. 2011).......................................... 31, 68

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................30, 33, 35, 74, 75, 77, 82, 84, 86

*Baltimore & Ohio Sw. R.R. Co. v. Burtch*,
  263 U.S. 540 (1924) ................................................................. 42

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015)............................................... 12

*Barr v. Clinton*,
  370 F.3d 1196 (D.C. Cir. 2004)....................................... 31, 63, 68

*Bates v. United States*,
  522 U.S. 23 (1997) ................................................................... 51

*Bechtel Power Corp. v. Sec'y of Lab.*,
  548 F.2d 248 (8th Cir. 1977) .......................................... 40, 42

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................... 68, 70, 73, 74, 75

*Brown v. Torrence*,
  88 Pa. 186 (1878)............................................................. 28, 39

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998). ............................................................. 41

*The authorities upon which we chiefly rely are marked with asterisks.

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
130 F. Supp. 3d 236 (D.D.C. 2015)......................................83

*Cannon v. Dist. of Columbia,*
717 F.3d 200 (D.C. Cir. 2013)..............................................12

*Capra v. Smith,*
372 So.2d 317 (Ala. Civ. App. 1978)....................................40

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) .............................................................43

*City of Moundridge v. Exxon Mobil Corp.,*
250 F.R.D. 1 (D.D.C. 2008)....................................31, 35, 69

*Convertino v. U.S. Dep't of Just.,*
684 F.3d 93 (D.C. Cir. 2012) ...............................................69

*Cook Inlet Tribal Council, Inc. v. Dotomain,*
10 F.4th 892 (D.C. Cir. 2021) ..............................................47

*Davarci v. Uber Techs., Inc.,*
No. 20-cv-9224, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021)..............45

*Doe v. Rumsfeld,*
683 F.3d 390 (D.C. Cir. 2012) .......................................33, 35

*Feldman v. CIA,*
797 F. Supp. 2d 29 (D.D.C. 2011)..................................70, 87

*Fikre v. Fed. Bureau of Investigation,*
142 F. Supp. 3d 1152 (D. Or. 2015)...............................79, 87

*Franks v. Delaware,*
438 U.S. 154 (1978) .......................................................80, 87

*Grand Lodge A.O.U.W. v. Haddock,*
82 P. 583 (Kan. 1905) ....................................................39, 41

*Gross v. United States,*
771 F.3d 10 (D.C. Cir. 2014) ...............................................35

*Hurd v. Dist. of Columbia,*
864 F.3d 671 (D.C. Cir. 2017)..............................................65

*In re Accuracy Concerns Regarding FBI Matters*
  *Submitted to FISC*, 411 F. Supp. 3d 333
  (FISA Ct. 2019)...................................................... 23, 34, 81, 82, 86

*In re Craftmatic Sec. Litig.*,
  890 F.2d 628 (3d Cir. 1989) ............................................ 35, 68

*Jones v. Kirchner*,
  835 F.3d 74 (D.C. Cir. 2016) ............................................... 74

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004)......................................... 12, 64

*Kapral v. United States*,
  166 F.3d 565 (3d Cir. 1999) .................................................. 48

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir.) ...................... 65, 75

*Kingman Park Civic Ass'n v. Williams*,
  348 F.3d 1033 (D.C. Cir. 2003) ............................................ 70

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1217 (D.C. Cir. 1994)........................................... 35, 68

*Krieger v. Fadely*,
  211 F.3d 134 (D.C. Cir. 2000)...................................... 31, 70, 85

*Locust Valley Water Dist. v. Dow Chem. Co.*,
  465 F. Supp. 3d 235 (E.D.N.Y. 2020) .................................... 75

*Loughrin v. United States*,
  573 U.S. 351 (2014) ...................................................... 49, 50

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013) ............................................................. 46

*Masters v. Stone*,
  367 A.2d 686 (Vt. 1976) .......................................... 28, 40, 45

*McClain v. West*,
  87 So. 49 (Fla. 1920) ......................................................... 39

*N.Y. Am. Water Co. v. Dow Chem. Co.*,
  No. 19-cv-2150, 2020 WL 9427226
  (E.D.N.Y. Dec. 11, 2020) .................................................... 74

*Neder v. United States,*
    527 U.S. 1 (1999) ...................................................................38

*Port Auth. Trans-Hudson Corp. v. Sec'y,*
    776 F.3d 157 (3d Cir. 2016) ..................................................46

*Repub. of Gam. v. Meta Platforms, Inc.,*
    588 F. Supp. 3d 1 (D.D.C. 2022) ........................................46

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................46

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ..............................................................75

*Shaw v. Williams,*
    87 Ind. 158 (1882).........................................................28, 39

*Slate v. Pub. Defender Serv. for D.C.,*
    31 F. Supp. 3d 277 (D.D.C. 2014).........................................12

*Stewart v. Nat'l Educ. Ass'n,*
    471 F.3d 169 (D.C. Cir. 2006)...............................................65

*Sw. Airlines v. Saxon,*
    142 S. Ct. 1783 (2022) ......................................28, 42, 43, 44

*Thomas v. Principi,*
    394 F.3d 970 (D.C. Cir. 2005)..................................31, 63, 84

*Toumazou v. Turkish Repub. of N. Cyprus,*
    71 F. Supp. 3d 7 (D.D.C. 2014) ............................................62

*Truelove v. Hunt,*
    67 F. Supp. 2d 569 (D.S.C. 1999) ........................................60

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.,*
    685 F. Supp. 2d 129 (D.D.C. 2010).......................................70

*United States ex rel. Head v. Kane Co.,*
    798 F. Supp. 2d 186 (D.D.C. 2011)........................................70

*United States v. Belfield,*
    692 F.2d 141 (D.C. Cir. 1982)...............................................59

*United States v. Clinesmith,*
  No. 20-165-JEB, 2021 WL 184316 (D.D.C. Jan. 19, 2021) .................. 20

*United States v. Colkley,*
  899 F.2d 297 (4th Cir. 1990) ................................................... 34, 81, 82

*United States v. Daoud,*
  755 F.3d 479 (7th Cir. 2014) ............................................................. 80

*United States v. Koyomejian,*
  946 F.2d 1450 (9th Cir. 1991) ........................................................... 51

*United States v. Leon,* 468 U.S. 897 (1984) ..................................... 60, 80

*United States v. Matthews,*
  172 F. Supp. 3d 1 (D.D.C. 2012) ................................................. 34, 81

*United States v. Spencer,*
  530 F.3d 1003 (D.C. Cir. 2008) ............................................. 34, 80, 82

*United States v. Tackett,*
  193 F.3d 880 (6th Cir. 1999) ............................................................. 50

*United States v. Wong Kim Bo,*
  472 F.2d 720 (5th Cir. 1972) ............................................................. 46

*Wis. Dep't of Revenue v. Sterling Custom Homes Corp.,*
  283 N.W.2d 573 (Wis. 1979) ............................................. 28, 40, 42, 44

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................................. 5

**Statutes**

18 U.S.C. § 2511 ........................................................................................ 51

18 U.S.C. § 2712 ....................................... 3, 5, 6, 24, 27, 32, 78

28 U.S.C. § 1291 .......................................................................................... 5

28 U.S.C. § 1331 .......................................................................................... 5

28 U.S.C. § 1346 .......................................................................................... 5

5 U.S.C. § 552a .......................................................................................... 5

*50 U.S.C. § 1801 ..................... 11, 14, 30, 36, 37, 46, 48, 52, 56, 57, 67, 77

50 U.S.C. § 1802 ..................................................................... 55

50 U.S.C. § 1804 ..................................... 14, 26, 59, 66, 80, 82

50 U.S.C. § 1805 ..................................................................... 81

*50 U.S.C. § 1806 ............................ 3, 4, 6, 22, 24, 27, 32, 54, 78, 79

*50 U.S.C. § 1809 ................ 3, 4, 5, 6, 27, 30, 36, 49, 61, 67, 75, 77

50 U.S.C. § 1810 ............................... 2, 3, 5, 6, 23, 24, 36, 51, 62

50 U.S.C. § 1812 ..................................................................... 49

50 U.S.C. § 1813 ..................................................................... 54

50 U.S.C. § 1827 ............................................................... 29, 49

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 .................. 40

**Rules**

Fed. R. App. P. 4 ...................................................................... 5

Fed. R. Civ. P. 59 ................................................................... 25

Fed. R. Evid. 201 .................................................................... 65

**Other Authorities**

*American Heritage Dictionary of the English Language*
  (4th ed. 2000) ..................................................................... 38

William Baude & Michael Stokes Paulsen,
  *The Sweep and Force of Section Three*,
  172 U. Pa. L. Rev.
  (forthcoming 2024) ............................................................. 39

*Black's Law Dictionary* (2d ed. 1910) ..................................... 50

Alan Butler,
  *Standing Up to* Clapper*: How to Increase Transparency
  and Oversight of FISA Surveillance*,
  48 New Eng. L. Rev. 55 (2013) ............................................. 58

The Federalist No. 48 (James Madison) (Libr. Cong.) ............................ 88

Felix Frankfurter,
  *Some Reflections on the Reading of Statutes*,
  47 Colum. L. Rev. 527 (1947) ............................................................ 45

*Foreign Intelligence Surveillance Act of 1976,*
  *Hearing on S. 743, S. 1888 & S. 3197 Before the*
  *Subcomm. on Crim. L. & Procs. of the S. Comm.*
  *on Judiciary*, 94th Cong. (1976) .......................................................... 87

*Foreign Intelligence Surveillance Act of 1978:*
  *Hearing on S. 1566 Before the Subcomm. on Intel. & the*
  *Rts. of Ams. of the S. Select Comm. on Intel.*,
  95th Cong. (1978) ................................................................................ 60

Michael Isikoff,
  *U.S. intel officials prove ties between Trump adviser*
  *and Kremlin*, Yahoo! News (Sept. 23, 2016) ...................................... 10

Ethan J. Leib & James J. Brudney,
  *The Belt-And-Suspenders Canon*,
  105 Iowa L. Rev. 741 (2020) ................................................................ 47

Letter from Melissa MacTough, Dep'y Asst. Att'y Gen.,
  U.S. Dep't of Just., to Hon. Anthony J. Trenga,
  U.S. F.I.S.C. (June 29, 2023) ............................................................... 65

Rochelle Lieber,
  *The Ecology of Nominalization* (2016) ................................................ 53

*Merriam-Webster's New Collegiate Dictionary* (1977) ...................... 38, 53

Ellen Nakashima et al.,
  *FBI Obtained FISA Warrant to Monitor Former*
  *Trump Adviser Carter Page*, Wash. Post (Apr. 11, 2017) .................... 76

Nat'l Sec. Agency,
  SP0018, *United States Signals Intelligence Directive* (2011) ............. 55

Off. of Inspector Gen., U.S. Dep't of Just.,
  *Review of Four FISA Applications and Other Aspects*
  *of the FBI's Crossfire Hurricane Investigation* (Dec. 2019) .. 8, 9, 56, 58,
  66, 71, 73, 81, 84

Order,
  *In re Carter W. Page*, Nos. 16-1182, 17-52, 17-375, 17-679
  (FISA Ct. June 25, 2020) .............................................. 2, 23, 26, 73, 85

*Oversight of the Crossfire Hurricane Investigation:*
  *Hearing Before the S. Comm. on the Judiciary,*
  111th Cong. (2010) ................................................................ 72

*Oxford English Dictionary* (2d ed. 1989) ........................................ 50, 54

*Oxford Thesaurus of English* (3d ed. 2009) ........................................ 38

Press Release, U.S. Dep't of Just.,
  FBI Attorney Admits Altering Email Used for FISA
  Application During "Crossfire Hurricane" Investigation
  (Aug. 19, 2020) .................................................................... 86

Jeanne Frazier Price,
  *Wagging, Not Barking: Statutory Definitions,*
  60 Clev. St. L. Rev. 999 (2013) ................................................... 47

Charlie Savage & Adam Goldman,
  *National Security Wiretap System Was Long Plagued by*
  *Risk of Errors and Omissions,* N.Y. Times (Sept. 20, 2021) .............. 71

Antonin Scalia & Bryan A. Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012) .... 38, 46, 47, 52

S. Rep. 94-755 (1976) ............................................................... 58, 59

S. Rep. 95-604, bk. I (1977) ....................................................... 60, 88

Verified Application,
  *In re Carter W. Page*, No. 16-1182 (FISA Ct. Oct. 21, 2016) .............. 11

Verified Application,
  *In re Carter W. Page*, No. 17-375 (FISA Ct. Apr. 1, 2017) ............. 18, 65

Verified Application,
  *In re Carter W. Page*, No. 17-52 (FISA Ct. Jan. 12, 2017) ............. 16, 65

Verified Application,
  *In re Carter W. Page*, No. 17-679 (FISA Ct. June 1, 2017) ........... 20, 65

# GLOSSARY

CIA         Central Intelligence Agency

DOJ         United States Department of Justice

FBI         Federal Bureau of Investigation

FISA        Foreign Intelligence Surveillance Act

FISC        Foreign Intelligence Surveillance Court

FTCA        Federal Tort Claims Act

# INTRODUCTION

This case is about holding government actors accountable for their plainly illegal conduct of using fraud and deceit to obtain secret search warrants against an innocent citizen. Worse still, such tactics were used against an innocent foreign policy advisor to a disliked presidential campaign in a transparently political effort to derail that campaign. If there is no realistic mechanism to hold government actors legally accountable for their illegal conduct, future government actors—of whatever political stripe—will be able to act with impunity against their political opponents. And both our political process and the public's trust in our Nation's intelligence system will be severely compromised.

Plaintiff-Appellant Dr. Carter Page found himself in the crosshairs of Operation Crossfire Hurricane—a seriously flawed Federal Bureau of Investigation ("FBI") probe into unsubstantiated accusations of ties between the 2016 presidential campaign of Donald Trump and Russia. Second Am. Compl. ¶211, Dkt. 73 ("Compl."). Through their bad-faith misstatements, misrepresentations, and omissions, the Crossfire Hurricane team willfully deceived the Foreign Intelligence Surveillance Court ("FISC") into believing Page was a Russian agent and into granting

not one, but four warrants to surveil him. And, when the existence and certain contents of this surveillance were illegally leaked to the media, Page was falsely maligned as a traitor.

The FISC has already held this very surveillance to be "unlawful." Order at 1, *In re Carter W. Page*, Nos. 16-1182, 17-52, 17-375, 17-679, (FISA Ct. June 25, 2020), Dkt. 88-18 ("FISA Ct. 6/25/20 Order"). And the FBI has admitted that its agents are responsible for the damage inflicted on Page. *See* Compl. ¶¶215-17.

In this lawsuit, Dr. Page sued eight federal officers who played a direct and significant role in causing the illegal surveillance of him— Defendants-Appellees James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Joe Pientka III, Stephen Somma, and Brian J. Auten (collectively, "Individual Defendants"). The Foreign Intelligence Surveillance Act ("FISA") creates a private right of action that allows an "aggrieved person ... who has been subjected to [unlawful] electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of [FISA]" to sue for damages against "any person who committed such violation." 50 U.S.C. § 1810. Page also sued several governmental

entities, including (as relevant here) the United States, for their agents' illegal use of FISA-acquired information for the unlawful purpose of deceiving the FISC. 50 U.S.C. § 1806. Such suits arise under the PATRIOT Act's private cause of action for "[a]ny person who is aggrieved by any willful violation of" certain parts of FISA. 18 U.S.C. § 2712.

Although the district court recognized that the allegations were "troubling," Memorandum Opinion 28 ("Op."), Dkt. 115, it nonetheless dismissed each of Page's claims without any discovery—much less a trial—under the incorrect legal understanding that the express causes of action provided by Congress do not reach the "clearly demonstrate[d] wrongdoing" alleged in the Complaint. Op. 32.

But FISA's private right of action, 50 U.S.C. § 1810, expressly provides a remedy for the violations allegedly committed by the defendants in this case. First, an aggrieved party may base his claim on a violation of 50 U.S.C. § 1809(a)(1), which makes it a crime to "engage[] in electronic surveillance under color of law except as authorized" by statute, as did each of the individual government agents that directed or otherwise played a substantial role in causing the illegal surveillance alleged here. Second, a Section 1810 claim can be based on a violation of

50 U.S.C. § 1809(a)(2), which makes it unlawful to use or disclose "information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by statute. Third, a claim against the United States, under the PATRIOT Act's § 2712, may be based on a willful violation of 50 U.S.C. § 1806, which addresses "[i]nformation acquired from an electronic surveillance conducted pursuant to" FISA and makes it unlawful for "Federal officers or employees" to "use[] or disclose[]" such information "except for lawful purposes." *Id.* § 1806(a).

As explained below, the facts alleged in Page's Second Amended Complaint were more than sufficient to plead each type of claim, and the district court thus erred in dismissing the complaint. Reversal of that erroneous decision is necessary to restore accountability for the kinds of unlawful surveillance in which the defendants engaged, and thereby to at least begin to reverse the loss of public trust in the Nation's intelligence-gathering system engendered by their illegal behavior.

# JURISDICTION

Jurisdiction in the district court arose under 28 U.S.C. § 1331, based on the complaint's federal claims under 5 U.S.C. § 552a(d)(3), 18 U.S.C. § 2712(a), 28 U.S.C. § 1346(b), 50 U.S.C. § 1810, and the Fourth Amendment to the U.S. Constitution. *See* Compl. ¶¶256-311. Appellate jurisdiction arises under 28 U.S.C. § 1291 based on the district court's September 1, 2022 final decision granting defendants' Motion to Dismiss and entering judgment in their favor and on its January 18, 2023 denial of plaintiff's Motion to Alter or Amend the Judgment and Motion for Relief from the Judgment.

Plaintiff filed a timely notice of appeal on February 17, 2023. Fed. R. App. P. 4(a).

# ISSUES

This appeal presents three issues that are central to preserving proper accountability for violations of FISA, and which this Court reviews *de novo*:

1.      Whether the Second Amended Complaint adequately pleaded that the Individual Defendants "engage[d] in" unauthorized electronic surveillance prohibited by 50 U.S.C. § 1809(a)(1) and thus are subject to private suit under 50 U.S.C. § 1810.

2.     Whether the Second Amended Complaint adequately pleaded that the Individual Defendants knowingly used and disclosed "information obtained … by" unlawful electronic surveillance in violation of 50 U.S.C. § 1809(a)(2), and thus are subject to private suit under 50 U.S.C. § 1810.

3.     Whether the Second Amended Complaint adequately pleaded that the Individual Defendants used FISA-acquired information for the unlawful purpose of deceiving the FISC, in violation of 50 U.S.C. § 1806(a), thus subjecting the United States to private suit under the PATRIOT Act, 18 U.S.C. § 2712.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent authorities appear in an addendum to this brief.

## STATEMENT

### A.     Plaintiff-Appellant Dr. Carter Page

Dr. Carter Page is an American citizen who has spent his career contributing to American national security in numerous capacities. After graduating from the U.S. Naval Academy, he served as an active-duty intelligence officer in the U.S. Navy between 1993 and 1998, and then in the Navy Reserve until 2004, when he was honorably discharged at the rank of Lieutenant. An expert on international relations, he has

collaborated often with the U.S. intelligence community, serving as an operational contact to the CIA between 2008 and 2013, and assisting the FBI in a similar capacity. Compl. ¶11.

Notwithstanding his unassailable background and prior assistance to the intelligence community, Page was targeted for surveillance in 2016 as part of Operation Crossfire Hurricane—the FBI's unfounded investigation into rumored ties between Russia and the Trump presidential campaign.

Dr. Page's limited association with the Trump campaign was as a volunteer on an "informal foreign policy advisory committee" to the campaign, and he had never "met or spoke to then-candidate Trump. *Id.* ¶21.Page did not have "any involvement with Russia on behalf of the Trump campaign before, during, and after his affiliation with the Trump campaign" *Id.* ¶86. And he has *never* engaged in any "unlawful communications [or] activities" with Russian operatives or anyone else. *Id.* ¶15.

## B. Operation Crossfire Hurricane

On July 31, 2016, the FBI commenced Operation Crossfire Hurricane, an investigation into rumors insinuating that individuals

"associated with the Trump campaign" were clandestinely working as foreign agents of Russia. Compl. ¶5 (quoting Off. of Inspector Gen., U.S. Dep't of Just., *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* 56 (Dec. 2019) [hereinafter *Horowitz Report*], available at https://tinyurl.com/mr4danfe). The investigation was conducted at FBI Headquarters in Washington, D.C., under the direct purview of FBI Director James Comey and Deputy Director Andrew McCabe, and supervised by FBI Deputy Assistant Director for Counterintelligence Peter Strzok. *See id.* ¶¶6, 26-27.

Shortly after the investigation began, Operation Crossfire Hurricane set its sights on several affiliates of the Trump campaign, including Dr. Page. *Id.* ¶5. By August 17, however, the Crossfire Hurricane team had learned from the CIA that Page had long served as a friendly source and that he had a positive reputation for truthfulness at that Agency. *Id.* ¶11. The investigation into Page should have ended there. But it did not.

The investigation into Dr. Page was largely based on the so-called "Steele Dossier"—two unverified and unsubstantiated reports volunteered to the FBI by Christopher Steele, a known political-

opposition researcher with ties to the political party opposing Trump. *Id.* ¶9. On September 19, 2016, Steele sent the FBI those reports, which "falsely alleged unlawful communications and activities involving Dr. Page" and Russian operatives. *Id.* ¶14.

From the outset, the FBI ignored the barrage of red flags signaling the unreliability of the Steele Dossier. Less than two weeks before the reports fell on their desks, defendants Comey and Strzok received an "investigative referral warning" from the CIA describing a "disinformation plan" from the opposing presidential campaign "involving a falsely alleged connection between the Trump campaign and Russia." *Id.*

The convenient appearance of the Steele Dossier was wholly "consistent with the CIA's express warning ... about receiving a false report containing this specific claim." *Id.* The Crossfire Hurricane team knew Steele was being paid to perform "political opposition research" in support of the competing presidential campaign, and "it was 'obvious' Steele's work was 'politically motivated.'" *Id.* ¶¶9, 74 (quoting *Horowitz Report, supra*, at 4). And, by October 2016, the Crossfire Hurricane team

knew that a key source for the Dossier had strong ties to Russian intelligence operatives. *Id.* ¶88.

Notwithstanding such red flags, Crossfire Hurricane "did not conduct any meaningful investigation of Steele's facially implausible allegation" that Dr. Page was somehow secretly working in the shadows as the middleman between "[Donald] Trump and Vladimir Putin." *Id.* ¶75. Rather, the FBI falsely cited as "independent corroboration" of the Dossier a September 23, 2016 *Yahoo! News* article that merely regurgitated the Steele Dossier's allegations. *Id.* ¶¶76-78 (citing Michael Isikoff, *U.S. intel officials prove ties between Trump adviser and Kremlin*, Yahoo! News (Sept. 23, 2016), https://tinyurl.com/43ytvfhk). But this information was anything but independent, and the FBI knew that Steele himself was the "source of the information" in that article. *Id.* ¶79.

Rightly shocked by the disparaging and baseless claims in the article, Dr. Page quickly sent James Comey a letter on September 25, 2016, unequivocally "denying he had had communications with any sanctioned Russian officials" and reminding the FBI of his "decades' long record" of assistance to U.S. intelligence. *Id.* ¶81. This information was

shared with the Crossfire Hurricane team and was corroborated by multiple interviews the team conducted. *See id.* ¶¶81, 85.

And yet, despite having no proof of the absurd and implausible allegations made against Dr. Page in the Steele Dossier—and having knowledge of substantial evidence undermining those claims—the Crossfire Hurricane team nonetheless applied for a FISA warrant to begin clandestine electronic surveillance of him.

### C.    The FISA Warrants

FISA requires that surveillance of American citizens for foreign-intelligence purposes be conducted pursuant to valid authorization by the FISC. FISA authorization may be granted only upon a showing by the applicant that there is probable cause to believe the target is actively acting "on behalf of a foreign power" against the interests of the United States. 50 U.S.C. § 1801(b)(2). Through their work in directing and preparing the faulty FISA applications, each Individual Defendant took a key role in effectuating unlawful electronic surveillance on Dr. Page.

### 1.    The Initial FISA Application

By October 2016, the Crossfire Hurricane team had begun to prepare their first application to surveil Dr. Page. *See* Verified Application, *In re Carter W. Page*, No. 16-1182 (FISA Ct. Oct. 21, 2016),

available at https://perma.cc/EX7A-S2XL [hereinafter Initial Application].[1] Addendum ("Add.") 22-106. Relying on the unverified Steele Dossier, FBI counterintelligence agent Stephen Somma spearheaded the drafting of the Initial Application. Compl. ¶201. To bolster the illusion of probable cause, Somma deliberately withheld from DOJ attorneys substantial information on Page's positive relationship with the CIA and Steele's adverse political agenda. *Id.* ¶¶205-07.

The Initial Application was thus marred with material misstatements and deliberate omissions of exculpatory evidence, including omitting that Dr. Page worked as a CIA source, *id.* ¶84, that

---

[1] Each of the four applications for FISA authorization, though not attached as exhibits to the Complaint, are referenced at length throughout it. *See, e.g.*, Compl. ¶¶95-100 (Initial Application); *id.* ¶¶111-18 (First Renewal); *id.* ¶¶122-26 (Second Renewal); *id.* ¶¶133-39 (Third Renewal); *see also id.* ¶231 (citing to each application's FISA docket). Because these documents are "specifically reference[d]" in the Complaint and are "integral" to Dr. Page's claim that defendants used FISA-acquired information in them in violation of 50 U.S.C. §§ 1806(a) and 1809(a)(2), they can be considered in reviewing a motion to dismiss. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)). Each declassified application was shared by the DOJ with the Senate Committee on the Judiciary and is a matter of public record of which this Court may take judicial notice. *Cannon v. Dist. of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (judicial notice of information publicly shared by agency); *Slate v. Pub. Defender Serv. for D.C.*, 31 F. Supp. 3d 277, 288-89 (D.D.C. 2014) (judicial notice of warrant).

foreign source-monitored communications with him produced no evidence of involvement with Russia, *id.* ¶86, that the Steele Dossier was "political opposition research," *id.* ¶¶93-94, that the CIA had specifically warned the FBI of the unreliability of such allegations, *id.* ¶95, that at least one of Steele's sources was likely a Russian agent, *id.* ¶88, and that the FBI failed to verify the information in the Steele Dossier, *id.*

Additionally, the Initial Application included a "misleading footnote" downplaying Steele's known ties to the opposing political party and presidential campaign, *id.* ¶¶92-93, and the knowingly false statement that the Steele Dossier was "corroborated and used in criminal proceedings," *id.* ¶179. Both statements were drafted by defendant Brian J. Auten, the FBI supervisory intelligence analyst responsible for reviewing the statements of probable cause. *Id.* ¶175. Despite the FBI's failure "to verify the accuracy of information included in the warrant applications," defendant Joe Pientka III falsely certified that the information contained in them was truthful and accurate pursuant to the FBI's Woods Procedures. *Id.* ¶¶42, 198.

Knowing of these material errors and omissions in the application and that probable cause did not exist to spy on Dr. Page, *see, e.g.*, *id.*

¶¶81, 91, 146-50, 157-59, the Complaint alleged that defendants Comey and McCabe nonetheless gave the "green light" to submit the application after intense lobbying by Defendants Strzok and Lisa Page. *Id.* ¶91. Despite Lisa Page's duty to provide candid legal guidance as Special Counsel to McCabe, she failed to apprise the Crossfire Hurricane team of the illegality of the knowing misrepresentations and omissions in the application. Instead, she pushed heavily for the surveillance. *See id.* ¶¶94-98.

Although Comey was aware of the material omissions, misstatements, and unverified allegations against Dr. Page in the Initial Application, *id.* ¶¶146-51, he signed it anyway, falsely certifying that the surveillance was "necessary to[] the ability of the United States to protect against" clandestine intelligence by a foreign government. 50 U.S.C. § 1801(e)(1); *see id.* § 1804(a)(6) (outlining requirements for this certification). On October 21, 2016, the Initial Application was submitted to the FISC. Compl. ¶150.

Misled by the application's false statements and omissions, the FISC granted the warrant—and electronic surveillance on Dr. Page commenced soon thereafter.

## 2. The First Renewal Application

Events following the Initial Application compounded its flaws and made subsequent renewal applications even more illegal. For example, on October 31, 2016, Steele leaked new, unsubstantiated accusations of Trump-Russia collusion to *Mother Jones*. *Id.* ¶101. His handler, FBI Agent Michael Gaeta, described those allegations as "one of the craziest" concoctions of a conspiracy theory he had seen in his twenty years at the Bureau. *Id.* ¶102 Despite a deliberate effort by Somma to "hide from DOJ attorneys the political bias that made Steele's reports about Dr. Page suspect," *id.* ¶207, the FBI terminated its relationship with Steele on November 17, 2016, *id.* ¶104, and began to look into Steele's biases more closely.

This belated inquiry only confirmed for the Crossfire Hurricane team what they already knew. For instance, on a November 2016 trip to London to assess Steele's credibility, the Complaint alleged that Strzok was told of Steele's "lack of judgment" and tendency of "pursuing people [with] political risk but no intel value." *Id.* ¶105. Defendants Strzok, Pientka, and Lisa Page were told again in a November 21, 2016, briefing that Steele was hired by "a lawyer who does opposition research" and

"was desperate that Donald Trump not get elected." *Id.* ¶106. And, in December of 2016, the Crossfire Hurricane team received additional evidence substantiating that one of Steele's key sources had "been the subject of an investigation by the FBI in 2009-2010 as a 'National Security Threat' and possible Russian spy." *Id.* ¶110.

Because such information would have seriously undermined the FBI's claim of probable cause to surveil Dr. Page, the Crossfire Hurricane team simply omitted it from the renewal application. *Id.* ¶¶111-13; *see* Verified Application, *In re Carter W. Page*, No. 17-52 (FISA Ct. Jan. 12, 2017), available at https://perma.cc/BH9Z-RG7F [hereinafter First Renewal Application] (Add. 107).

Indeed, the First Renewal Application corrected no errors made in the Initial Application and continued to rely upon Pientka's false certification of accuracy. It also obscured the fact that Steele had been terminated by the FBI and reiterated Auten's previous lie that the reported information was still reliable because it had "been verified and used in criminal proceedings." *Id.* ¶111.

The First Renewal Application also described the results of surveillance under the Initial FISA Warrant and included the misleading

statement that electronic surveillance information would "continue to produce foreign intelligence information," despite nothing being uncovered to substantiate the baseless claim that Dr. Page was secretly a Russian spy. *Id.*¶¶114-15. Although they knew of the First Renewal Application's material misstatements and omissions, according to the Complaint, McCabe approved the application and Comey once again signed it on January 12, 2017, *Id.*¶¶152, 162. The FISC, none the wiser, granted the application.

### 3. The Second Renewal Application

Subsequent events continued to compound the illegality of the surveillance of Dr. Page. Two weeks after the renewal application was granted, members of the Crossfire Hurricane team, including Defendants Auten and Somma, interviewed Igor Danchenko, one of Steele's sources.

Danchenko made clear that Steele "had no proof to support the statements from [his] sub-sources" and that the Dossier was "misstated or exaggerated," and based on "rumor and speculation." *Id.* ¶120. Comey learned of Danchenko's statements and contemporaneously informed the President that the Steele Dossier was "unverified." *Id.* ¶152. But no one informed the FISC of this.

Instead, the Second Renewal Application misleadingly stated that the FBI found Danchenko "truthful and cooperative" in the interview—but failed to report the damning substance of his statements, thus falsely implying support for the credibility of the Steele Dossier. *Id.* ¶121; *see* Verified Application at 31-35, 39-44, *In re Carter W. Page*, No. 17-375 (FISA Ct. Apr. 1, 2017), available at https://perma.cc/KC6A-D9L2 [hereinafter Second Renewal Application] (Add. 207).

Before submitting the Second Renewal Application, Somma conducted five interviews with Dr. Page, in which he voluntarily participated without counsel. And, although Page's answers "undermined any contention that he was acting as an agent of a foreign power," the results of the interviews were never reported to the FISC. *Id.* ¶122. On the contrary, the Second Renewal Application failed to disclose any known exculpatory information and failed to correct any known misstatements in the prior applications—it simply continued to rely on the now-irrefutably worthless Steele Dossier and Pientka's false certification of factual accuracy. The Second Renewal Application also discussed the results of the surveillance on Dr. Page to date and falsely

reasserted that further surveillance would "continue to produce foreign intelligence information." *Id.* ¶123.

Comey signed the Second Renewal Application, thus falsely swearing to its veracity, and submitted it to the FISC on April 7, 2017. *Id.* ¶153. Once again deceived, the FISC granted the application.

### 4.   The Third Renewal Application

As its previous misstatements and omissions became more and more untenable, the Crossfire Hurricane team moved on to the final act of its charade—the cover-up.

In preparing to file the Third Renewal Application, the (undisclosed) prospective affiant for that application asked Clinesmith whether Dr. Page had worked as an operational contact for the CIA. Although the FBI had known from the investigation's outset of Page's service to the CIA, Clinesmith sent a "disingenuous" email to his CIA liaison on June 15, 2017, "inquiring" whether Dr. Page had worked with the CIA. *Id.* ¶130. Clinesmith was told—as he already knew—that Dr. Page *had* been a source for the CIA.

But even the ruse of pretending prior ignorance of such exculpatory information was not enough to save face. To avoid having to write a

"terrible footnote" to the FISC revealing Dr. Page's previously undisclosed CIA affiliation, Clinesmith doctored the email to falsely read that Dr. Page "was *not* a source" and shared that misinformation with the Third Renewal Application's affiant. *Id.* ¶¶193-94. [2]

The Third Renewal Application, like its predecessors, omitted this and all other known exculpatory evidence, continued to rely on the Steele Dossier and misleadingingly tout Danchenko's credibility, and made no correction to Pientka's false certification of veracity. *See id.* ¶135; Verified Application, *In re Carter W. Page*, No. 17-679 (FISA Ct. June 1, 2017), available at https://perma.cc/5TNF-SSUD [hereinafter Third Renewal Application]. And again, the Third Renewal Application discussed the results of all prior surveillance of Dr. Page to falsely support the assertion that renewal would "continue to produce foreign intelligence information." *Id.* ¶136.

Having been involved in Crossfire Hurricane from the start—and having continually received briefings on and discussed the progress of the

---

[2] For this wrongful conduct, Defendant-Appellee Clinesmith later pleaded guilty to making a false statement in violation of 18 U.S.C. § 1001. *See United States v. Clinesmith*, No. 20-165-JEB, 2021 WL 184316, at *1 (D.D.C. Jan. 19, 2021).

surveillance—McCabe was well-aware of the Third Renewal Application's unlawful disregard for the truth. *See id.* ¶161. Even so, McCabe signed the application, which he knew contained "numerous factual errors [and] failed to include information that should have been brought to the court." *Id.* ¶215. So the FISC, once again, unwittingly granted the renewal despite the absence of probable cause.

## D.    The Media Leaks

As ongoing surveillance failed to deliver any evidence establishing probable cause that Dr. Page was a Russian asset, some members of Crossfire Hurricane desperately turned to their "insurance policy" of maligning Page to the media. *Id.* ¶71. On April 10, 2017—soon after the FISC approved the Second Renewal Application—Strzok texted Lisa Page to discuss their "media leak strategy with DOJ." *Id.* ¶220.

The next day, the *Washington Post* ran a story reporting that the FBI had authorization to conduct electronic surveillance on Dr. Page "after convincing [the FISC] that there was probable cause to believe Page was acting as an agent of ... Russia." *Id.* ¶221. The story explicitly confirmed that Dr. Page "had his communications directly targeted with a FISA warrant," *id.*, information that was only available to the Crossfire

Hurricane team. *See Id.* ¶6; 50 U.S.C. § 1806(a) (limiting access to information "only in accordance with the minimization procedures required" by law).

Immediately after, Strzok informed Lisa Page that two more similar articles were forthcoming. *See* Compl. ¶222. On April 22, the *New York Times* released an article parroting the FBI's supposed basis for surveilling Dr. Page. *Id.* ¶224. Upon its publication, Strzok excitedly texted Lisa Page that the "article is out!" and congratulated her on a job "[w]ell done" as a source for the article. *Id.* ¶223. With these well-orchestrated leaks of FISA information, Defendants Strzok and Lisa Page unilaterally marked Dr. Page as a traitor in the eyes of the public, all the while knowing the baselessness of this accusation.

### E. The *Horowitz Report*

In March 2018, the DOJ's Office of the Inspector General began investigating the legality of the electronic surveillance on Dr. Page. Over a year later, the *Horowitz Report* brought to light the egregious and unlawful actions of each Individual Defendant taken to deceive the FISC into granting improper FISA warrants. The *Horowitz Report* found seventeen distinct, material errors and omissions in the FISA warrant

applications, leading it to conclude that the surveillance of Dr. Page was unlawful for lack of probable cause. *Id.* ¶42.

The FISC agreed. Because the applications' consistent misrepresentations, false statements, and material omissions destroyed probable cause, *In re Accuracy Concerns Regarding FBI Matters Submitted to FISC*, 411 F. Supp. 3d 333, 337 (FISA Ct. 2019), the FISC court ruled the surveillance on Dr. Page to be "unlawful." FISA Ct. 6/25/20 Order at 1. The government later acknowledged this with respect to surveillance pursuant to the Second and Third Renewal Applications, and "declined to argue" that surveillance pursuant to *any* warrant was lawful. *See id.* at 4.

## F.    District Court Proceedings

To hold the various government actors accountable for their illegal conduct and the damage it caused, Dr. Page filed suit against the Individual and Institutional Defendants in the U.S. District Court for the District of Columbia on November 27, 2020.

Dr. Page brought four claims—one for each invalid FISA warrant—against the Individual Defendants in their individual capacities under 50 U.S.C. § 1810, which grants any "person ... subjected to [unlawful]

electronic surveillance" or "about whom information obtained by electronic surveillance ... has been [unlawfully] disclosed or used" a "cause of action against any person who committed such violation." 50 U.S.C. § 1810.

On June 8, 2021—after exhausting his administrative remedies under the PATRIOT Act—Dr. Page filed his Second Amended Complaint, adding one claim against the United States based on the PATRIOT Act. Dkt. 73. That law allows "[a]ny person who is aggrieved by any willful violation of [50 U.S.C. § 1806(a)]" to "commence an action ... against the United States to recover money damages." 18 U.S.C. § 2712(a). Section 1806(a), in turn, addresses "[i]nformation acquired from an electronic surveillance conducted pursuant to" FISA and makes it illegal for "Federal officers or employees" to "use[] or disclose[]" such information "except for lawful purposes."

All Defendants moved to dismiss the various claims against them on September 17, 2021. Dkts. 80-88.

The district court granted each Defendant's motion to dismiss on all claims. *See* Dkt. 114. The court held that the claims based on alleged violations of § 1809(a)(1) failed because that section's prohibition against

"engag[ing] in electronic surveillance" without authorization only covers "those who *conduct* unauthorized surveillance, and not those who at the application stage mislead the FISC to approve that surveillance." Op. 27 (emphasis added). The district court further held that the claims based on alleged unlawful use and disclosure of FISA-acquired information in violation of § 1809(a)(2) were deficient "without providing [more] details about [defendants'] individual actions." Op. 33.

And, despite characterizing Dr. Page's allegation that Defendants "misled the FISC to obtain surveillance warrants without probable cause" as his "core claim," *id.* at 53, the district court nonetheless dismissed the PATRIOT Act claim. It did so for failing to allege that "FISA information was used or disclosed … *for an unlawful* purpose," as is required "[t]o plead a violation of the PATRIOT Act [based] on § 1806(a)," *id.* at 44—as though obtaining a surveillance warrant without probable cause is *not* "an unlawful purpose."

Dr. Page timely moved for reconsideration in the district court under Fed. R. Civ. P. 59(e), in part based on newly discovered evidence suggesting the Individual Defendants "deliberately put one of the fabricators of the Steele Dossier on FBI payroll in order to ... cover up

[their] misdeeds." Pl.'s Br. in Supp. of Mot. to Alter or Amend J. at 17, Dkt. 119-1. The district court denied this motion on January 18, 2023. Dkt. 126. On February 17, 2023, Dr. Page appealed. Dkt. 128.

## SUMMARY OF ARGUMENT

To preserve Americans' civil liberties and public trust in the Nation's intelligence-gathering system, FISA mandates that electronic surveillance be conducted only pursuant to a valid FISC order supported by a truthful showing of probable cause that "the target of the electronic surveillance is ... an agent of a foreign power." 50 U.S.C. § 1804(a)(3)(A). In direct contravention of this requirement, Individual Defendants engaged in unlawful electronic surveillance of Dr. Page based on "false statements ... in the absence of probable cause." Op. 39 (quoting Compl. ¶16). The FISC has recognized—and the government has not contested— that surveillance pursuant to each of the four FISA authorizations was unlawful because the applications contained "material errors and omissions," the inclusion of which would have defeated "probable cause to believe that Page was an agent of a foreign power." FISA Ct. 6/25/20 Order, at 1.

As alleged and described in the Complaint, the Individual Defendants' conduct is unlawful under each of three distinct provisions of FISA, 50 U.S.C. §§ 1806, 1809(a)(1), and 1809(a)(2). Defendants' conduct falls squarely within the proscriptions of those sections, thus subjecting the Individual Defendants to suit under FISA's private cause of action, Section 1810, and the United States to suit under the PATRIOT Act's private cause of action, 18 U.S.C. § 2712. In holding otherwise, the district court made multiple errors of statutory interpretation, each of which (if left uncorrected) will undermine civil liberties and public trust in the Nation's intelligence community.

I.    The district court erred in interpreting § 1809(a)(1), which makes it unlawful to "intentionally ... engage[] in [unauthorized] electronic surveillance under color of law," to impose liability only on agents who personally "conduct" the surveillance, Op. 23, or who perform "the act of obtaining communications by using a device" or "the specific act of collecting information by listening to or watching someone," *id*. 22-23, and excluding those who engage in surveillance through others, *id*. 25. The district court's narrow reading contravenes both the ordinary

legal meaning of "engage" and the broader legislative purpose of the statute.

As used across legal texts, "engages in" traditionally takes a broad meaning to cover the conduct of not only those who physically conduct an act, but also anyone who meaningfully directs or participates in realizing that act. *See, e.g.*, *Brown v. Torrence*, 88 Pa. 186, 186 (1878); *Shaw v. Williams*, 87 Ind. 158, 160-62 (1882). Additionally, even without directing the conduct, a person may "engage[] in" proscribed conduct by taking a prerequisite act that is "directly related" to realizing that conduct's outcome. *See, e.g.*, *Wis. Dep't of Revenue v. Sterling Custom Homes Corp.*, 283 N.W.2d 573, 575-76 (Wis. 1979); *Sw. Airlines v. Saxon*, 142 S. Ct. 1783, 1790 (2022) (loading cargo a "direct and 'necessary role in'" commerce). And, as understood by common law courts, that person may be held principally liable for the proscribed conduct *either* by having physically executed the result *or* through meaningful involvement in bringing it about. *See, e.g.*, *Masters v. Stone*, 367 A.2d 686, 688 (Vt. 1976), *superseded by statute,* Vt. Stat. Ann. tit. 13, § 3606 (2010).

This more inclusive definition also finds support throughout FISA's text. For example, an analogous provision of FISA regulating physical

searches makes liable any person who "*executes* a physical search." 50 U.S.C. § 1827(a) (emphasis added). This shows that, had Congress intended to limit § 1809(a)(2) only to those who execute—that is, carry out, electronic surveillance—it could have done so. But Congress used the broader phrase "engages in," the ordinary meaning of which covers a broader class of actors who direct or otherwise meaningfully participate in bringing about the surveillance.

II.  The district court also erred in holding that Dr. Page did not adequately plead that Defendants "intentionally ... disclose[d] or use[d] information obtained under color of law by [unauthorized] electronic surveillance" in violation of § 1809(a)(2). Op. 33. As explained above, the Defendants clearly "used" information obtained as a result of each warrant or warrant renewal in support of at least one *subsequent* renewal application.

The district court also wrongly concluded that the complaint failed to allege that any Individual Defendant unlawfully "disclosed" FISA-acquired information to the media because the referenced articles only reported on "the fact of the surveillance," rather than "information 'obtained' by the electronic surveillance." Op. 34 (quoting 50 U.S.C.

§ 1809(a)). But that misconstrues the term "information" in the statute: As defined in FISA, the "contents" of electronic surveillance "includes *any* information concerning the identity of the parties to such communication or the existence … of that communication." 50 U.S.C. § 1801(n) (emphasis added). Here, the referenced *Washington Post* article reported that Dr. Page "had his communications directly targeted with a FISA warrant," Compl. ¶221, thus identifying Dr. Page as a party to intercepted communications. This information falls squarely within the statute's definition of FISA-acquired information—it revealed Page's "identity" as well as "the existence … of [his] communications." Thus, Dr. Page pleaded a viable claim under § 1810's private cause of action based on Defendants' unlawful "disclos[ure]" in violation of § 1809(a)(2).

Given the plethora of factual pleadings regarding each Individual Defendant's participation in the FISA application process, *see, e.g.*, Compl. ¶¶144-210, and the contents of the FISA applications themselves, *see, e.g.*, Compl. ¶¶92-97, 111-14, 123, 134-36. the district court was well-equipped to "draw the reasonable inference," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that Defendants violated § 1809(a)(2), by both "us[ing]" and "disclos[ing]" FISA-acquired information obtained pursuant to the

invalid Warrants to "obtain the subsequent FISA Warrants, unlawfully pursue investigative ends, and for unlawful leaks to the media and others." Compl. ¶142.

In dismissing Dr. Page's well-pleaded allegations, the district court also claimed he had not provided sufficient "details about [each defendant's] individual actions." Op. 33. But this Court does not require a complaint to identify specific violations, *see Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000), so long as the allegations are supported by "some circumstantial facts that support an inference" of defendant's liability. *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 7 (D.D.C. 2008). The Complaint far exceeds that lenient standard, and sufficiently supports Page's § 1810 claim based on Defendants' unlawful use of FISA-acquired information—especially given this Court's instruction that a district court must give the "plaintiff the benefit of all inferences that can be derived from the facts alleged," *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)); *accord Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (requiring a district court to "assume the truth of all material

factual allegations in the complaint and construe the complaint liberally"
(internal quotations omitted)).

III.  Finally, the district court erred in holding that Dr. Page failed
to sufficiently plead a violation of § 1806(a) to support his claim against
the United States under the PATRIOT Act's private cause of action.
18 U.S.C. § 2712. Section 2712(a) allows an aggrieved party to sue the
United States based on any "willful violation of" 50 U.S.C. § 1806(a),
which in turn proscribes the use or disclosure of FISA-acquired
information obtained from unauthorized surveillance for an unlawful
purpose. 50 U.S.C. § 1806(a).

Here, Dr. Page based his PATRIOT Act claim against the United
States on the Individual Defendants' use of unlawfully acquired FISA
information, not in the Initial Application, but in the Renewal
Applications—for the unlawful purpose of deceiving the FISC into
believing probable cause to exist. In dismissing this claim, the district
court twice erred.

Initially, the district court erroneously held that Dr. Page did not
adequately plead that FISA-acquired information was used in the
Renewal Applications, even though the complaint expressly alleged that

"Defendants used the information obtained from the issued FISA warrants to obtain each of the subsequent warrants." Compl. ¶230. And, despite its obligation to "construe [all] reasonable inferences" in the plaintiff's favor, *Doe v. Rumsfeld*, 683 F.3d 390, 391 (D.C. Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79), the district court failed to reach the logical conclusion that the redacted FISA-acquired information referenced in the Renewal Applications plausibly came from the FISA surveillance of Dr. Page.

Additionally, the district court erred in concluding that Dr. Page did not adequately allege this information was used for an unlawful purpose. On the contrary, the complaint states that Individual Defendants "used information obtained by electronic surveillance … in violation of the FISA Act," Compl. ¶¶307-09, for the unlawful purpose of "mislead[ing] the FISC …  to obtain surveillance despite the absence of probable cause," *id.* ¶16. Essentially, Individual Defendants included in the Renewal Applications whatever FISA information on Dr. Page they could cobble together to make it seem like probable cause and that a need for further surveillance existed, even though full disclosure of the facts

would have shown it did not. *See In re Accuracy Concerns*, 411 F. Supp. 3d at 335-37.

The unlawfulness of such conduct is well-supported by a body of caselaw consistently holding that government officials undertake "impermissible … conduct" where a warrant application selectively includes and omits information to deliberately "mislead the judge" into finding probable cause where none exists. *United States v. Matthews*, 172 F. Supp. 3d 1, 5-6 (D.D.C. 2012), *aff'd,* 753 F.3d 1321 (D.C. Cir. 2014); *see United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008); *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). Here, the invalid Renewal Applications used illegally acquired FISA information to mask or distract from their glaring omissions and misstatements—giving the illusion of probable cause—and thus misled the FISC into granting the warrants. This is obviously an "unlawful use" of surveillance, in violation of § 1806(a).

## STANDARD OF REVIEW

The district court's decision to grant Defendants' motion to dismiss is reviewed *de novo*. *See Gross v. United States*, 771 F.3d 10, 12 (D.C. Cir. 2014). This Court "accept[s] the well-pleaded factual allegations set forth in [the] complaint as true … and construe[s] reasonable inferences from those allegations in [a plaintiff's] favor." *Rumsfeld*, 683 F.3d at 391 (citing *Iqbal*, 556 U.S. at 678-79). Where "the necessary information lies within defendants' control," a plaintiff's pleadings on information and belief are assumed as true, *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1217, 1279 n.3 (D.C. Cir. 1994) (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 646 (3d Cir. 1989)), so long as they are supported by "some circumstantial facts that support an inference" of defendant's liability, *City of Moundridge*, 250 F.R.D. at 7.

## ARGUMENT

Dr. Page has sufficiently alleged that Individual Defendants are liable under 50 U.S.C. § 1810, and the United States is liable under 18 U.S.C. § 2712(a), for several violations of FISA. The district court's contrary view was based largely on misinterpretations of critical provisions in (i) Section 1809(a)(1), (ii) Section 1809(a)(2), and (iii) Section 2712. If allowed to stand, each of these misinterpretations will undermine accountability for violations of FISA and, correlatively, public trust in the whole FISA system.

## I. Dr. Page Sufficiently Alleged that All Individual Defendants "Engage[d] in" Unauthorized Electronic Surveillance in Violation of Section 1809(a)(1).

FISA provides a private cause of action to "[a]n aggrieved person … who has been subjected to an electronic surveillance … in violation of section 1809," including against "any person" who "intentionally … engages in electronic surveillance under color of law except as authorized[.]" 50 U.S.C. §§ 1810, 1809(a)(1). The district court acknowledged—and Defendants cannot dispute—that Dr. Page is an "aggrieved person" who was "subjected to" illegal electronic surveillance. Op. 19; *see also* 50 U.S.C. § 1801(k) (defining this as any person "whose

communications or activities were subject to electronic surveillance"). Rather, the disagreement here is whether their conduct amounts to "engag[ing] in [unauthorized] electronic surveillance," as prohibited by § 1809(a)(1). To the district court, only those who personally "conduct the search" are "engage[d] in" electronic surveillance, Op. 28-29 not those who direct and/or contribute to the actual search or acquire the information resulting from that search. But, as explained below, this interpretation is not even remotely a correct reading of § 1809(a)(1).

**A. The phrase "engages in" as used in § 1809(a)(1) easily includes the Individual Defendants' meaningful participation in procuring FISA authorization and in receiving the information obtained thereby.**

"Engag[ing] in electronic surveillance" covers far more than the operative acts of planting a bug or conducting a search. It also includes directing others to do so, meaningfully participating in the prerequisite steps for such operative conduct, and receiving— or "acqui[ring]"—the information produced thereby.

**1. Limiting liability to those who physically conducted the surveillance ignores the ordinary and legal meaning of "engages in."**

FISA does not expressly define what it means to "engage[] in" unauthorized surveillance. *Cf.* 50 U.S.C. § 1801. Relying on a dictionary,

the district court observed that to "'engage' means 'to take part' or 'participate.'" Op. 21 (quoting *Engage, Merriam-Webster's New Collegiate Dictionary* 378 (1977)). But this definition in isolation does not identify what type of "participation" is required to satisfy § 1809(a)(1). And, despite the district court's conflation of the two terms, *see* Op. 26-27, to "engage in" does not necessarily mean to personally "conduct." *Compare Engage, Oxford Thesaurus of English* 280 (3d ed. 2009), *with Conduct, id.* at 158. Instead, in its ordinary meaning, "engage" denotes a broader scope of behavior, including not only when a person carries out some act but also when she directs or otherwise meaningfully "involve[s]" herself in effectuating its occurrence. *See Engage, American Heritage Dictionary of the English Language* 592 (4th ed. 2000).

The same conclusion holds when one examines the term's common-law meaning—as one should do when interpreting legal language used in a statute. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 320 (2012); *see Neder v. United States*, 527 U.S. 1, 23 (1999) (applying this canon in the criminal-law context). And here, the ordinary legal use of "engage[d] in" demonstrates two key insights for understanding § 1809(a)(1).

*First*—and foremost—a person can "engage in" an activity without physically conducting particular operative physical steps herself. Under the common law, "engages in" was a familiar "expansive and encompassing term connoting many forms of participation in" the relevant conduct. William Baude & Michael Stokes Paulsen, *The Sweep and Force of Section Three*, 172 U. Pa. L. Rev. (forthcoming 2024) (manuscript at 7), available at https://tinyurl.com/SweepAndForce. Thus, numerous courts and legislatures have traditionally understood that a person can *engage in* an activity without physically *performing* it. *See, e.g.*, *Brown*, 88 Pa. at 186  (proprietor of coal plant is "engaged in the manufacture of coke"); *Shaw*, 87 Ind. at 160-62 (newspaper publisher unlawfully "engages in his ordinary vocation" on Sunday if the paper is delivered by others on that day); *Grand Lodge A.O.U.W. v. Haddock*, 82 P. 583, 583-84 (Kan. 1905) (individual business owner is "engage[d] in the sale of intoxicating drinks," even if he does not personally sell the drinks); *McClain v. West*, 87 So. 49, 49 (Fla. 1920) (fishing boat's "owner, manager, [and] employee" "engage in … taking fish").

Moreover, this more encompassing meaning of "engages in" continued into the years surrounding FISA's adoption in 1978. *See, e.g.*,

*Masters*, 367 A.2d at 688 (observing that operations personnel can be held principally liable for "engag[ing] in [proscribed] logging activity … even though he may not have personally felled a tree"); *Bechtel Power Corp. v. Sec'y of Lab.*, 548 F.2d 248, 249 (8th Cir. 1977) (per curiam) (construction foreman was "engaged in construction work" because he "worked in a managerial or supervisory capacity" notwithstanding that he "did not perform the actual work of construction"); *Capra v. Smith*, 372 So.2d 317, 320 (Ala. Civ. App. 1978) (realtor who hires another to build a house is "engaged in building houses" even though "she did not personally perform the work or … personally supervise the work"), *rev'd on other grounds*, 372 So.2d 321 (Ala. 1979); *Sterling Custom Homes*, 283 N.W.2d at 575 (off-site manufacturer of component parts was "engaged in 'real property construction activities'" since it "dictated the assembly sequence … in which the houses were [later] erected" on-site). More recent legislation also adopts this understanding. *See, e.g.*, Immigration Act of 1990 § 601, Pub. L. 101-649, 104 Stat. 4978 (person can be liable for "engag[ing] in a terrorist activity" even if that person did not personally "commit … an act of terrorist activity").

Thus, § 1809(a)(1) is best read in the legal context to apply not only, as the district court put it, to "the agents who conduct the" physical actions of activating a wiretap or clicking a keyboard to access a target's email account, Op. 28, but also to any officer who directs or otherwise meaningfully participates in making those actions happen or in receiving the results. That is particularly true for senior officials who instruct their subordinates to conduct unlawful surveillance. Under principles of vicarious liability present throughout our legal system, for example, employers are held liable for the tortious acts of their employees performed within the scope of their employment. *E.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998). That backdrop tenet of holding principals liable for the actions of their agents reinforces the conclusion that senior officials cannot, as the district court's logic suggests, evade § 1809(a) liability simply by ordering someone else to perform unlawful surveillance.

Holding otherwise would erroneously read into the text a limitation that simply is not there. Just as a store proprietor can "engage" in the sale of liquor without standing behind a bar, *see Haddock*, 82 P. 583 at 583-84, or a foreman can "engage" in construction without ever holding a

hammer, *Bechtel Power*, 548 F.2d at 249, so too can an FBI officer or agent—especially those in senior positions—*engage* in electronic surveillance without personally *conducting* discrete acts of intercepting communications.

*Second*, and independently, a person can "engage" in proscribed conduct by taking a *prerequisite* act that is "directly related" to realizing its occurrence. *Sterling Custom Homes*, 283 N.W.2d at 575. For example, the Wisconsin Supreme Court held in *Sterling Custom Homes* that an off-site manufacturer of building materials was "engaged in real property construction activities," despite its work being done long before a home was erected. *Id.* at 574-76. That the materials it prepared were "directed exclusively" for, and "directly related to," the construction of homes was sufficient for it to *engage* in the "act" of constructing—even though the manufacturer never actually *performed* an act of constructing. *Id.* at 575.

Also instructive are cases interpreting the phrase "engaged in interstate commerce." Time and again, the Supreme Court has found that workers who "load[] … an interstate shipment" are engaged in interstate commerce. *Baltimore & Ohio Sw. R.R. Co. v. Burtch*, 263 U.S. 540, 544 (1924); *see Saxon*, 142 S. Ct. at 1790. While recognizing that

"engaged in" is not as broad as "'affecting' or 'involving'" commerce, the Court has nonetheless reached beyond personal transport to include behavior by others who are "intimately involved with the [act of transporting] … that cargo." *Saxon*, 142 S. Ct. at 1789-90 (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115-16 (2001)) It is irrelevant that these workers never "physically move goods … across foreign … boundaries," as this understanding "too narrowly" limits what it means to be "engaged" in something. *Id*. at 1791.

Here, the district court erroneously downplayed cases addressing commerce as having a different statutory history. *See* Op. 23 n.11. The Court in *Saxon*, for example defined "engaged in" *before* considering its commerce context. *See Saxon*, 142 S. Ct. at 1789. And, even after giving "engaged" a "narrower" meaning than that provided by *Black's Law Dictionary*, the Supreme Court *still* found that workers who took "necessary" prerequisite acts for cross-border shipping were "engaged" in interstate commerce. *Saxon*, 142 S. Ct. at 1790.

In this case, the Complaint alleges that Individual Defendants took steps that were intimately involved in the preparation, direction, and receipt of conduct and products of electronic surveillance. *See, e.g.,*

Compl. ¶¶144–210. Like a stevedore who loads cargo in preparation for an interstate voyage, their work in directing, preparing, and procuring the warrants was essential for the subsequent physical and electronic acts of conducting surveillance, and for Defendants themselves to personally acquire the information produced by such conduct.

In holding otherwise, the district court rested on its observation that "[t]he application for an order approving electronic surveillance and the actual surveillance are not one and the same." Op. 23. But, as these cases consistently show, this is a distinction without a difference given that "engag[ing] in" surveillance encompasses more than the functional act of starting the wiretap, gaining access to email accounts, or any other part of *executing* a FISA warrant. *See Sterling Custom Homes*, 283 N.W.2d at 574-76 (prerequisite off-site activity part of engaging in construction of a home); *see also Saxon*, 142 S. Ct. at 1789-91 (loading a ship distinct from act of transporting good yet dockworkers still "engage in" foreign transportation). The Defendants' involvement here was "part of a continuous chain" of conduct, "controlled" and "coordinated" by the supervising Defendants, that was an "integral part of a single, unbroken" effort to effectuate the acquisition of FISA information and that

meaningfully contributed to that acquisition. *See Davarci v. Uber Techs., Inc.*, No. 20-cv-9224, 2021 WL 3721374, at *13 (S.D.N.Y. Aug. 20, 2021) (interstate commerce case). Defendants thus "engaged" in electronic surveillance within the meaning of § 1809(a)(1).[3]

**2. The district court misapplied the presumption of meaningful variation by ignoring differences in language supporting a broad application of § 1809(a)(1)**

Rather than looking to the "familiar legal [use]" of "engage" to contextualize its meaning in § 1809(a)(1), *see* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947), the district court latched onto what it thought to be significant variations in the use of that phrase in another provision of FISA to ostensibly

---

[3] Moreover, one who engages in proscribed conduct—either by physical execution or meaningful involvement—is a principal performer, not merely an aider and abettor, of such conduct. Accordingly, the district court's rejection of secondary aiding and abetting liability under FISA, Op. 19-21, deals with a separate issue than the primary scope of "engages in." Although the Individual Defendants would certainly be liable as aiders and abettors if they are not principally liable, this Court need not reach that open question here because, under the proper meaning of § 1809(a)(1), Defendants are *principally* liable for engaging in unauthorized surveillance. *Cf. Masters*, 367 A.2d at 531 (worker who actively participates in preparing for the cutting job sufficiently "engage[d] in … logging activity" to be "liable as a principal" for the offense of "cutting down trees belonging to another person," "even though he may not have personally felled a tree") (citation omitted).

"confirm" the court's unduly narrow interpretation. *See* Op. 22-25. Looking to FISA's definition of an "agent of a foreign power"—which includes any person who "engages in the international proliferation of weapons of mass destruction, or activities in preparation therefor"—the district court reasoned that "'engaging in' an activity," without more, must not include any preparatory acts. Op. 23 (quoting 50 U.S.C. § 1801(b)).

But, as that court has held in other cases, this "argument reads too much into too little." *Repub. of Gam. v. Meta Platforms, Inc.*, 588 F. Supp. 3d 1, 5 (D.D.C. 2022). Although it is "generally presumed that Congress acts intentionally … [in] disparate inclusion or exclusion" of language, *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)), that heuristic is not absolute and should be applied only with "careful regard to context." Scalia & Garner, *supra*, at 176; *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Here, the dissimilar statutory context of each provision undermines the district court's application of the presumption of reliability. *See Port Auth. Trans-Hudson Corp. v. Sec'y,* 776 F.3d 157, 165 (3d Cir. 2016). The

supplementary language in § 1801(b) appears in FISA's definition section. In articulating statutory definitions, Congress often employs "redundant drafting" out of an "abundance of caution" to "reinforce the meaning of a term" and avoid misinterpretation. Ethan J. Leib & James J. Brudney, *The Belt-And-Suspenders Canon*, 105 Iowa L. Rev. 741-43 (2020); *see* Jeanne Frazier Price, *Wagging, Not Barking: Statutory Definitions*, 60 Clev. St. L. Rev. 999, 1021-22 (2013). It is common for Congress to "draft redundantly in more expansive contexts within a single statute"—like a definition section, Leib & Brudney, *supra*, at 742— to "allow[] the statute's normative provisions to be more efficiently articulated," Price, *supra*, at 1024. *See Cook Inlet Tribal Council, Inc. v. Dotomain*, 10 F.4th 892, 896 (D.C. Cir. 2021) (describing "belt-and-suspenders" legislative drafting).

This "lamentably common" drafting technique is ubiquitous in FISA's definition section. Scalia & Garner, *supra*, at 177. For example, FISA's definition of "agent of a foreign power"—the same provision cited by the district court—includes both one who unqualifiedly "engages in the international proliferation of weapons of mass destruction" and one who specifically does so "for or on behalf of a foreign power." 50 U.S.C. §

1801(b)(1)(D)-(E). Other provisions are likewise redundant or overlapping. See *e.g.*, *id.* § 1801(e)(2)(a) (defining "foreign intelligence information" as information necessary to both "the national defense" and "the security of the United States"); *id.* § 1801(p) (including both "explosive" and "incendiary" devices, and "biological agent" and "toxin", in the definition of "weapon of mass destruction"). Such redundancy significantly undercuts the "hypothesis of careful draftsmanship" on which the district court's reasoning rests. *Kapral v. United States*, 166 F.3d 565, 579 (3d Cir. 1999) (Alito, J., concurring). In light of this legislative reality, the textual exhaustiveness of § 1801(b)'s definition provides little justification for narrowing the ordinary legal meaning of "engages in" elsewhere in the statute.

And, while the district court fixated on this expectedly meaningless variation, it ignored several other textual variations that cut against its narrow reading of "engages."

For example, § 1809(a)(1) itself makes liable anyone who "engages in electronic surveillance … except as authorized by this chapter," that provision allows surveillance pursuant to "any express statutory authorization that is an additional exclusive means for *conducting*

48

electronic surveillance [under 50 U.S.C. § 1812]." 50 U.S.C. § 1809(a)(1) (emphasis added). In the same sentence, Congress enjoined "engaging" in unauthorized electronic surveillance while authorizing surveillance "conduct[ed]" under specific statutory exceptions. By using different words in this provision, Congress presumptively "intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

That "conducting" takes a more limited meaning here is shown by the fact that § 1812 specifically covers the discrete "interception" of communications. 50 U.S.C. § 1812. Had Congress intended liability under § 1809(a)(2) to cover only the agents that "conduct" the surveillance, it knew how to do it—and even used that language elsewhere in the same sentence. But, because § 1809(a)(2) instead creates an offense for anyone who "engages" in electronic surveillance, this phrase must be interpreted to cover a broader class of actions than merely conducting the surveillance.

The disparate language of FISA's provision governing physical searches also supports the broader reading of "engages in." That section creates liability for any person who "*executes* a physical search within the United States except as authorized by statute." 50 U.S.C. § 1827(a)

(emphasis added). By the district court's own account, to "execute" means to "carry out." Op. 25 (citing *Execute*, *Oxford English Dictionary* (2d ed. 1989)). It appears reasonable—and the district court agreed—that Congress's specific use of "executes" here reasonably suggests that liability under § 1827(a) is limited to the agents who carry out the search. *See* Op. 25; *see also Execute*, *Black's Law Dictionary* (2d ed. 1910) ("finish," "perform," or "carry out").

But § 1809(a) does not limit liability to those who merely "execute" electronic surveillance. It is puzzling then that the district court viewed § 1827(a) as a "helpful parallel" supporting its *narrow* reading of § 1809(a)(1) when use of the more capacious "engages"—instead of "executes"— suggests a *broader* scope to § 1809(a)(1). *See Loughrin*, 573 U.S. at 357. *Cf. Alderman v. United States*, 394 U.S. 165, 205 (1969) (Fortas, J., concurring) ("[T]he Government will not *engage* in unreasonable *searches* …." (emphasis added)); *United States v. Tackett*, 193 F.3d 880, 883 (6th Cir. 1999) ("[S]everal agents had been required to … *execute* the *electronic surveillance* of [a conspirator]." (emphasis added)).

Rather than considering the significance of *this* variation, the district court attempted to "graft" the language of § 1827(a) onto § 1809(a). Op. 44-45. In doing so, it read § 1809(a) to imply that "civil liability under 50 U.S.C. § 1810 attaches only to those who *conduct or perform* electronic surveillance." Op. 53 (emphasis added); *see also id.* at 26 n.15 (quoting *United States v. Koyomejian*, 946 F.2d 1450, 1459 n.16 (9th Cir. 1991)) (crediting the Ninth Circuit's passing observation that § 1809(a)(1) is "best understood as subjecting to criminal liability anyone who performs electronic surveillance"). But § 1809(a) does not use such narrow language, and courts should "resist reading words or elements into a statute that do not appear on its face," Op. 44-45 (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)), it was an error for the district court to have done so here.[4]

---

[4] The same can be said for the district court's treatment of the Wiretap Act, which creates liability for one who, without valid authorization, "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." Op. 26 (quoting 18 U.S.C. § 2511(1)(a)). Because FISA, "unlike the Wiretap Act … does not include [language regarding the] procurement phrase," the district court reasoned that FISA must be read to cover only the physical act of acquiring communications, and not to include "procuring" another to do so. *Id.* But § 1809(a)(1) does not employ so active and limiting a verb as "intercept." Instead, that section extends liability to anyone who "*engages in"* the act of acquiring information.

The ordinary legal meaning of the text *as written*, not as grafted by the district court, brings the conduct of each Individual Defendant in procuring the FISA surveillance on Dr. Page under the purview of § 1809(a)(1)—just as Congress intended.

**B.    Even under the district court's erroneously narrow interpretation of "engage[],"each Defendant is also liable under Section 1809(a)(1) by virtue of having personally "acqui[red]" FISA information.**

Even under an improperly narrow reading of "engage[d] in" Defendants still engaged in "electronic surveillance" because they "obtained communications pursuant to" unauthorized electronic surveillance, Compl. ¶142, and hence directly "acquired" such information. "Electronic surveillance" is defined in FISA as "the acquisition by an electronic, mechanical, or other surveillance device of the contents" of a communication. 50 U.S.C. § 1801(f)(1). One can

---

Moreover, given that FISA was crafted a decade after the Wiretap Act, Congress could have drafted § 1809(a)(1) to apply only to those who "intercept" electronic communications and just omitted the "procurement" portion of the provision if FISA liability was to extend only to those who only physically collect the information. *See* Op. 26. Because of § 1809(a)(1)'s broader verb choice, no "procurement phrase" was needed to extend FISA liability beyond those who personally intercepted the communications—any such language would have been a surplusage. *See, e.g.*, Scalia & Garner, *supra*, at 174.

knowingly and personally "acquire" information even after the act of unlawful collection, apart from whether one directed or otherwise meaningfully participated in the prerequisites to such active collection activities.

1. In narrowing the definition of electronic surveillance, the district court relied on one possible definition of "acquisition" as merely "the *act* of acquiring." Op. 22 (quoting *Merriam-Webster's New Collegiate Dictionary* 11 (1977)). But that active form of the definition does not fit the context of this statute.

"Acquisition" is a nominalization—a noun derived from the verb "to acquire." "Nominalizations derived with suffixes such as [-]*ation* are systematically ambiguous" between two potential readings—an "event reading" and a "result reading." Rochelle Lieber, *The Ecology of Nominalization* 5 (2016). The ambiguity can be resolved only by recognizing the textual context, not merely by abstracting the word and picking a favored reading.

The district court's interpretation—the physical "act of acquiring"—is the "event reading" of "acquisition," as it refers to the

discrete event where information is *first* acquired.[5] But the statutory context of § 1801(f)(1) clearly supports the "result reading"—that the acquisition of information also covers the act of resultantly coming into possession or knowledge of that information. *See Acquisition*, *Oxford English Dictionary* (2d ed. 1989).

In fact, the "result reading" of "acquisition" is pervasive throughout FISA. For instance, § 1813 requires minimization procedures for "any intelligence collection activity … that is reasonably anticipated to result in the acquisition of a covered communication to or from a United States person …." 50 U.S.C. § 1813(b)(3)(A). Here, "acquisition" clearly refers to the broader phenomenon of receiving *and* coming into knowledge of a covered communication, as distinguished from the bare physical or electronic collection activity. *See also*, 50 U.S.C. § 1806(a) ("Information *acquired* from an electronic surveillance *conducted* pursuant to this subchapter … may be used and disclosed … only in accordance with the

_____

[5] Even under an event reading, there are multiple events involved in surveillance activity, not merely the first event of collection. Here Defendants were able to "learn or develop," that is, "acquire," information collected by electronic means. *Acquire*, *Oxford English Dictionary*, *supra*. Learning information—by requesting and reading it—is an acquisitive event no less than the initial collection of such information from its primary source.

minimization procedures required by this subchapter.") (emphasis added); *id.* § 1802(a)(2) ("An electronic surveillance authorized by this subsection may be *conducted* only in accordance with the Attorney General's certification and the minimization procedures adopted by him.")

2.     Despite straightforward examples of "acquisition" taking the results reading in FISA, the district court concluded that "'acquisition' is a specific, narrow event in the FISA process … refer[ring] to the actual gathering of information." Op. 24-25. But this is not how the statute is drafted, nor is it how the intelligence community uses this term in practice. For example, the *United States Signals Intelligence Directive*, the blueprint for the Nation's surveillance operations, provides that "[i]nformation … acquired incidentally *as a result of collection* directed against appropriate foreign intelligence targets may be retained and processed." Nat'l Sec. Agency, SP0018, *United States Signals Intelligence Directive* § 4.3 (2011) (emphasis added). Information is first "collect[ed]" and then only subsequently "acquire[d]" by agents. *See also id.* § 4.1(b)(3) ("[T]he purpose of the collection is to *acquire* significant foreign intelligence information." (emphasis added)). That the acquisition here

occurred "as a result of collection" further supports the reading that § 1809(a)(1) covers more than just the "actual collection of the communications"—but includes the resultant possession or learning of that information by those engaging in surveillance.

3.    Under a proper reading of "acquisition," Defendants each actually and individually "acquired" information from Page's electronic communications within the terms of § 1809(a)(1). Without the electronic surveillance on Dr. Page, Defendants would not have been in possession of—that is, acquired—private information about him. Through their roles in the Crossfire Hurricane investigation, it is more than merely plausible that each obtained "information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication." 50 U.S.C. § 1801(n); *see Horowitz Report* at 7 (access to electronic surveillance information on Dr. Page was limited to "individuals assigned to the Crossfire Hurricane investigation (and their supervisors)"). Thus, each Defendant "acquired" information collected through electronic surveillance of Dr. Page when they came into possession of it, and in doing so directly "engage[d] in" the "acquisition"

of such information, which is the definition of "electronic surveillance." 50 U.S.C. § 1801(f)(1).

Accordingly, even under the district court's limited construction of "engage," Defendants are still liable under § 1809(a) because they obtained investigative information on Dr. Page by using an electronic surveillance device in direct violation of the statute's plain text.

**C.** **Limiting FISA's private cause of action to agents who physically conduct unauthorized electronic surveillance would vitiate FISA's purpose of curbing abuses of civil liberties by the executive branch.**

The district court's excessively narrow reading of who engages in electronic surveillance for purposes of § 1809(a)(1) makes it impossible, as a practical matter, for an aggrieved party to obtain a remedy for the harms from illegal surveillance, thereby undermining accountability for violations of the underlying law. Although the district court *claimed* that Page "can sue the agents who conduct[ed] the search," it is almost invariably impossible to identify the unfortunate individuals who actually did the grunt work and, indeed, the court dismissed Page's claims against such John Doe agents given his predictable inability, at

the pleading stage, to detail the particular conduct of nameless agents "unknowable to him." Op. 27-28, 32 n.18.[6]

Absent disclosures by the rare whistleblower, the FBI controls access to this vital information and has many reasons—some valid some not—to keep that information secret. *See, e.g.*, Alan Butler, *Standing Up to* Clapper*: How to Increase Transparency and Oversight of FISA Surveillance*, 48 New Eng. L. Rev. 55, 66-71 (2013). If only the field agents can be sued for illegal surveillance and if that information is "concealed from its victims," as it almost always will be, the FBI and its brass can easily circumvent any meaningful "opportunity [for a victim] to challenge the actions taken against him." S. Rep. 94-755, bk. II, at 2-3 (1976).

To diminish the significance of this absurd result, the district court suggested that FISA had only the exceedingly narrow purpose of "counter[ing] the abuses of *warrantless* surveillance." Op. 28. But Congress had broader concerns, reflected in numerous provisions of FISA

---

[6] While the FBI knows the identify of its agents who executed the FISA warrants, *Horowitz Report* at 354 (noting that the "Crossfire Hurricane teams and supervisors" coordinated the "surveillance teams"), they remain unknown to the public notwithstanding the extensive media coverage, investigations, and litigation regarding such matters.

itself addressing the procedures and substance of what is needed for obtaining a warrant, not merely the need for a warrant per se, regardless of how flimsy or fraudulent its basis.

Before FISA, agency heads would simply provide "a general authorization for" a surveillance "arrangement without understanding what it entailed or considering its propriety." S. Rep. 94-755, bk. I, at 408 (1976). FISA was thus passed in part to "establish a regularized procedure" for seeking legal authorization for surveillance, *United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982), and that is why it "details numerous steps that must be followed to get an order." Op. 28 (citing *Belfield*, 692 F.2d at 145-46); 50 U.S.C. § 1804(a)(3) (the applicant must "justify his belief that the target of the electronic surveillance is … an agent of a foreign power."). The legitimacy of the application process— and not simply the court order itself—was intended to serve as the substantive "safeguard" against surveillance abuse. S. Rep. 94-755, bk. I, at 575 (1976). Congress was well aware that FISA would be largely meaningless if "the whole procedure of the act [could be] just ignored …." *Foreign Intelligence Surveillance Act of 1978: Hearing on S. 1566 Before the Subcomm. on Intel. & the Rts. of Ams. of the S. Select Comm. on Intel.*,

95th Cong. 147 (1978) (comment of George M. Hasen, Chairman). It is absurd to imagine that Congress intended to exclude from liability the intentional disregard or abuse of such safeguards and to penalize only the field agents for the wrongdoing of their superiors.

Further, the district court's attempt to separate "warrantless surveillance" from surveillance pursuant to an *invalid* warrant is a distinction without a meaningful difference. *See Truelove v. Hunt*, 67 F. Supp. 2d 569, 577 (D.S.C. 1999) (search "based upon an invalid warrant is the same as a warrantless search." (citing *United States v. Leon*, 468 U.S. 897 (1984)); *see* Corrected Op. & Order, *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, No. Misc. 19-02 (FISA Ct. Mar. 5, 2020), Dkt. 88-19 (search pursuant to warrant obtained by fraud is unauthorized surveillance). And FISA's requirement that surveillance occur only pursuant to a valid warrant was designed to serve as an "external control on arbitrary executive action … [and] assure[] written accountability within the Executive branch for the decision made to engage in such surveillance." S. Rep. 95-604(I) at 32 (1977).

Under the ordinary legal meaning of the text, that is exactly what the statute does: It fosters accountability of all who direct, decide, secure,

or otherwise meaningfully participate in the entire process of unlawful electronic surveillance, not merely to low-level field officers who merely execute an unlawful warrant. The district court's misinterpretations of Section 1809(a)(1) compromise that accountability and thereby threaten the public's trust in the FISA regime.

## II. Dr. Page Adequately Pleaded that Defendants Disclosed and Used Information Obtained from Unauthorized Electronic Surveillance in Violation of Section 1809(a)(2).

The district court committed similar errors of statutory interpretation—with likely similar consequences—in dismissing Dr. Page's claim for improper disclosure and use of information obtained from unauthorized surveillance. FISA firmly forbids the government from making any use of information obtained from unlawful surveillance. *See* 50 U.S.C. § 1809(a)(2). In turn, FISA provides a private cause of action for an "aggrieved person … about whom information obtained by electronic surveillance … has been disclosed or used in violation of section 1809" against the offending party. *Id.* § 1810.

Here, under a proper interpretation of "use," the Complaint adequately alleges that the Individual Defendants knowingly "used" information obtained from unlawful electronic surveillance in violation

of FISA. And under a proper interpretation of "disclosed," the facts alleged support the inference that Defendants Stzrok and Lisa Page unlawfully "disclosed" FISA-acquired information to media sources.

**A. The Complaint amply alleges that all Individual Defendants "used" FISA-acquired information on Dr. Page in violation of § 1809(a)(2), either in procuring surveillance reauthorization or in strategic investigative communications.**

To state a claim under § 1809(a)(2), Dr. Page must plausibly allege that Defendants: (1) "disclose[d] or use[d]" information obtained by electronic surveillance; (2) intentionally; and (3) with "reason to know" such surveillance was unlawful. *See* Op. 33.

Here, the district court committed two errors in applying this standard. First, the court failed to recognize that the FISA applications for surveillance on Dr. Page referenced in the Complaint expressly invoke FISA-acquired information, contradicting the district court's assertion that the Complaint was "merely speculating that the applications included FISA-acquired information." Op. 45. Second, the court wrongly dismissed these claims for supposedly "providing no factual basis to distinguish [defendants'] conduct," *see* Op. 33 (quoting *Toumazou v. Turkish Repub. of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014)), despite

the Complaint's extensive descriptions of each Individual Defendant's participation in the FISA application process and surveillance of Dr. Page. *See, e.g.*, Compl. ¶¶144-210. And, in any event, this Court's precedent does not require Dr. Page to identify specific violations at the pleading stage.

1. **The facts alleged in the Complaint and the materials cited there support a reasonable inference that information obtained from unlawful electronic surveillance on Dr. Page was used in subsequent FISA applications.**

On a motion to dismiss, the district court was obliged to give the "plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas*, 394 F.3d at 972 (quoting *Barr*, 370 F.3d at 1199). Such inferences easily support Dr. Page's allegation that Defendants used information obtained from unlawful surveillance in "obtaining each subsequent renewal warrant." Compl. ¶229.

Despite several paragraphs in the Complaint devoted to outlining the process of procuring each FISA renewal, *see, e.g.*, *id.* ¶¶101-18, 119-26, 127-142, the district court concluded that Dr. Page is "merely speculating that the applications included FISA-acquired information,"

and claimed that the Complaint did not "reference any filings before the FISC." *See* Op. 45. But that is not true.

The Complaint, in fact, references each of the four FISC dockets pertaining to surveillance on Dr. Page, Compl. ¶231, discusses each FISA application at length, *id.* ¶¶18-31, 95-100; *id.* ¶111-118; *id.* ¶¶122-126 (Second Renewal); *id.* ¶¶133-139, and specifically cites to three letters the Department of Justice filed with the FISC admitting "there were material omissions and misstatements in the FISA warrants applications," *id.* ¶45. Because these documents are "referred to in the complaint and are integral" to Plaintiff's § 1809(a)(2) claim, the district court should have given them due consideration in reviewing the motion to dismiss. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *see supra*, n.1. Those references and documents amply supported a plausible inference that Defendants "used the information [about Dr. Page] obtained from the issued FISA warrants to obtain each of the subsequent warrants." Compl. ¶230.

Swaths of pages in the declassified versions of each renewal application—in sections describing Dr. Page's actions and "Recent Investigative Results," no less—are redacted as "FISA-acquired

information subject to sequestration." *See, e.g.*, First Renewal Application at 30-33, 36-38 (Add. 138-41, 144-46); Second Renewal Application at 31-35, 39-44 (Add. 237-41, 245-50); Third Renewal Application at 34-38, 45-49 (Add. 350-54, 361-65). Each renewal application also noted that surveillance would "continue to produce" information on Dr. Page, suggesting that at least some material was obtained from the surveillance, even if it did not work to establish probable cause.[7] Compl. ¶114 (quoting First Renewal Application at 5; Second Renewal Application at 5; Third Renewal Application at 5). FISA specifically requires that renewal applications contain "a statement of

---

[7] Appellant also asks the Court to take judicial notice of the Department of Justice's acknowledgement of being in possession of information acquired from the "Page FISAs" in a Letter from Melissa MacTough, Dep'y Asst. Att'y Gen., U.S. Dep't of Just., to Hon. Anthony J. Trenga, U.S. F.I.S.C. (June 29, 2023), *available at* https://perma.cc/XV9B-VTNQ. *See* Fed. R. Evid. 201(b); *see also Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) ("In determining whether a complaint states a claim, the court may consider . . . matters of which it may take judicial notice."). A federal court may take judicial notice of a fact if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)). Here, this document is a court filing with the FISC by a government agency, attesting to the reliability of the source. *See, e.g.*, *id.*; *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir.), *cert denied sub nom. Kareem v. Burns,* 142 S. Ct. 486 (2021) (mem.).

the facts concerning all previous applications … and the action taken on each previous application," suggesting that the renewal applications would discuss information learned from prior surveillance. 50 U.S.C. § 1804(a)(8). It is therefore reasonable to infer that at least some of the (undisclosed) FISA-acquired information included in a section discussing developments in the surveillance of Dr. Page *came from* the surveillance of Dr. Page.

Other materials referenced in the Complaint support this inference. According to the *Horowitz Report*, which the Complaint extensively employs to support the allegation that the FISA applications were unlawful, *see, e.g.*, Compl. ¶¶42-43, 60, 233, "the three renewal applications submitted to the FISC … include[ed] new information the FBI intercepted and collected during surveillance of Page." *Horowitz Report* at 197. In each instance where the *Report* describes updates on the investigation's results in each subsequent application, those findings are redacted in the declassified version, further suggesting that FISA-acquired information obtained on Dr. Page was used to prepare these applications. *See id.* at 201, 210, 213, 221-22.

In refusing to recognize the plausibility of this allegation, the district court constructed a purported paradox—that the Complaint is based on "internally contradictory allegations" that: (1) the applications used FISA-acquired information; and (2) that the surveillance found "no evidence at all" Page was a foreign agent. Op. 45 (quoting Compl. ¶114). But this observation confuses FISA's standard for liability.

FISA proscribes the use of *any* information obtained by unauthorized surveillance—not just information that would prejudice the target of surveillance. *See* 50 U.S.C. § 1809(a)(2); *see also id.* § 1801(n) (defining the "contents" of electronic surveillance as "any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication"). Thus, it was not contradictory for Dr. Page to both allege that the later applications employed fruits of surveillance on him and that this information was still insufficient to establish probable cause that he was a foreign agent. Indeed, given Defendants' pattern of misrepresentation and omission in the Applications, it is a natural, and certainly "plausible," inference that the description of the FISA-acquired

information in the Renewal Applications was similarly incomplete and misleading.

Given the classified nature of the FISA process, Dr. Page could not have possibly shown at the pleading stage what specific FISA-acquired information on him was used in subsequent warrant applications. But proving a claim is not required at this stage of litigation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Where, as here, "the necessary information lies within defendants' control," pleadings on information and belief must be assumed as true so long as they are supported by a sufficient factual basis. *Kowal*, 16 F.3d at 1279 n.3 (quoting *Craftmatic*, 890 F.2d at 646). That each renewal application acknowledged that it contained redacted FISA-acquired information supports a reasonable inference that such information specifically pertained to Page—an inference that must be resolved in his favor. *See Barr*, 370 F.3d at 1199. Thus, the district court erred in refusing to "assume the truth," *Am. Nat'l Ins.*, 642 F.3d at 1139, of Dr. Page's well-supported allegation that "information obtained from the issued FISA warrants [was used] to obtain each of the subsequent warrants." Compl. ¶230.

### 2. The district court improperly required Page to identify individualized conduct at the pleading stage.

The district court also demanded unnecessary individualized detail for Dr. Page's Complaint to survive a motion to dismiss. But, a plaintiff need only plead "some circumstantial facts that support an inference" of defendant's liability. *City of Moundridge*, 250 F.R.D. at 7.

In demanding allegations that each "*particular* defendant" performed specific illegal acts in order to "show … intent[]," Op. 33 (emphasis added), the district court required more specificity than necessary at the pleading stage. Indeed, it did so notwithstanding its later recognition that, although a "plaintiff must eventually show [intent], which may require knowing who [used] the information … he does not have to 'allege the full details'" to survive a motion to dismiss. Op. 51-52 (citing *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99 (D.C. Cir. 2012); quoting *Feldman*, 797 F. Supp. 2d at 41).

But, "a plaintiff can hardly be expected to know the full details behind an improper [use of sensitive information] prior to discovery," especially where the necessary information lies solely within the defendant's control. *Feldman v. CIA*, 797 F. Supp. 2d 29, 41 (D.D.C.

2011); *see Krieger*, 211 F.3d at 136. Nor must a plaintiff "match facts to every element of a legal theory" to state a viable claim. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (quoting *Krieger*, 211 F.3d at 136). Rather, a plaintiff need only plead "enough facts to … nudge[] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Pleading individualized violations is not necessary to meet this bar, so long as the facts alleged permit the court to reasonably infer some defendant's liability. *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011) (citing *Krieger*, 211 F.3d at 136); *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 133 (D.D.C. 2010). For example, the court in *Feldman* refused to dismiss plaintiff's claim for illegal disclosure—despite the Complaint's not identifying the individual tortfeasor—because the "totality of the plaintiff's allegations … adequately allege[d] intentional or willful conduct." 797 F. Supp. 2d at 42.

So too here, the Complaint offers sufficient allegations for a plausible inference that each Individual Defendant unlawfully used FISA-acquired information as part of the Crossfire Hurricane

investigation. For example, Plaintiff alleges that FISA-acquired information was used in "obtaining each subsequent renewal warrant," Compl. ¶229. Each Individual Defendant's role in the FISA-application process, as detailed in the Complaint, makes it more than "facially plausible" that *each* participated in generating the faulty warrants. *See, e.g.*, Compl. ¶¶33, 120-21, 151, 175-82 (Auten); *id.* ¶¶28, 186, 193-94 (Clinesmith); *id.* ¶¶26, 91, 150, 152-54 (Comey); *id.* ¶¶27, 91, 155-63, 215 (McCabe); *id.* ¶¶30, 91, 106, 147, 158, 195-96 (Lisa Page); *id.* ¶¶31, 60, 97, 106, 109-14, 128, 198-200 (Pientka); *id.* ¶¶32, 201-10 (Somma[8]); *id.* ¶¶29, 70-71, 81, 91, 105-06, 151, 158-59, 164, 168, 170 (Strzok); *see also* Op. 30 (acknowledging that Defendants Pientka, Auten, Somma, and Clinesmith "did contribute to the material errors in the applications" ).

---

[8] The Complaint also notes that Somma is referred to a "Case Agent 1" throughout the *Horowitz Report*. Compl. ¶201; *see also* Charlie Savage & Adam Goldman, *National Security Wiretap System Was Long Plagued by Risk of Errors and Omissions*, N.Y. Times (Sept. 20, 2021), https://perma.cc/HA73-HCL6 (identifying Somma as "Case Agent 1"). As referenced in the Complaint, *see, e.g.*, Compl. ¶¶32, 201-11, the *Horowitz Report* details that Somma participated in the drafting of the Initial Application and First Renewal Application, *see Horowitz Report* at 161, 243, and reviewed the First and Second Renewal Applications, *id.* at 207, 217.

Indeed, the Complaint explains that McCabe *himself* has acknowledged that, by holding "a leadership position with oversight" of the FISA process, "Director Comey and [McCabe] and [their] subordinate leaders are all responsible for the failures" of submitting the faulty applications. Compl. ¶¶215-17 (quoting *Oversight of the Crossfire Hurricane Investigation: Hearing Before the S. Comm. on the Judiciary*, 111th Cong., at 0:34:56, 2:42:11 (2010) (statement of Andrew McCabe, Former Deputy Dir., FBI). Individual Defendants' roles in Crossfire Hurricane thus provide a reasonable basis to infer that each used the FISA-acquired information in "drafting or substantively reviewing" the invalid applications. Op. 30.

The Complaint also sets forth sufficient facts to reasonably conclude that each Defendant "used" such information in briefings or other strategic communications throughout Crossfire Hurricane in taking "investigative measures" against Dr. Page. Compl. ¶230; *see, e.g.*, *id*. ¶151 (Auten); *id*. ¶¶185-94 (Clinesmith); *id*. ¶¶6, 151, 161 (Comey); *id*. ¶151, 161, 215 (McCabe); *id*. ¶¶106, 219-20, 226 (Lisa Page); *id*. ¶106, 109, 198 (Pientka); *id*. ¶¶201, 209-10 (Somma); *id*. ¶¶29, 151, 164 (Strzok). The government also has conceded to FISC that, because it is

the fruit of unlawful surveillance, "the Page FISA information may not be used for … *further* investigation," suggesting that it had already been used for this purpose. FISA Ct. 6/25/20 Order at 7 (emphasis added) (internal quotations omitted); *see also* Compl. ¶50 (citing this order). And the *Horowitz Report* explains that access to FISA-acquired information on Page was granted to "those individuals assigned to the Crossfire Hurricane investigation (and their supervisors) … includ[ing] Department attorneys and officials assisting in and overseeing the investigation." *Horowitz Report* at 7; *see also* Compl. ¶252 (noting "the subject of the report is the unlawful surveillance of Dr. Page by Defendants"). By virtue of their participation in Crossfire Hurricane, it is far more than merely "plausible on its face," *Twombly*, 550 U.S. at 570, that all Individual Defendants "used information and records regarding Dr. Page" that was received from the unlawful FISA surveillance during the investigation. Compl. ¶229; *see id.* ¶219.

But even if one imagined a lack of sufficient individual allegations, *collective* references to the Defendants' using unauthorized FISA information would still have been sufficient. "Nothing in [Federal] Rule [of Civil Procedure] 8 prohibits collectively referring to multiple

defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *N.Y. Am. Water Co. v. Dow Chem. Co.*, No. 19-cv-2150, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020) (citation and quotation marks omitted). Here, Dr. Page has alleged that each Individual Defendant, through conduct taken during Crossfire Hurricane, violated his rights under § 1809(a)(2). The Complaint makes "clear that identical claims are asserted against each defendant even though each defendant is differently situated." *Id.* That all Individual Defendants are alleged to have used the invalid FISA-acquired information throughout the investigation establishes a reasonable "factual basis for" the Complaint to collectively assert its claims under § 1809(a)(2). Page has sufficiently provided "'the defendants fair notice of what the claim is and the grounds upon which it rests'"—and Rule 8 requires nothing more. *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (quoting *Twombly*, 550 U.S. at 555); *see Iqbal*, 556 U.S. at 678.

For all these reasons, dismissal of this claim was improper. Whether Dr. Page will prevail on this claim against any one Defendant "requires an evaluation of the evidence [that] can be resolved only on summary judgment or at trial." *Locust Valley Water Dist. v. Dow Chem.*

*Co.*, 465 F. Supp. 3d 235, 241 (E.D.N.Y. 2020). Whether or not discovery will uncover such evidence, a district court may not dismiss a claim because it believes that "actual proof of … facts [supporting relief] is improbable," *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984)), so long as the alleged facts "accepted as true," support this inference. *Iqbal*, 556 U.S. at 678. Considering Defendants' individual and collective involvement in Crossfire Hurricane, the facts alleged in this portion of the Complaint give rise to a "plausible inference" that all used information received from the unlawful surveillance of Dr. Page, rendering dismissal improper. *See Kareem*, 986 F.3d at 866.

## B. Dr. Page has stated a plausible claim that Defendants Strzok and Lisa Page knowingly disclosed information obtained from electronic surveillance in violation of FISA.

The Complaint also adequately supports the allegation that Defendants Strzok and Lisa Page illegally disclosed such information to the media in violation of 50 U.S.C. § 1809(a)(2). *See* Compl. ¶¶ 195-96. In fact, the Complaint outlined ample evidence to infer that both Defendants disclosed information about the investigation to the media. *See* Op. 34 ("Page's media leak allegations are stated with particularity

... ."). Even so, the district court dismissed this claim on the belief that none of the media reports cited in the Complaint contained FISA-acquired information. *See id.* This is incorrect.

The Complaint alleges that, on April 10, 2017, Defendants Strzok and Lisa Page concocted a "media leak strategy" for information they acquired from the ongoing surveillance of Dr. Page. Compl. ¶220. The next day, the *Washington Post* reported that "[Carter] Page is the only American to have had *his communications directly targeted* with a FISA warrant in 2016 as part of the Russia probe, officials said." *Id.* ¶221 (quoting Ellen Nakashima et al., *FBI Obtained FISA Warrant to Monitor Former Trump Adviser Carter Page*, Wash. Post (Apr. 11, 2017) (emphasis added)). The fair inference from these facts is that, at a minimum, Strzok and Lisa Page gave Dr. Page's identity to the *Post,* along with the necessary suggestion that, because he was being surveilled, he was suspected of being a Russian agent.

Information about Dr. Page's identity clearly falls within the statutory prohibition: As defined by FISA, the "contents" of information obtained by electronic surveillance, "when used with respect to a communication, includes *any* information concerning the *identity* of the

parties to such communication or the existence ... of that communication." 50 U.S.C. § 1801(n) (emphasis added). Dr. Page is identified in the *Washington Post* story as a "party" to FISA-targeted communications, information that was necessarily "obtained ... by electronic surveillance" on him. *Id.* § 1809(a)(2). Because this statement in the *Washington Post* story reports on the "results" of the surveillance— "sensitive information possessed only by law enforcement and intelligence agencies," Op. 52—the Complaint supports its allegation that this protected information was leaked to the media in violation of FISA's prohibitions on disclosures.

In turn, the conversations between Strzok and Lisa Page regarding media leaks in the days surrounding this story, *see* Compl. ¶¶220-26, "allow[]the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The district court committed reversible error in failing to make this inference, and this claim too should not have been dismissed.

III. **The District Court Erred in Dismissing Page's Claims under the PATRIOT Act for "Unlawful Use" and "Disclosure" of Information Acquired from Electronic Surveillance.**

Dr. Page has also adequately pleaded his claim for damages against the United States under the PATRIOT Act. That law creates a civil cause of action for "[a]ny person who is aggrieved by any willful violation of" certain provisions of FISA, 18 U.S.C. § 2712, and has been interpreted to waive sovereign immunity for claims against the federal government "for the 'use[ ] and disclos[ure]' of information 'by Federal officers and employees' in an unlawful manner." *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 852-53 (9th Cir. 2012) (quoting 50 U.S.C. § 1806(a) and citing 18 U.S.C. § 2712). Here, the Complaint alleges that the United States is liable to Dr. Page under § 2712 because Individual Defendants knowingly used "information obtained by electronic surveillance" "in violation of ... FISA." Compl. ¶307. By knowingly incorporating unauthorized surveillance information on Dr. Page into subsequent warrant applications to deceive the FISC into allowing further surveillance, the FBI used this information for an "unlawful purpose" in violation of § 1806. Here again, the district court's dismissal rests on a

misinterpretation of the statute that, if it stands, will simultaneously undermine accountability and reduce public trust in the FISA system.

**A.** **Using FISA-acquired information to deliberately mislead a court into granting surveillance authorization constitutes "use" of that information for an "unlawful purpose" in violation of the PATRIOT Act.**

To establish a PATRIOT Act claim based on a violation of § 1806(a), an aggrieved party must plausibly allege:

> (1) A willful (2) disclosure or use (3) of information acquired from an electronic surveillance conducted pursuant to FISA (4) without the consent of the person who was the subject of the surveillance and (5) without the required minimization procedures or without any lawful purpose.

*Fikre v. Fed. Bureau of Investigation*, 142 F. Supp. 3d 1152, 1169 (D. Or. 2015) (citing 50 U.S.C. § 1806(a)). At issue here is the fifth element—whether the Complaint adequately alleges FISA-acquired information was "used" for an "unlawful purpose." It manifestly does.

1. Dr. Page's PATRIOT Act claim alleges that FISA-acquired information was used in subsequent warrant applications "to achieve the unlawful end" of "mislead[ing] the FISC ... to obtain surveillance despite the absence of probable cause." Compl. ¶16; *see* Op. 42-44. Information is used unlawfully where it is manipulated to knowingly mislead a court to believe probable cause for surveillance exists when it does not. As the

Supreme Court has long recognized, where surveillance authorization "demands a factual showing sufficient to [constitute] 'probable cause', the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978); *see also United States v. Daoud*, 755 F.3d 479, 489 (7th Cir. 2014) (Rovner, J., concurring) (listing cases supporting the "widely assumed, if not affirmatively stated" principle that "*Franks* applies to FISA applications"). Accordingly, it is not a "lawful purpose" for officers seeking judicial warrants to mislead a court by including "information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" or where the affidavit omits material information, the inclusion of which "would defeat probable cause." *Spencer*, 530 F.3d at 1007 (citations omitted). And, by knowingly failing to act in "objective good faith" in seeking FISA authorization, *id.* at 1006 (quoting *Leon*, 468 U.S. 907-08), those involved in procuring an invalid warrant violate the statutorily imposed duty to truthfully affirm that probable cause exists. *See* 50 U.S.C. § 1804(a)(3).

This is important because, under FISA, the FISC may authorize electronic surveillance only if it finds that "there is probable cause to

believe that the target of the electronic surveillance is ... an agent of a foreign power." *Id.* § 1805(a)(2). And, to renew an authorization, the government must "justify continued FISA coverage" in light of any "new findings" learned from the ongoing surveillance. *Horowitz Report* at 39; 50 U.S.C. § 1805(d)(2). In making that determination, the FISC must rely on "the facts submitted" in the verified application. *In re Accuracy*, 411 F. Supp. 3d at 335 (emphasis omitted) (quoting 50 U.S.C. § 1805(a)(2)).

Thus, when a renewal application *incorporates* information obtained from prior surveillance—but, as the FISC found here, *omitted* exculpatory information, *see id.* at 334-35—then any included FISA-acquired information served the "unlawful purpose" of misleading the FISC into granting the application where the government knew probable cause did not exist. *See Matthews*, 172 F. Supp. 3d at 5-6 (recognizing "'impermissible official conduct'" where a warrant application selectively includes information in a "deliberate attempt to mislead the judge" (quoting *Colkley*, 899 F.2d at 301).

Indeed, FISA imposes on the FBI a legal duty to truthfully present the FISC with a complete and accurate account of the "facts and circumstances" that would allow it to find probable cause. 50 U.S.C.

§ 1804(a)(3); *see In re Accuracy Concerns*, 411 F. Supp. at 335-36 ("The FISC's assessment of probable cause can serve [as an effective check] only if the applicant agency fully and accurately provides information in its possession that is material to whether probable cause exists."). Where material information is omitted, any included FISA-acquired information employed to obscure the fact that no probable cause exists serves the "unlawful purpose" of misleading the FISC to authorize surveillance. *See Spencer*, 530 F.3d at 1007; *Colkley*, 899 F.2d at 301. Deliberate use of FISA-acquired information in this way violates § 1806(a) and can therefore serve as the basis for a claim against the United States under the PATRIOT Act.

**B.    Dr. Page adequately pleaded that FISA-acquired information was "used" for the "unlawful purpose" of misleading the FISC to receive FISA authorization.**

In addition to conceptually satisfying the "use" element of § 1806(a), the Complaint contained more than sufficient facts and detail to survive a motion to dismiss Dr. Page's PATRIOT Act claim.. *See Iqbal*, 556 U.S. at 680. The Complaint alleges that the Individual Defendants "used information obtained by electronic surveillance ... in violation of the FISA Act" for the unlawful purpose of "mislead[ing] the FISC ... to obtain

surveillance despite the absence of probable cause." Compl. ¶¶307-09, 16. Dr. Page's "use" theory for PATRIOT Act liability is "referenced explicitly" in Count IX, and the allegation that FISA-acquired information was used for this unlawful purpose is appropriately incorporated by reference there. *See, e.g.*, *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 130 F. Supp. 3d 236, 252 n.13 (D.D.C. 2015) (allowing incorporation by reference of preceding factual allegations); *see also* Compl. ¶303 ("Plaintiff re-alleges and incorporates by reference the allegations of paragraphs 1-302 above, as if fully set forth herein.").

Despite the Complaint's making clear the basis for the PATRIOT Act claim, the district court wrongly assumed that it did not "allege that the FISA information was used ... for an unlawful purpose." Op. 44 (emphasis omitted). As a matter of statutory interpretation, this is plainly wrong, as the face of the Complaint explicitly alleges that it was used—unlawfully—"[i]n order to mislead the FISC into concluding that there was probable cause," Compl. ¶16.

Dismissal on these grounds is particularly distressing, given that elsewhere in its opinion the district court even acknowledged that Dr. Page "alleges that the defendants made false statements in the FISA

application process so that the warrants would be granted in the absence of probable cause." Op. 39 (citing Compl. ¶16). At another point, the district court characterized this allegation as Dr. Page's "core claim." Op. 53. By its internally inconsistent refusal to credit this well-pleaded allegation, the district court abdicated its obligation to "accept[] as true" the Complaint's factual assertions. *Iqbal*, 556 U.S. at 678.

Nor is the district court correct that the Complaint contained a mere "unadorned allegation that the FISA warrant results were used to procure the renewal warrants." Op. 45. As already established, *see* Section I.A.i, *supra*, the FISA Renewal Applications referenced in the Complaint specifically acknowledged that they include FISA-acquired information, that these affirmed that renewed surveillance would "continue to produce information foreign intelligence information," *see* Compl. ¶¶114, 123 136, and that the *Horowitz Report* found that later applications included "new information the FBI intercepted and collected during surveillance of Page." *Horowitz Report* at 197. All of this provides ample basis to infer that unlawful FISA-acquired information was used in procuring the Renewal Applications. *See Thomas*, 394 F.3d at 972 (plaintiff is entitled to "all inferences that can be derived from the facts

alleged"); *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18 n.5 (D.C. Cir. 2008) ("So long as the basis for a claim is clear, a complaint need not 'plead law' in specific detail." (quoting *Krieger*, 211 F.3d at 136)),

In turn, the Complaint alleges ample facts to establish that Defendants willfully misled the FISC with this information to get authorization. The FISC recognized that each of the FISA reauthorization applications contained "material errors and omissions," the inclusion of which would have defeated "probable cause to believe that [Dr. Page] was an agent of a foreign power." Compl. ¶50 (quoting FISA Ct. 6/25/20 Order at 1); *see also* FISA Ct. 6/25/20 Order at 3-4 (noting the government's acknowledgment that surveillance under the Second and Third Renewal Applications "lacked adequate factual support," and its failure to contest that allegation before the FISC with respect to the Initial and First Renewal Applications).

The Complaint provides many specific instances where the Individual Defendants manipulated the FISA applications to prevent the FISC from discovering the lack of probable cause for the surveillance on Dr. Page. *See, e.g.*, Compl. ¶¶157, 170, 179-84, 189-94, 206-09. The

district court itself was convinced that Defendants Pientka, Auten, Somma, and Clinesmith "contribute[d] to the material errors in the applications." Op. 30. Further, Defendants' knowledge of exculpatory facts and the "frequency with which representations made by [Defendants] turned out to be unsupported or contradicted by information in their possession," *In re Accuracy Concerns*, 411 F. Supp. 3d at 337, should have "allow[ed] the court to draw the reasonable inference" that these omissions and false statements were made willfully. *Iqbal*, 556 U.S. at 678; *see, e.g.*, Compl. ¶¶109, 180-84, 189-94, 209-10.

In fact, Clinesmith has already pleaded guilty to willfully making a false statement in violation of 18 U.S.C. § 1001 for "intentionally altering an email in connection with the submission of the [Third Renewal Application]." *Id.* at ¶28 (quoting Press Release, U.S. Dep't of Just., FBI Attorney Admits Altering Email Used for FISA Application During "Crossfire Hurricane" Investigation (Aug. 19, 2020), available at https://perma.cc/KU3K-W47X). And he did so to avoid revealing to the FISC that the prior applications misleadingly withheld exculpatory information. *Id.* ¶193.

As the district court stated, "[i]f proven, these allegations clearly demonstrate wrongdoing." Op. 32 (citing *Franks*, 438 U.S. at 164-65). Yet, at the pleading stage, all that is required to survive a motion to dismiss is that the "totality of the plaintiff's allegations ... adequately allege intentional or willful conduct." *Feldman*, 797 F. Supp. 2d at 42. By the district court's own words, Dr. Page has not only adequately but "clearly" done so. Because the Complaint provides sufficient allegations as to each element of PATRIOT Act claim based on § 1806(a), *see Fikre*, 142 F. Supp. 3d at 1169, the district court erred in dismissing this claim as well.

## CONCLUSION

The proscriptions of FISA aim to ensure that electronic surveillance "occur[s] only when reasonably justified in circumstances demonstrating an overriding national interest ... according to standards and procedures that protect against possibilities of abuse." *Foreign Intelligence Surveillance Act of 1976, Hearing on S. 743, S. 1888 & S. 3197 Before the Subcomm. on Crim. L. & Procs. of the S. Comm. on Judiciary*, 94th Cong. 1 (1976) (Sen. John L. McClellan reading remarks of Pres. Gerald Ford). If those who wrongfully direct and effectuate illegal electronic

surveillance on an innocent American citizen can wholly escape liability under FISA and the PATRIOT Act's private causes of action, those procedures will be rendered mere "parchment barriers against the encroaching spirit of power[.]" The Federalist No. 48 (James Madison) (Libr. Cong.). Not only would that result contravene those laws' text and structure, but it would also contravene their purpose of enhancing public trust in our Nation's intelligence system by ensuring that the "rule of law" will "prevail in the area of foreign intelligence surveillance." S. Rep. 95-604(I), at 4 (1977).

Accordingly, this Court should reverse and reinstate Dr. Page's claims against the Individual Defendants under 50 U.S.C. § 1810 and his claim against the United States under 18 U.S.C. § 2712.

October 31, 2023

Respectfully submitted,

*s/ Gene C. Schaerr*
GENE C. SCHAERR
 *Counsel of Record*
ERIK S. JAFFE
BRIAN J. FIELD
ANNIKA BOONE BARKDULL
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Appellant complies with the type-face requirements of Fed. R. App. P. 32(a)(5) & (6) and this Court's Order of July 19, 2023 allowing up to 17,000 in that it uses Century Schoolbook 14-point type and contains 16,967 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). The number of words was determined through the word-count function of Microsoft Word.

*s/Gene C. Schaerr*
Gene C. Schaerr


## ANTI-VIRUS CERTIFICATION

I hereby certify that the foregoing Brief of Appellant submitted in PDF format via the ECF system was scanned using the current version of McAfee and no viruses or other security risks were found.

*s/Gene C. Schaerr*
Gene C. Schaerr