# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 6, 2024          Decided May 23, 2025

No. 23-5038

CARTER PAGE,
APPELLANT

v.

JAMES B. COMEY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03460)

———

*Gene C. Schaerr* argued the cause for appellant. With him on the briefs were *Erik S. Jaffe* and *Brian J. Field*.

*David N. Kelley* argued the cause for individual appellees. With him on the brief were *Meaghan VerGow*, *Andrew R. Hellman*, *Meredith N. Garagiola*, *Daniel Brovman*, *Brigida Benitez*, *Patrick F. Linehan*, *Brian M. Heberlig*, *Robert J. Katerberg*, *Kaitlin Konkel*, *Christopher C. Muha*, *Aitan D. Goelman*, *Ivano M. Ventresca*, *Joseph R. Palmore*, *James M. Koukios*, and *Alexandra M. Avvocato*.

2

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for government appellees.  With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, at the time the brief was filed, and *Sharon Swingle*, Attorney.

Before: HENDERSON, PILLARD, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

CHILDS, *Circuit Judge*: Carter W. Page appeals the district court's dismissal of his second amended complaint for failure to state a claim.  *Page v. Comey*, 628 F. Supp. 3d 103 (D.D.C. 2022).  Page filed an action against the United States, the Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), as well as current and former known and unknown FBI officials (individual defendants[1]) (collectively Appellees), alleging that the FBI unlawfully obtained four warrants to electronically surveil him pursuant to the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1801–1885c, and that Appellees leaked to the press information obtained pursuant to those warrants, giving rise to liability under FISA and the Patriot Act.  Page alleged that as the result of the public revelation of this unlawful surveillance he suffered reputational harm, pain and suffering, and lost lucrative business opportunities.  Ultimately, the district court

---

[1] In the second amended complaint, Page identified as individual defendants James Comey, Andrew McCabe, Kevin Clinesmith, Peter Strzok, Lisa Page, Joe Pientka III, Stephen Somma, Brian J. Auten, John Does 1–10, and Jane Does 1–10.

3

dismissed Page's claims, finding them either time-barred or insufficiently pleaded.

For the reasons below, we are unanimous in affirming dismissal of Page's claims of unlawful surveillance under FISA (*see* 50 U.S.C. § 1809(a)(1)) on the ground that they are conclusively time-barred. We also unanimously affirm the dismissal of the Patriot Act claim against the United States, with the majority concluding that claim, too, is time-barred and the partial dissent resting instead on Page's failure to preserve the claim and its legal insufficiency in any event. Finally, the majority concludes that Page's claim of unlawful disclosure or use of the results of unlawful surveillance under FISA (*see* 50 U.S.C. § 1809(a)(2)) is also time-barred and, in part, insufficiently pleaded.

Judge Henderson dissents only insofar as she would have allowed Page's section 1809(a)(2) disclosure-or-use claim to proceed. She parses that claim into distinct strands. She would hold, first, that the claim that certain defendants used FISA-derived information to apply for ensuing warrant applications should not be dismissed as time-barred without first allowing discovery into whether, once Page knew he was subject to FISA warrants, he knew or reasonably should have inquired into FISA's warrant-renewal requirements. On its merits, she explained, that claim was plausibly pleaded. Second, Judge Henderson analyzes Page's media-leak theory as two distinct claims. The first, that media leaks by defendants Lisa Page and Peter Strzok led to publication of the fact that Carter Page was under FISA surveillance, she would dismiss for failure to state an unlawful-disclosure claim because Page's identity and the fact of surveillance were not themselves information "obtained by" FISA surveillance. As to the second, Judge Henderson reads the complaint to support a reasonable inference that those two leakers also disclosed FISA-acquired information that the

4

newspapers decided not to mention.  She therefore discerns an unlawful-disclosure claim against the pair that she would deem timely.

## I.

### A.

In this appeal from an order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the relevant facts are those "alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia, Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).  Unless otherwise noted, the following background is derived from Page's second amended complaint.

"During the 2016 U.S. Presidential election," Page volunteered as a "member of an informal foreign policy advisory committee to then-candidate Donald J. Trump's election campaign."  2d Am. Compl. ¶ 21 (JA027).  Page alleged that on July 31, 2016, he became the target of an FBI surveillance program called Operation Crossfire Hurricane.  The purpose of Crossfire Hurricane was "to determine whether 'individual(s) associated with the Trump campaign [we]re witting of and/or coordinating activities with the Government of Russia.'"  *Id.* ¶ 5 (JA022).

In August 2016, the Central Intelligence Agency (CIA) informed members of the Crossfire Hurricane team that Page had been a CIA "operational contact" from 2008 to 2013, assisting in countering Russian and other foreign intelligence activity.  *Id.* ¶ 11 (JA023).  Several weeks later, the CIA sent

5

an investigative referral to FBI Director James Comey (Comey) and Deputy Assistant Director of Counterintelligence Peter Strzok (Strzok) conveying that presidential candidate "Hillary Clinton had approved a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server." *Id.* ¶¶ 12, 167 (JA024, JA054–JA055). A few weeks later, on September 19, 2016, the FBI received information from Christopher Steele, a Confidential Human Source, that "falsely alleged unlawful communications and activities involving . . . Page and two Russians with close ties to Russian President Vladimir Putin." *Id.* ¶¶ 9, 14 (JA023–JA024). However, the CIA had identified this information from Steele as possibly containing false allegations. In addition, the FBI became aware of several other facts that raised questions regarding Steele's credibility, including: (1) that the Democratic Party and/or the Clinton campaign supposedly paid Steele to perform "political opposition research," and (2) that the CIA had reportedly warned the FBI of a "potential political scheme" involving a disinformation effort to report a connection between the Trump campaign and Russia. *Id.* ¶¶ 9, 15, (JA023, JA025). Steele eventually provided similar information to public news media regarding the investigation.

On September 23, 2016, Michael Isikoff published an article in *Yahoo! News* titled "U.S. intel officials probe ties between Trump adviser and Kremlin." Michael Isikoff, *U.S. intel officials probe ties between Trump adviser and Kremlin*, *Yahoo! News* (Sept. 23, 2016), https://perma.cc/T2GE-M22D. The article stated that in July 2016, Page "[spoke] at a commencement address for the New Economic School, an institution funded in part by major Russian oligarchs close to Putin." *Id.* Additionally, the article stated that "U.S. intelligence agencies ha[d] also received reports that Page met

6

with another top Putin aide while in Moscow—Igor Diveykin." *Id.* "In response to [this] article, on September 25, 2016, . . . Page sent a letter to . . . Comey in which he categorically denied that he had any such communications with the Russian individuals and documented his previous cooperation with the CIA and the FBI to combat Russian spying." 2d Am. Compl. ¶¶ 15, 81 (JA025, JA039). Upon the receipt and sharing of Page's letter with the Crossfire Hurricane team the following day, Strzok wrote to FBI lawyer Lisa Page that "[a]t a minimum, the letter provides [the team] a pretext to interview" Page. *Id.* ¶ 147 (JA051).

On October 21, 2016, the FBI submitted its first FISA warrant application to the Foreign Intelligence Surveillance Court (FISC), relying on the *Yahoo! News* article and other allegedly false and misleading information. Under 50 U.S.C. § 1805(a)(2)(A), the FISC has authority to issue orders for electronic surveillance when presented with evidence that there is probable cause to believe that a target is an "agent of a foreign power."

After a second FISA warrant application had been submitted on January 12, 2017, two FBI agents—one of whom was individual defendant Stephen Somma—conducted an "ambush interview" of Page, followed by four additional interviews in March 2017. 2d Am. Compl. ¶¶ 122, 210 (JA047, JA063). In total, the five interviews lasted roughly ten hours. Page opines that he "was candid and cooperative with the agents, and his answers undermined any contention that he was acting as an agent of a foreign power." *Id.* ¶¶ 122, 210 (JA047, JA063). On April 7, 2017, the FBI submitted a third FISA warrant application to continue its surveillance of Page.

A few days later, on April 10, 2017, Strzok purportedly texted Lisa Page to devise a plan to leak information about the

7

Crossfire Hurricane investigation to the news media. The following day, the *Washington Post* published a story entitled, "FBI obtained FISA warrant to monitor former Trump adviser Carter Page." JA095–JA100; *see also* 2d Am. Compl. ¶ 221 (JA068). The article, which reported on information provided by "law enforcement and other U.S. officials" who "were not authorized to discuss details of a counterintelligence probe," stated that "[t]he FBI and the Justice Department obtained [a] warrant targeting Carter Page's communications after convincing a Foreign Intelligence Surveillance Court judge that there was probable cause to believe Page was acting as an agent of a foreign power, in this case Russia." JA095; 2d Am. Compl. ¶ 221(a) (JA068).

The *Washington Post* story quoted Page as saying that "[t]his confirms all of my suspicions about unjustified, politically motivated government surveillance" and that "[he] ha[s] nothing to hide." JA096. According to the *Post*, Page "compared surveillance of him to the eavesdropping that the FBI and Justice Department conducted against civil rights leader Martin Luther King Jr." *Id.* Page "dismissed what he called 'the dodgy [Steele] dossier' of false allegations" and maintained that he wanted to testify before Congress to clear his name, JA98, because any information he provided to the Russians was "innocuous," *i.e.*, "basic immaterial information and publicly available research documents." JA100. Page also stated in his defense that he had assisted the government in an earlier espionage case against a Russian national.

Ten days later, on April 22, 2017, the *New York Times* published an article entitled "Comey Tried to Shield the F.B.I. From Politics. Then He Shaped an Election." Matt Apuzzo, Michael S. Schmidt, Adam Goldman, and Eric Lichtblau, *Comey Tried to Shield the F.B.I. From Politics. Then He Shaped an Election*, N.Y. TIMES (Apr. 22, 2017),

8

https://perma.cc/YC6A-UGBY. The *New York Times* article focused on the investigation of Hillary Clinton's emails. The article mentioned Page, stating that he "gave a speech in Moscow criticizing American foreign policy" and that he "had previously been under F.B.I. scrutiny years earlier, as he was believed to have been marked for recruitment by Russian spies." 2d Am. Compl. ¶ 224(a) (JA069). This was the *Times* article's only explicit reference to Page.

On April 27, 2017, Page was interviewed by former CNN news anchor Chris Cuomo, wherein Page acknowledged having read both the *Washington Post* and the *New York Times* articles. *Page v. Comey*, Case No. 1:20-cv-03460, ECF No. 88-10, at 9 (D.D.C. Sept. 17, 2021). In response to questioning regarding whether the FBI had probable cause to surveil him, Page expressed his eagerness to obtain full disclosure about the warrant applications because "there [had] been terrific reporting in various news outlets, including '[the] Washington Post', [and] '[the] New York Times' based on various leaks and some of them have exactly pointed back to that dodgy dossier." *Id.*

Approximately a month later, on May 22, 2017, Page again acknowledged and explicitly cited to the *Washington Post* article in a letter to Congressmen K. Michael Conaway and Adam Schiff, responding to a request to voluntarily appear before the United States House of Representatives Permanent Select Committee on Intelligence (House Intelligence Committee).[2] In the letter, Page stated that the Clinton campaign had engaged in illegal activities and leaks, and he could "help set the record straight . . . following the false evidence, other illegal activities as well as additional extensive lies distributed by the Clinton campaign and their transnational

---

[2] The Joint Appendix only contains three pages from Carter's twenty-three-page submission.

9

associates." JA101.  Page referenced the "unfortunate front-page *Washington Post* article about the civil rights abuses committed against me which you might have seen: 'Applications for FISA warrants' . . . filled with a potpourri of falsehoods from the Clinton/Obama regime which fabricated this travesty from the outset."  JA102.

Page's letter welcomed the invitation to testify before the House Intelligence Committee on the "civil rights injustices" against him.  He informed the Committee that public access to the FISA warrants in advance of his testimony would be "essential" to dispel "the continued delusional charade regarding Russia's connections with the new Administration."  JA102–JA103.  Page contrasted the "proper legal procedures of disclosure currently underway" with the "recent misleading illegal leaks," plainly referring to the government leaks reported in the *Washington Post* article.  JA 101.  Thereafter, on June 29, 2017, the FBI submitted the fourth and final FISA warrant application.

On November 2, 2017, Page testified before the House Intelligence Committee.  Page stated that he was a victim of two felonies: the leaking of both his identity and classified information in relation to the FISA warrant documented in the *Washington Post* article.  *Testimony of Carter Page: Hearing Before the Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (*Page Testimony*), https://perma.cc/74C9-RWZ9 at 16–17, 21–22.  During his testimony, Page referenced the surveillance activities taken against him by the FBI.  In his opening statement, Page stated that "the alleged U.S. cyber operations of wiretap against myself . . . marked a new low with this baseless domestic interference in our democracy prior to the 2016 election."  *Id.* at 35.  Page further observed that although neither he nor the Committee "kn[e]w the details about how [he] was illegally hacked and wiretapped," they

10

should "soon" learn the information because of his and the Committee's requests for information. *Id.* During questioning by Congressman Gowdy, Page again referenced the *Washington Post* article, stating that someone leaked his interviews with the FBI to the *Post*. *Id.* at 59. Page's congressional testimony also incorporated his May 22, 2017 letter in which he observed that "[b]ased on revelations in the press thus far, [he] was the primary known person allegedly put under the most intensive surveillance by the Obama Administration as part of their 2016 domestic political intelligence operation." *Id.* at 15.

In March 2018, the DOJ's Office of Inspector General (OIG) initiated a review of the FBI's surveillance of Page. The OIG published a report on December 9, 2019, in which it observed that the FBI's factual misstatements and omissions regarding Page "taken together resulted in FISA applications that made it appear that the information supporting probable cause was stronger than was actually the case." OIG, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019), https://perma.cc/8TGE-VGTK at xiii.

**B.**

On November 27, 2020, Page filed a complaint in the United States District Court for the District of Columbia, alleging eight causes of action, including four claims of FISA violations against the individual defendants; one claim against individual defendants seeking damages under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); one claim against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680; one claim against the DOJ for violating the Privacy Act, 5 U.S.C. § 552a; and one claim against both the FBI and DOJ for

11

violating the Privacy Act.  Page amended his complaint on
April 15, 2021, but did not make any substantive changes to his
allegations.    After  attempting  to  comply  with  mandatory
prerequisites,[3] Page filed a second amended complaint on June
8, 2021, adding a claim against the United States for a violation
of the Uniting and Strengthening America by Providing
Appropriate Tools Required to Intercept and Obstruct
Terrorism Act of 2001 (Patriot Act), 18 U.S.C. § 2712.

On September 17, 2021, each of the individual defendants
separately moved to dismiss Page's FISA and *Bivens* claims.
That same day, the United States, the FBI, and the DOJ moved
to dismiss the FTCA, Privacy Act, and Patriot Act claims.

**C.**

In the district court, Appellees sought to dismiss Page's
second amended complaint on the grounds that his claims were
time-barred by the statute of limitations and that he failed to
state a claim upon which relief may be granted.  *Page*, 628 F.
Supp. 3d at 115.  The United States also moved to dismiss
Page's FTCA claim and one of his Privacy Act claims on the
basis that the district court lacked jurisdiction over them.  *Id.*
In addressing whether Page's FISA claims were time-barred,
the district court found that a three-year general statute of
limitations under D.C. law was applicable due to FISA's
silence on the issue.  *Id.* at 116–17.  Notwithstanding its finding
that "by April 11, 2017, Page knew that he was subject to
surveillance by the FBI and DOJ," *id.* at 118, the district court
held that in the context of the discovery rule, "it is far from
clear that a diligent investigation would have revealed enough

---

[3] Seeking to exhaust his administrative remedies under the Patriot
Act  pursuant  to  18  U.S.C.  §  2712(b)(1),  Page  presented  an
administrative claim to the DOJ on September 30, 2020, which it
denied on April 22, 2021.

12

evidence of illegality to avoid filing suit on a hunch." *Id.* at 119 (internal quotation marks and brackets omitted).

For the same reasons, the district court declined to dismiss Page's *Bivens* and Patriot Act claims on statute of limitations grounds. *Id.* at 129, 134. Instead, the district court disposed of Page's FISA and Patriot Act claims on the basis that Page failed to plead sufficient facts to state a plausible claim for relief. *Id.* at 129, 134. The district court dismissed Page's *Bivens* claim holding that "an extension of the *Bivens* remedy to this new context is unwarranted." *Id.* at 129 (internal quotation marks omitted). As to Page's Privacy Act claims, the district court found that Page "has neither exhausted his administrative remedies nor filed a timely claim." *Id.* at 140. The district court dismissed Page's remaining Patriot Act and abuse of process claims on the grounds that he failed to state a claim under the Patriot Act and that his abuse of process claim "is not cognizable under D.C. law." *Id.*

Page timely appealed dismissal of his FISA claims and his Patriot Act claim.

## II.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. "We review the district court's dismissal *de novo* and may affirm its judgment on any basis supported by the record." *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1236 (D.C. Cir. 2018) (citation omitted). On *de novo* review, we generally take as true all plausibly pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

13

### III.

Appellees contend that Page did not timely file his claims in accordance with the applicable statutes of limitation. Upon its review, the district court determined that "the complaint does not conclusively show that Page was sufficiently on notice of his claims before November 27, 2017." *Page*, 628 F. Supp. 3d at 119. On *de novo* review, we hold that Page's second amended complaint on its face is conclusively time-barred.

### A.

"Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352 (1983). Accordingly, statutes of limitations "afford[] plaintiffs what the legislature deems a reasonable time to present their claims [while simultaneously] protect[ing] defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, . . . fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (citations omitted).

At the motion to dismiss stage under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "dismissal is appropriate on statute of limitations grounds 'only if the complaint on its face is conclusively time-barred.'" *Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019) (citation omitted). This face-of-the-complaint principle, although rarely explained, limits a court's consideration to materials properly before it. In this Circuit, a "court may consider the facts alleged in the complaint, [and] documents attached thereto or incorporated therein, . . . ." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). The

14

incorporation-by-reference doctrine "permits courts to consider documents not attached to a complaint if they are 'referred to in the complaint and integral to the plaintiff's claim.'" *Real World Media LLC v. Daily Caller, Inc.*, No. CV 23-1654, 2024 WL 3835351, at *3 (D.D.C. Aug. 14, 2024) (*quoting Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1133 (D.C. Cir. 2015) (cleaned up)).  Additionally, a court may consider those portions of "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Terveer v. Billington*, 34 F. Supp. 3d 100, 110 (D.D.C. 2014) (*quoting Ward v. D.C. Dep't of Youth Rehab. Servs.,* 768 F. Supp. 2d 117 (D.D.C. 2011)).

A court may also consider "matters of which it may take judicial notice," *Stewart*, 471 F.3d at 173, because that information "is not subject to reasonable dispute," Fed. R. Evid. 201(b).  Courts have acknowledged the appropriateness of taking judicial notice of the public availability of newspaper articles and the existence of specified congressional testimony.  *E.g.*, *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) ("This court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area . . . ."); *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 n.5 (2d Cir. 2008) ("[C]ongressional testimony is an appropriate subject for judicial notice as a public record for the fact that the statements were made.").

Therefore, for purposes of our *de novo* review of the district court's decision dismissing Page's FISA and Patriot Act claims, we consider not only the allegations of the second amended complaint, but also the publication of the April 11, 2017 *Washington Post* article, the April 22, 2017 *New York Times* article, and his November 2, 2017 testimony before the House Intelligence Committee, which transcript included

15

Page's May 22, 2017 letter to Congressmen Conaway and Schiff. To determine if Page's claims are time-barred, we must assess, first, the applicable limitations period, and second, the time at which his claims accrued.

**B.**

Page's FISA claims center on four warrant applications submitted to the FISC, which he alleges the FBI knowingly supported with insufficient evidence. "FISA is concerned with foreign intelligence surveillance." *United States v. Belfield*, 692 F.2d 141, 148 (D.C. Cir. 1982). "The statute is meant to 'reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights.'" *Id.* (quoting S. Rep. No. 95–701, 95th Cong., 2d Sess. 16 (1978)). FISA ensures individual privacy "'through its provisions for in-depth oversight . . . by all three branches of government and . . . an expanded conception of minimization that differs from that which governs law-enforcement surveillance.'" *Id.* (quoting Allan S. Schwartz, *Oversight of Minimization Compliance Under the Foreign Intelligence Surveillance Act: How the Watchdogs Are Doing Their Job*, 12 Rutgers L.J. 405, 408 (1981)). Section 110 of FISA (50 U.S.C. § 1810) creates civil liability for individuals who violate Section 1809 by engaging in unauthorized surveillance and/or disclosing/using the information so obtained. 50 U.S.C. § 1809(a).

The district court correctly noted that "FISA's civil cause of action does not contain a statute of limitations." *Page*, 628 F. Supp. 3d at 116. Generally, "[w]hen a federal action contains no statute of limitations, courts will ordinarily look to analogous provisions in state law as a source of a federal limitations period." *Loumiet v. United States*, 828 F.3d 935, 947 (D.C. Cir. 2016) (quoting *Doe v. DOJ*, 753 F.2d 1092,

16

1114–15 (D.C. Cir. 1985)); *see also Richards v. Mileski*, 662
F.2d 65, 68 (D.C. Cir. 1981) ("In this instance, as no specific
statute of limitations has ever been enacted by Congress for
such claims, the appropriate local statute of limitations is
borrowed.").    The individual defendants contend that the
appropriate limitations period is found either in D.C.'s one-
year statute of limitations for libel and invasion of privacy, or
in the two-year statute of limitations set forth in the Wiretap
Act and the Stored Communications Act—two federal laws
that, like FISA, regulate surveillance. *See* D.C. Code § 12-
301(4); 18 U.S.C. §§ 2707(f) [Stored Communications Act],
2520(e) [Wiretap Act].    Page maintains that the analogous
limitations period is instead found in D.C.'s three-year statute
of limitations for "actions . . . *for which a limitation is not
otherwise specifically prescribed*."  D.C. Code § 12-301(a)(8)
(emphasis added).  Though recognizing the contrary inclination
of our partially dissenting colleague, Partial Dissent at 13–14,
we assume without deciding that the longer period applies
because Page's FISA claims accrued before November 27,
2017—more than three years before he filed his November 27,
2020 complaint—and are therefore barred under even the most
generous of the potentially applicable limitations periods.

     "State law dictates the statute of limitations, but the timing
of the accrual of . . . claims is a question of federal law."
*Loumiet*, 828 F.3d at 947.  "In federal courts 'the general rule
of accrual' in cases in which the injury is 'not of the sort that
can readily be discovered when it occurs' is that a cause of
action accrues and the limitations period begins to run only
when 'the plaintiff discovers, or with due diligence should have
discovered, the injury that is the basis of the action.'" *Sprint
Commc'ns Co. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996)
(quoting *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336,
341–42 (D.C. Cir. 1991)).  Importantly, accrual is not delayed
just because the plaintiff does not yet have "access to or

17

constructive knowledge of *all* the facts required to support [a] claim." *Id.* at 1228 (emphasis added).

In *Hobson v. Wilson* we held that, when a claim is fraudulently concealed, its limitation period begins to run at the time the claimants have reason to know of both their injury and the unlawfulness of the defendant's conduct. 737 F.2d 1, 33–41 (D.C. Cir. 1984). There, we observed that plaintiffs were put on sufficient notice more than three years before they sued when they read an article describing an unlawful FBI investigation of which they knew or had reason to know they were targets. *Id.* at 38–39. We explained that if plaintiffs *either* simply read the article about an unlawful FBI scheme *or* simply knew of an FBI investigation targeting them without any reason to think it was unlawful, the information would not suffice to provide notice of their claims. *Id.* at 38–39. However, we emphasized that in reading the article describing the FBI investigation as unlawful and knowing they were the subjects of that investigation, the *Hobson* plaintiffs had enough "timely information to claim that *they* were victims of unconstitutional FBI activities." *Id.*

Page does not contest that, by April 11, 2017—the publication date of the *Washington Post* article describing the FBI's surveillance of Page and quoting Page's description of the surveillance as "unjustified" and "politically motivated"— he "knew that he was subject to surveillance by the FBI and DOJ, and he suspected that the allegations, and the ensuing warrants, were baseless." *Page*, 628 F. Supp. 3d at 118. Nonetheless, Page contends that his claims did not accrue until he received confirmation from the OIG report that the warrants contained significant errors.

Our precedent does not require a plaintiff to have access to a warrant's supporting affidavit before claim accrual starts. In

18

*Richards v. Mileski*, we held that it was "irrelevant" to consider when the government agency would have made relevant documents available to the plaintiff; instead, we concluded that "[t]he test of due diligence measures the plaintiff's efforts to uncover his cause of action against what a reasonable person would have done in his situation *given the same information*." 662 F.2d at 71 (emphasis added). In *Sprint Communications Company v. FCC*, we explained that once a prospective plaintiff is put on notice that they may have an actionable claim, they are "required to make a diligent inquiry into the facts and circumstances that would support th[e] claim." 76 F.3d at 1228. Finally, in *Sparshott v. Feld Entertainment, Inc.*, we held that "there is no need that someone actually 'discover' or be aware of the violation." 311 F.3d 425, 429 (D.C. Cir. 2002) (emphasis in original). "Rather, the question is whether the person had a *reasonable opportunity* to discover [it]." *Id.* (emphasis in original).

Page's argument erroneously focuses on his lack of access to the affidavits, rather than whether he took reasonable measures to uncover his cause of action once he learned of the defendants' alleged wrongful conduct. We disagree that Page did not have "notice of the basis for his claims until the [OIG] Report was issued in December 2019." Reply Br. 3. Rather, by spring of 2017, Page knew all the essential facts on which he relies in support of his FISA claims that defendants surveilled him in violation of 50 U.S.C. § 1809(a)(1) and "disclosed or used" results of that surveillance in violation of § 1809(a)(2).

Relying on the discovery rule and our precedent, we hold that Page had actual or inquiry notice of his FISA claims for unauthorized surveillance and disclosure by April 2017. (Judge Henderson would assume without deciding that the discovery rule applies to Page's FISA claims, Partial Dissent at

19

16, but because we read our precedent to embrace that rule, we apply it here.)  In his second amended complaint, Page alleged that the individual defendants surveilled him knowing that there was no probable cause to do so, and then unlawfully used or disclosed the information gathered from that surveillance. 2d Am. Compl. ¶ 142 (JA 50).

As previously noted, the April 11, 2017 *Washington Post* article quoted Page himself describing the surveillance as "unjustified" and "politically motivated." JA096.  Those statements show that he had concluded by April of 2017 that the FBI was unlawfully subjecting him to surveillance without probable cause.

The *Post* article also reported that the FBI had renewed the initial warrant "more than once," JA097, thereby informing readers, including Page, that the FBI had submitted multiple warrant renewal applications.  FISA requires warrant renewal applications to describe information gathered from previous surveillance.  That requirement is readily available public information—especially to a person like Carter Page with multiple advanced degrees and prior interest in CIA operations.[4]  The statute declares that:

> Each application for an order approving electronic surveillance . . . shall include . . . a statement of the *facts concerning all previous applications* that have been made to any judge .

---

[4] Page alleges that he earned a Master's degree in National Security from Georgetown, an MBA from New York University, and a PhD from the School of Oriental and African Studies University of London, in addition to serving in the Navy in "intelligence-related billets" and serving as an International Affairs Fellow at the Council on Foreign Relations.  2d Am. Compl. ¶ 21 (JA026–JA027).

20

. . .

50 U.S.C. § 1804(a)(8) (emphasis added). And it specifies that "an application for an extension of an order under this subchapter for a surveillance targeted against a United States person," such as the surveillance of Page, must include:

> *a summary statement of the foreign intelligence information obtained* pursuant to the original order (and any preceding extension thereof) as of the date of the application for extension, *or a reasonable explanation of the failure to obtain such information*.

*Id.* § 1804(a)(11) (emphasis added). Page himself highlights this requirement to support his FISA claims. *See* 2d Am. Compl. ¶¶ 229, 230 (JA 70). The statute's command plus the *Post* report of repeated renewals sufficed to put Page on notice that the FBI "used or disclosed" information gathered under the initial warrant in its ensuing applications in contravention of 50 U.S.C. § 1809(a)(2).

Given the direct quotations from Page in the *Post* article together with FISA's express terms, nothing more is needed to show the claim is time-barred. But Page's May 22, 2017 letter to the House Intelligence Committee provides helpful confirmation that, when he spoke to the *Post* the previous month about the "unjustified" and "politically motivated" surveillance, he thought the government had intentionally misrepresented his connection to Russia and surveilled him in reliance on that pretense. [5] Page's letter described the warrants

---

[5] Our dissenting colleague posits that we cannot rely on Page's May 22, 2017, letter to the House Intelligence Committee because the letter is a matter outside of the pleadings, Partial Dissent at 22–23,

21

as "filled with a potpourri of falsehoods from the Clinton/Obama regime which fabricated this travesty from the outset." JA102. The letter also confirms that he believed the *Post* article was based on "illegal" leaks from within the government. Therefore, Page's May 22, 2017 letter reiterating his awareness reflected in the April 11, 2017 article confirms that Page knew of the unlawfulness of the FISA warrants and his resultant injury more than three years before he filed his FISA claims on November 27, 2020.[6] These facts are materially indistinguishable from those supporting the time bar in *Hobson*, 737 F.2d at 39. Far from requiring him to file suit "on a hunch," the stated concern of the *Hobson* court, Page–who had both read the *Post* and *Times* articles and knew he was the subject of alleged illegal government surveillance–had sufficient notice by April 2017 to bring FISA claims. *See id.*

---

and Appellees forfeited and/or waived reference to it, Partial Dissent at 28 n.11. However, matters judicially noticed are not considered matters outside the pleadings. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Moreover, D.C. Circuit precedent does not foreclose our discretion to consider "forfeited" issues. *Molock v. Whole Foods mkt. Grp., Inc.*, 952 F.3d 293, 298–99 (D.C. Cir. 2020) (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993)). Forfeiture binds parties, not the court. *Miguel-Pena v. Garland*, 94 F.4th 1145, 1158 (10th Cir. 2024) (citation omitted). Accordingly, in our evaluation of whether Page had notice of his FISA claims, we are not required to ignore Page's Congressional testimony or his May letter, which occurred more than three years before he filed his complaint.

[6] Page did not argue judicial deception or any other basis to toll the statute of limitations.

22

Our partially dissenting colleague discerns in Page's complaint a distinct claim of which he was not aware in early 2017, and so is not time-barred: that Peter Strzok and Lisa Page's media leaks included FISA-obtained information. Partial Dissent at 30, 35–37. We do not read the complaint to state any such claim. The dissent's sole citation (*id*. at 35–36) is to snippets of a sentence in the complaint that lumps together distinct "use or disclose" theories and four different defendants:

> On information and belief, Defendants, known and unknown to Dr. Page, but including but not limited to, Comey, McCabe, Strzok, and Page, leaked information and records concerning Dr. Page, including but not limited to the existence of the FISA Warrants, the contents of the warrant applications, and the results of the Warrants, that were protected from disclosure under the FISA and the Privacy Act to media outlets, including the New York Times, the Washington Post, and possibly others.

2d. Am. Compl. ¶ 226 (JA 69–70). But the complaint elsewhere attributes distinct actions to those individual defendants. It describes Comey and McCabe as applying for further FISA warrants—necessarily using information obtained from earlier surveillance and disclosing it to the FISA court in "obtaining each subsequent renewal warrant." 2d. Am. Compl. ¶ 229 (JA 70); *see id.* ¶¶ 152–154, 162–63 (JA 52–53, 54). And, according to the complaint, Lisa Page and Peter Strzok were the media leakers. *See* 2d. Am. Compl. ¶¶ 196, 220-225 (JA 60, 67–69). Page alleges that they leaked to the *Washington Post* and the *New York Times* the existence of and putative bases for FISA warrants to surveil him—allegations later confirmed by the OIG Report. But the complaint includes

23

no plausible factual allegations supporting any inference that Page or Strzok leaked the FISA warrants' results. In other words, "Page's bare allegation that the defendants disclosed the results of this surveillance to the media, without any further detail, does not raise his 'right to relief above the speculative level.' *Twombly*, 550 U.S. at 555." *Page*, 628 F. Supp. 3d at 129.

To the extent such a theory is thought to be pleaded in the summary sentence quoted above, it hangs on a naked assumption: Despite a lack of factual allegations, Strzok and Lisa Page leaked not just the warrants' existence, putative basis, and Page's identity, as the *Post* reported, but FISA-obtained information, too. In sum, as to the distinct theory our colleague discerns and concludes is timely, the reality that the complaint adds no more factual support to the assumed broader leak than Page either knew or had reason to know in 2017 only confirms that no such timely claim exists.

## C.

Page's Patriot Act claim arises under 18 U.S.C. § 2712, which permits actions against the United States to recover money damages for violations of specified sections of FISA. *Id.* § 2712(a). The Patriot Act expanded the investigatory tools federal law enforcement agents can employ to allow for easier exchange of information and cooperation between units. *See* Patriot Act, H.R. 3162, 107th Congress (2001–2002). The Patriot Act contains its own statute of limitations, providing:

> Any action against the United States under this section shall be forever barred unless it is presented in writing to the appropriate Federal agency within 2 years after such claim accrues or unless action is begun within 6 months after the date of mailing, by certified or registered

24

> mail, of notice of final denial of the claim by the
> agency to which it was presented.

18 U.S.C. § 2712(b)(2).  Although the D.C. Circuit has not
passed on this particular provision, we have interpreted an
identically worded provision in the FTCA, 28 U.S.C.
§ 2401(b).[7]  We held the FTCA provision "requires the
claimant both to file the claim with the agency within two years
after accrual of the claim and then to file a complaint in the
District Court within six months after the agency denies the
claim." *Schuler v. United States,* 628 F.2d 199, 201 (D.C. Cir.
1980).  "Were we to read the 'or' in the section as really
intending the disjunctive, a claimant who filed a claim with the
agency within two years would then be able to bring it to a
District Court at any remote future time after the agency denied
him relief." *Id.  See Sanchez v. United States*, 740 F.3d 47, 50
n.6 (1st Cir. 2014) ("We read this disjunctive language as
setting out two deadlines, both (not just either) of which must
be satisfied.  Otherwise, there would effectively be no deadline
at all.").

   The Patriot Act not only employs limitations language
identical to the FTCA but adopted it decades after *Schuler* had
interpreted it as we do today.  *See Smith v. City of Jackson,*

---

[7] Section 2401(b) states:

> A tort claim against the United States shall be
> forever barred unless it is presented in writing to the
> appropriate Federal agency within two years after
> such claim accrues or unless action is begun within
> six months after the date of mailing, by certified or
> registered mail, of notice of final denial of the claim
> by the agency to which it was presented.

28 U.S.C. § 2401(b).

25

*Miss.*, 544 U.S. 228, 260 (2005) (O'Connor, J., concurring) (emphasizing that like language appearing in separate statutes is a "strong indication" that they should be interpreted alike, particularly where judicial interpretation of one statute precedes Congress' adoption of the second) (citing *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 626 (1992) ("Congress' use of the same language . . . indicates a likely adoption of our prior interpretation of that language.")); *Shirk v. U.S. ex. rel. Dep't of Interior*, 773 F.3d 999, 1004 (9th Cir. 2014) ("A basic principle of interpretation is that courts ought to interpret similar language in the same way, unless context indicates that they should do otherwise.").  Accordingly, we hold that, for statute of limitations purposes, Page was required to present his Patriot Act claim to the FBI within two years after the claim accrued and file the resulting lawsuit within six months after notice of the FBI's denial of the claim.  Our partially dissenting colleague disagrees with our use of *Schuler* and the other cases that rely on it.  Partial Dissent at 18–21.  However, *Schuler* is precedent of this Circuit and stare decisis requires us to follow it unless "the court [e]n banc has overruled it," which it has not.  *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373–74 (D.C. Cir. 1979).

Page successfully met the six-month filing requirement.  As alleged in the second amended complaint, the FBI issued the final denial of Page's administrative claim on April 22, 2021.  Page filed his second amended complaint—the first complaint to include his Patriot Act claim—on June 8, 2021, well within the six-month deadline provided in 18 U.S.C. § 2712(b)(2).  But Page failed to file his administrative claim with the FBI within two years of its accrual.

Under the Patriot Act, accrual occurs "on the date upon which the claimant first has a reasonable opportunity to discover the violation."  18 U.S.C. § 2712(b)(2).  Page asserts

26

that he presented his Patriot Claim to the FBI in a letter dated September 30, 2020.  Therefore, if Page had notice of facts and circumstances supporting the discoverability of a Patriot Act claim before September 30, 2018, Page's claim is barred by the statute of limitations.

Page's allegations and their documentary support show that, as of April 2017, Page had ample bases to discover the FISA violation supporting his Patriot Act claim.  In his second amended complaint, Page alleged that the FBI and DOJ violated the Patriot Act by using the surveillance information gathered on him for unlawful purposes, including to obtain further surveillance without probable cause.  2d. Am. Compl. ¶¶ 229, 230 (JA 70).  As explained above, by April 2017, Page was on notice of that claim.  The April 11, 2017, *Washington Post* article confirmed the existence of two warrant applications:

> The government's application for the surveillance order targeting Page included a lengthy declaration that laid out investigators' basis for believing that Page was an agent of the Russian government and knowingly engaged in clandestine intelligence activities on behalf of Moscow . . . [and s]ince the 90-day warrant was first issued, it has been renewed more than once by the FISA court.

JA097.

And, as explained above, *see supra* Section III.B., in addition to knowing that the FBI and DOJ had secured at least one renewal warrant, Page knew or could have known from the FISA statute itself that any warrant renewal application had to disclose the information gathered on him from previous surveillance.  *See* 50 U.S.C. § 1804(a)(8).  As such, Page had

27

sufficient information by April 2017 to advance his theory that the FBI and DOJ violated the Patriot Act by using surveillance information gathered on him to obtain subsequent warrant renewals. Page later acknowledged as much by asserting in his May 22, 2017, letter to the House Intelligence Committee that U.S. government operatives leaked his identity and revealed classified information regarding "the completely unjustified FISA warrant against [Page]" documented in the *Washington Post* article. *Page Testimony*, https://perma.cc/74C9-RWZ9 at 16–17, 21–22. These events confirm that Page discovered the basis for his Patriot Act claim by April 2017, significantly more than two years before he submitted it to the FBI. As a result, the statute of limitations bars Page's claim under the Patriot Act.

*****

For the foregoing reasons, we affirm the district court's dismissal of Carter Page's FISA and Patriot Act claims pursuant to Federal Rule of Civil Procedure 12(b)(6) as time-barred.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part: In my view, this case involves the Government running roughshod over institutional guardrails designed to safeguard our civil liberties. The several defendants now evade liability, not because they are guiltless, but because the Court finds Carter Page's claims time barred. Although I agree in part with that conclusion, I cannot join the majority in full because I am convinced that one of Page's claims is timely and, accordingly, he is entitled to his day in court.

# I. BACKGROUND

## A. FISA's History

I begin by summarizing the history of the Foreign Intelligence Surveillance Act (FISA)—history that is particularly pertinent to this case. With the advent of electronic surveillance, the Government struggled to strike a balance between two ancient and competing interests: the need for a "vigorous executive" capable of "secrecy[] and dispatch" in the national security realm, The Federalist No. 70 (A. Hamilton) (Clinton Rossitier ed., 1961), versus the risk that the President's "Minions" would use "dangerous or oppressive Measures" and "shelter themselves" from "Inquiry into their own misconduct in Office." George Mason, *Objections to the Constitution of Government Formed by the Convention* (1787). In the early twentieth century, the United States Supreme Court held that domestic wiretapping and surveillance fell outside the ambit of the Fourth Amendment absent a physical trespass into a constitutionally protected area. *Olmstead v. United States*, 277 U.S. 438, 464–66 (1928). Under this framework, "the Fourth Amendment was inapplicable to non-trespassory electronic surveillance . . . [and] . . . warrants were not required." *Zweibon v. Mitchell*, 516 F.2d 594, 617 (D.C. Cir.

2

1975) (*en banc*). And so, the Executive expanded the scope of warrantless electronic surveillance, which "was generally accomplished without a physical trespass." *Id.* at 617–18.

That regime was upended in *Katz v. United States*, the decision that replaced the Fourth Amendment's trespass model with the now prevailing reasonable-expectation-of-privacy test and held that the Government must obtain a warrant before employing electronic surveillance during a criminal investigation. 389 U.S. 347, 353, 356–57 (1967). But the *Katz* Court reserved judgment on whether its holding applied "in a situation involving the national security"—that is, when the Government's reason for surveillance was not traditional criminal enforcement but intelligence gathering. *Id.* at 358 n.23. The Congress responded to *Katz* by passing the Omnibus Crime Control and Safe Streets Act of 1968 (OCCSSA). Title III of OCCSSA, known as the Wiretap Act, established procedures for judicial authorization of electronic surveillance by law enforcement but disclaimed regulation of the President's ability to intercept "[t]he contents of any wire or oral communication" if the purpose was "to obtain foreign intelligence information . . . or to protect national security information against foreign intelligence activities." Pub. L. No. 90-351, Title III, § 802, 82 Stat. 197, 212, 214 (1968) (then-codified at 18 U.S.C. § 2511(3)).

Five years later, in *United States v. U.S. District Court* (the "*Keith*" case) the Supreme Court narrowed the national security carve-out recognized in *Katz*. 407 U.S. 297 (1972). It first interpreted § 2511(3) of the Wiretap Act as agnostic on "the President's electronic surveillance power," neither endorsing nor denying its existence. *Id.* at 303. It then held that the Fourth Amendment applies to "domestic security surveillance" if the target has no "significant connection with a foreign power, its agents or agencies." *Id.* at 309 n.8, 320–22.

3

The *Keith* Court, like its predecessor, declined to pass on the "scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308.

In the mid-1970s, courts continued to grapple with the existence and scope of a national-security exception to the Fourth Amendment. After *Keith*, three federal circuits held that the President's foreign affairs powers allowed the Government to conduct warrantless electronic surveillance to monitor domestically an agent of a foreign power. *See United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973); *United States v. Butenko*, 494 F.2d 593, 608 (3d Cir. 1974); *United States v. Buck*, 548 F.2d 871, 875–76 (9th Cir. 1977). Our Court bucked the trend and—in a fractured plurality opinion— implied that "wiretapping in the area of foreign affairs should [not] be exempt from prior judicial scrutiny." *Zweibon*, 516 F.2d at 651.[1]

Around the same time, the Congress and the media brought to light a cascade of abuses committed by the intelligence community. Presidents from Franklin Roosevelt onward had authorized ever-expanding warrantless electronic surveillance rooted in claims of inherent executive power. S. Rep. No. 95-604, at 7–9 (1977). Because of the need for secrecy, this surveillance was conducted without legislative or judicial oversight. S. Rep. No. 95-217, at 1 (1977). Although the surveillance began as a tool for matters "involving the

---

[1] The eight judges of the *en banc* Court filed five separate opinions. A four-judge plurality "suggest[ed]" that domestic surveillance of an agent of a foreign power required a warrant but did "not rest [their] decision" thereon. *Id.* Two judges declined to speak to the issue and the remaining two believed that the plurality's dicta was wrong. *Id.* at 681, 686, 688–89, 705–06.

4

defense of the nation," it drifted into domestic affairs. *Keith*, 407 U.S. at 310 n.10.

In 1975, the Congress formed a select committee chaired by Maryland Senator Frank Church to investigate the Executive's alleged misuse of its vast surveillance apparatus. The Church Committee uncovered abuses that "infringed upon" the "rights of United States citizens." S. Rep. No. 94-755, at 12 (1976). The revelations spurred the Congress to create the first Senate Select Committee on Intelligence, which concluded that responsibility for surveillance "must be shared by the three branches of Government." S. Rep. No. 95-217, at 1.

The legal and political tumult of the 1970s led to a protracted legislative struggle to rein in the President. The Foreign Intelligence Surveillance Act resulted from those efforts. FISA aimed to resolve the legal haze of *Keith* and the public's eroded confidence in the intelligence community with one "basic premise"—"that a court order for foreign intelligence electronic surveillances can be devised that is consistent with . . . the fourth amendment." S. Rep. No. 95-701, at 9 (1978). FISA "was a surprisingly simple statute" that "banned the Government from conducting 'electronic surveillance' without a FISA warrant," absent one of a narrow list of exceptions. Orin S. Kerr, *Updating the Foreign Intelligence Surveillance Act*, 75 U. Chi. L. Rev. 225, 230 (2008). The warrant was to be issued by the newly created Foreign Intelligence Surveillance Court (FISC), the Congress's mechanism for balancing secrecy and accountability. The FISC lies at the heart of FISA's grand bargain: the Executive Branch agreed to legal oversight and restraint in exchange for procedural safeguards implemented behind a veil of secrecy. "Unlike most other courts, [the] FISC holds its proceedings in secret and does not customarily publish its decisions." *ACLU*

5

*v. United States*, 142 S. Ct. 22, 23 (2021) (Gorsuch, J., dissenting from the denial of certiorari).  The Congress would police the FISA process through two newly formed intelligence committees that themselves conduct a significant share of their business behind closed doors.

FISA thus resolved the lingering *Keith* exception and remedied the intelligence community's rudderless surveillance through a series of internal and external checks.  *See* 50 U.S.C. §§ 1804(a) (executive oversight procedures), 1805(a) (judicial oversight), 1808 (congressional oversight) (1978).  Foreign intelligence surveillance now requires a warrant and that warrant is subject to Executive Branch attestation, judicial approval and post-hoc congressional oversight.

Sadly, the closed nature of the process allowed a mix of complacency and duplicity to unspool FISA's tightly wound safeguards.  One early pressure point arising in the FISA process was the Government's purpose for surveilling: foreign intelligence surveillance is the domain of FISA but traditional law enforcement is subject to Title III procedures.  *Compare* 50 U.S.C. § 1804(a) *with* 18 U.S.C. §§ 2516–18; *see also U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 453 (D.C. Cir. 2000).  Whereas a Title III warrant requires a probable cause of criminal activity determination, FISA requires only probable cause that a target is acting as a foreign power's agent.  Before procuring a warrant, then, FISA required the Executive Branch to certify "that the purpose of the surveillance is to obtain foreign intelligence information."  Foreign Intelligence Surveillance Act of 1978, Pub. L. No. 95-511, § 104(a)(7)(B), 92 Stat 1783, 1789.  To police the FISA/Title III line, in the mid-1990s the Attorney General constructed a "wall" between the intelligence community and the Department of Justice (DOJ).  Under DOJ's 1995 policy, federal prosecutors avoided giving even the "appearance" that they were "directing or

6

controlling" an investigation if FISA applied or was even being contemplated. *See* Memorandum from the Att'y Gen. on Procedures for Contacts Between the FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence Investigations (July 19, 1995), https:// perma.cc/X42F-QESR.

In 2001, the FISC presiding judge unearthed a series of FBI affidavits that claimed adherence to the wall when in fact information had leaked from the FBI to federal prosecutors. The issue was not the merits of the wall; indeed, the Congress would later amend FISA to remove the wall. *See* USA Patriot Act of 2001, Pub. L. No. 107–56, § 218, 115 Stat. 272, 291 (amending 50 U.S.C. § 1804(a) from "the purpose" to "a significant purpose" to allow for greater information sharing across the Executive); *In re Sealed Case*, 310 F.3d 717, 736–46 (FISC Rev. 2002) (upholding the amended language). Rather, the concern was the Executive's disregard for its own procedural buffers and its sometimes-doubtful representations to the court. It initially "confess[ed] error in some 75 FISA applications . . . related to misstatements and omissions of material facts," a number that only grew with time. *In re All Matters Submitted to Foreign Intel. Surveillance Ct.*, 218 F. Supp. 2d 611, 620–21 (FISC 2002), *abrogated on other grounds by In re Sealed Case*, 310 F.3d 717. In response, the FISC presiding judge convened the full FISC and issued an order banning one FISA affiant from ever again appearing before the court. Bernard Horowitz, *FISA, the "Wall," and Crossfire Hurricane: a Contextualized Legal History*, 7 Nat. Sec. L. J. 1, 64–65 (2020) (recounting this history).

In response to the lapses recounted above, the FBI implemented what became known as the "Woods procedures," a series of internal checks requiring the FBI agent responsible for a FISA warrant application to maintain a "Woods File"—

7

supporting documentation for every factual assertion contained in the FISA warrant application. *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, No. 19-02, 2020 WL 1975053, at *1 (FISC Apr. 3, 2020).

## B.   Carter Page Warrants

As the majority describes it, the FBI made some "factual misstatements and omissions regarding Page." Maj. Op. 10. Assuming the facts as alleged to be true, as we must at this litigation stage, *see Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 395 (D.C. Cir. 2024), I find the record far more troubling. According to Page, the FBI engaged in serious Woods File breaches: it failed to scrutinize the conflicting motives of its primary source, Christopher Steele; it concealed information from the FISC that cast doubt on Steele's credibility; and it omitted Page's past work for the Central Intelligence Agency (CIA) in its FISA application.[2] It is solely because of these breaches that the FISC authorized the Government's surveillance of Page. Ordinarily, these facts would be allegations we would simply assume to be true. But we need not rely on assumptions. In 2019, the Justice Department's Office of the Inspector General (OIG) issued a report cataloging the delicts. *See* OIG, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (Dec. 2019), https://perma.cc/8TGE-VGTK (OIG Report).

---

[2] In addition to his work for the CIA, Page served in the United States Navy, led a distinguished career at a leading financial institution and taught courses on energy and politics at New York University. After graduating from the United States Naval Academy, Page obtained a Master's degree from Georgetown, an MBA from NYU and a PhD from the School of Oriental and African Studies University of London.

8

The OIG found that the FBI *ex industria* concealed exculpatory information regarding Page from the FISC while embellishing more negative information. The FBI suspected Page of involvement in Russia's infamous 2016 election interference based on a report prepared by Steele. *Id.* at vii. Yet the "FBI did not have information corroborating the specific allegations against Carter Page in Steele's reporting when it relied upon his reports in the first FISA application or subsequent renewal applications." *Id.* at viii. Indeed, the FBI "obtained [] information raising significant questions about the reliability of" Steele yet said nary a word to the FISC. *Id.* at vi. On the contrary, it "overstated" Steele's reliability. *Id.* at viii.

The OIG identified several "instances in which factual assertions relied upon in the [] FISA application[s] were inaccurate, incomplete, or unsupported." *Id.* In one of the most glaring acts of defiance, an FBI lawyer, Kevin Clinesmith, altered emails to indicate that Page was "not a source" for the CIA when he had in fact acted as a source in the past. *Id.* at 7–8; *see also United States v. Clinesmith*, No. 20-cr-165, ECF Nos. 8–9, (D.D.C. Aug. 19, 2020). All in all, the OIG identified *seventeen* significant errors in the Page FISA applications. *See* OIG Report at viii–xii. As the Government itself now belatedly concedes, but for those errors it could not have sustained its surveillance of Page. *See* Gov't Br. 6 (acknowledging that "in light of th[e]se errors, in the last two renewal applications, if not earlier, there was insufficient predication to establish probable cause to believe that Page was acting as an agent of a foreign power") (quotations omitted).

It would be egregious enough if this conduct were the work of a few wayward defalcators. But the OIG found that similar shortcomings infected the entire FISA process. On the heels of the Page fiasco, the OIG conducted a random audit of 29 other FISA applications to ascertain their compliance with

9

the Woods File procedures. Every reviewed application contained Woods violations. Twenty-five files contained inadequately supported claims or errors and four applications had *no* Woods File. OIG, *Audit of the Federal Bureau of Investigation's Execution of its Woods Procedures for Applications Filed with the Foreign Intelligence Surveillance Court Relating to U.S. Persons* ii (Sept. 2021), https://perma.cc/3LKS-72CP. The Justice Department informed the FISC that these 29 applications contained 209 errors and the OIG identified an additional 209 instances in which the Woods Files did not support claims made in the warrant applications. *Id.* at ii, 7–8. A broader audit of every FISA application made between January 2015 to March 2020 produced yet another 179 instances "where the required Woods File was missing, destroyed, or incomplete." *Id.* In other words, the manifest failures in the Page FISA process were not an aberration but par for the course for the FBI.

## C.  The Page Leaks

But the FBI did not stop at misleading the FISC. Page was not only unlawfully surveilled—the surveillance then became public fodder due to a steady drip of leaks to the media that painted Page as a foreign agent; in particular, a Russian agent. First, the FBI's informant, Christopher Steele, disclosed selected portions of his subsequently discredited investigation to the media, including that Page had met with sanctioned Russian individuals. Second, two FBI employees, Lisa Page and Peter Strzok, executed a scheme to leak to the media that Page was the subject of a FISA warrant. In a series of crass text messages sent via their government devices, Strzok and Lisa Page shared their mutual enmity for Page and crowed about their "media leak strategy" to tarnish his reputation.[3] The

---

[3]  Deputy FBI Director Andrew McCabe allegedly put his imprimatur on the Page media leak operation. Indeed, McCabe was

10

Deputy Attorney General later released these text messages because he believed that they "were so inappropriate and intertwined with their FBI work that they raised concerns about political bias influencing official duties." Declaration of Rod J. Rosenstein, *Strzok v. Barr*, No. 1:19-cv-2367, ECF No. 38-1, (D.D.C. Jan. 17, 2020). The leaks had their predictable effect. For years Page has been branded with the false label of "agent of a hostile foreign power."

## II. ANALYSIS

Despite our Government's appalling conduct, I agree with my colleagues' conclusion that Page cannot prevail on all but one of his claims. His FISA claims cannot be brought against the Government defendants—the Department of Justice, the FBI and the United States—and his Patriot Act claim—which can lie against governmental agencies—is, I believe, forfeited and, in any event, is without merit as discussed *infra*.[4] As for Page's first FISA claim against the individual defendants, I reach the same result that my colleagues do but on slightly different analyses. And, most importantly, I do not agree that Page's second FISA claim is time-barred; I believe that Page states a timely and plausible claim for relief and would therefore reverse the district court's dismissal of that claim.

---

later fired from the FBI after personally authorizing a leak of other "sensitive information" to, as the OIG found, "enhanc[e] [his] reputation." OIG, *A Report of Investigation of Certain Allegations Relating to Former FBI Deputy Director Andrew McCabe* 1–2, 33–34 (Feb. 2018), https://perma.cc/8TZK-9GZM. When questioned about the leaks, McCabe "lacked candor" with the FBI Director and—under oath—again "lacked candor" with the FBI's Inspection Division and OIG. *Id.* More colloquially, McCabe leaked, then lied.

[4] *See* discussion II.B.

11

## A.   FISA Section 1809(a)(1)

I begin where the majority does: with Page's § 1809(a)(1) claim.  My colleagues conclude that Page's first FISA claim is time-barred but "assume without deciding" which of the parties' three proffered limitations periods governs.  Maj. Op. 16.  And they decide that the federal discovery rule controls in determining when a FISA claim first accrues.  *Id.*  I would resolve the question they assume and assume the question they decide.

### 1.    Limitations Period/Accrual Rule

FISA contains no statute of limitations, "a void which is commonplace in federal statutory law."  *Bd. of Regents v. Tomanio*, 446 U.S. 478, 483 (1980).  In the absence of congressional preemption, the applicable state limitations statute applies of its own force; that is, the court "'borrow[s]' the most closely analogous state limitations period."  *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 414 (2005).  The parties advance a slew of options for the governing limitations period.  In my view, only one—D.C. Code § 12-301(8)—has merit.

The individual defendants argue that we should use the two-year limitations period found in both the Wiretap Act and the Stored Communications Act because those laws "work in tandem with FISA and share its objective[s]," and because a resort to state law would result in "forum shopping and inconsistent judgments."  Red Br. 52–53 (internal quotations omitted).[5]  The Wiretap Act, Pub L. No. 90-351, Title III, § 802, 82 Stat. 197, 212, 18 U.S.C. § 2510 *et seq.*, governs prospective surveillance of the contents of oral, wire or

---

[5]  For clarity, I refer to the individual defendants' brief as the Red Brief and to the Government's brief as the Gov't Brief.

12

electronic communications. Its counterpart, the Stored Communications Act, Pub. L. No. 99-508, Title II, § 201, 100 Stat. 1848, 1860, 18 U.S.C. § 2701 *et seq.*, governs acquisition of the contents or metadata of those communications. In other words, the Wiretap Act applies when the Government actively intercepts communications and the Stored Communications Act applies when the Government seeks to retrieve stored communications. It can be the difference between listening in on a live telephone call and retrieving a one-month log of a cellphone's intercepted text messages.

The three statutes are *in pari materia*—they relate "to the same subject matter," employ contiguous statutory terms and form discrete pieces of a uniform whole: the means by which the Government may lawfully conduct electronic surveillance of its citizens. 2B Singer & Singer, *Sutherland Statutes & Statutory Construction* (7th ed. Nov. 2024 update) § 51:1–3. For this reason, the individual defendants argue that the Court should apply the two-year limitations period prescribed for the Wiretap Act and for the Stored Communications Act to FISA. With respect, I disagree.

I do agree that state statutes of limitations apply of their own force unless legitimately displaced by an act of the Congress. Perhaps because this doctrine became the inaptly named "borrowing doctrine," courts thought it equally proper to "borrow" statutes of limitations from other *federal* laws. *See, e.g.*, *Haggerty v. USAir, Inc.*, 952 F.2d 781, 786–88 (3d Cir. 1992); *Smith v. Int'l Org. of Masters, Mates & Pilots*, 296 F.3d 380, 382 (5th Cir. 2002). But properly understood, "the borrowing doctrine involves no borrowing at all." *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 163 (1987) (Scalia, J., concurring in the judgment). Instead, "state statutes of limitations . . . apply as a matter of state law" to "federal statutory causes of action" if the Congress has not

13

otherwise prescribed. *Id.* at 161. A court that applies a state statute of limitations is engaged in a quintessentially judicial role: the application of law to facts. But a court treads on legislative terrain when it "borrows" what it views as a sufficiently analogous federal limitations period from one statute and applies it to another. To do so "is not a construction of a statute, but, in effect, an enlargement of it by the court." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019). Accordingly, the Supreme Court has termed it "the rare case" in which it is appropriate to "borrow [an] analogous federal limitations period in the absence of an expressly applicable one." *Graham Cnty.*, 545 U.S. at 415; *see N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34–35 (1995) (describing it as "a closely circumscribed and narrow exception to the general rule" that state law applies) (alterations omitted). And here, FISA's close relationship to the Wiretap and Stored Communications Acts and its express omission of a statute of limitations does not support "borrowing" either of the latter limitations periods; instead, the negative inference is just as justified, if not more so. If a statute "omits words used in a prior statute on a similar subject," that omission is considered deliberate and indicative of a "different intent." 2B *Sutherland* § 51:2.

In the alternative, the individual defendants ask that we apply D.C.'s one-year statute of limitation for claims alleging "libel, slander" or "other invasion of privacy claims." D.C. Code § 12-301(4); *see Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1062 (D.C. 2014) (extending § 12-301(4) to privacy torts). Section 12-301(4) claims apply to private tortfeasors; FISA governs only those who engage in conduct "under color of law." 50 U.S.C. § 1809(a)(1), (2); *see Payne v. District of Columbia*, 559 F.2d 809, 817 n.32 (D.C. Cir. 1977) (explaining that "injuries inflicted by officers acting under color of law are significantly different in kind from those resulting from acts of private persons"). We have also held that

14

D.C.'s catchall three-year limitations period applies to analogous Fourth Amendment *Bivens* actions. *See Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986); D.C. Code § 12-301(8) (setting a three-year limitation for any claim "not otherwise specifically prescribed"). Accordingly, I agree with my colleagues that § 12-301(8)'s three-year limitation applies—not because I assume it but because the law commands it.

Although I believe the limitations period is straightforward, the accrual rule presents a closer question that I would not resolve today. Section 12-301(8)'s three-year limitation runs from "the time the right to maintain the action accrues." As the majority explains, the accrual rule for a federal claim—even when applying a state limitations period—is a question of federal law. *See Albright v. Oliver*, 510 U.S. 266, 280 n.6 (1994).

A claim accrues "when the plaintiff has a complete and present cause of action—*i.e.*, when she has the right to file suit and obtain relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024) (internal quotations omitted). A claim for retrospective relief becomes complete, and thus accrues, at the moment of injury. This is called the "incident of injury rule," *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 & n.4 (2014), and constitutes the "standard rule" for accrual. *Rotkiske*, 589 U.S. at 13; *Graham County*, 545 U.S. at 418 (same). Sometimes, however, courts employ a "discovery rule," under which the limitations period begins "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Petrella*, 572 U.S. at 670 n.4. The discovery rule "arose in 18th-century fraud cases as an 'exception' to the standard rule," *Gabelli v. SEC*, 568 U.S. 442, 449 (2013), and has since been expanded by the Supreme Court to only "two

15

contexts, latent disease and medical malpractice." *TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001).

The majority posits that the discovery rule is "the general rule" in federal courts, at least "in cases in which the injury is 'not of the sort that can readily be discovered when it occurs.'" Maj. Op. 16 (quoting *Sprint Commc'ns Co. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996)). I respectfully disagree. The majority relies on our decision in *Sprint Communications*, which in turn relies on *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341–42 (D.C. Cir. 1991). In *Connors*, then-Judge Ruth Bader Ginsburg concluded that courts of appeals had coalesced around the view that "the discovery rule is to be applied in all federal question cases in the absence of a contrary directive from Congress." 935 F.2d at 342 (quotation omitted). I believe that consensus may no longer be good law.

The Supreme Court has "observed that lower federal courts 'generally apply a discovery accrual rule when a statute is silent on the issue'" but it has conspicuously "not adopted that position as [its] own." *TRW Inc.*, 534 U.S. at 27 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)).[6] On the contrary, the Court has cautioned against an "expansive approach to the discovery rule" and termed its broad use a "bad wine of recent vintage." *Rotkiske*, 589 U.S. at 14 (quoting *TRW Inc.*, 534 U.S. at 37 (Scalia, J., concurring in the judgment)). *Rotkiske* "expressly rejected" the "default presumption that all federal limitations periods run from the date of discovery." *Id.* at 12. Granted, the clandestine nature of FISA surveillance may often preclude FISA's civil cause of action absent a discovery accrual rule. But no party here challenged the applicability of

_____

[6] Notably, *TRW Inc.* was authored by Justice Ginsburg. Justice Ginsburg cited to her *Connors* decision but drew a contrast between the default rule as developed in the circuit courts and the default rule applied by the Supreme Court. *Id.* at 27–28.

16

the discovery rule and so we lack the benefit of adversarial briefing on the matter.  I would accordingly assume without deciding that the discovery accrual rule applies here.

With these reservations noted, I agree that Page's § 1809(a)(1) claim alleging that the individual defendants engaged in unlawful surveillance is untimely for the reasons explained by the majority.

### B.   The Patriot Act

#### 1.   *The Plain Text*

The Patriot Act provides that:

> Any action against the United States under this section shall be forever barred unless it is presented in writing to the appropriate Federal agency within 2 years after such claim accrues *or* unless action is begun within 6 months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.  The claim shall accrue on the date upon which the claimant first has a reasonable opportunity to discover the violation.

18 U.S.C. § 2712(b)(2) (emphasis added).  Section 2712(b)(2) is plainly disjunctive: a plaintiff must *either* present his claim to the agency within two years *or* bring an action within six months of final agency denial.

The Patriot Act's statute of limitation echoes the Federal Tort Claims Act (FTCA), which provides that:

17

> (a)    [E]very civil action commenced against
> the United States shall be barred unless the
> complaint is filed within six years after the right
> of action first accrues.
>
> (b)    A tort claim against the United States
> shall be forever barred unless it is presented in
> writing to the appropriate Federal agency within
> two years after such claim accrues or unless
> action is begun within six months after the date
> of mailing, by certified or registered mail, of
> notice of final denial of the claim by the agency
> to which it was presented.

28 U.S.C. § 2401.  Both the Patriot Act and the FTCA impose
two   distinct   procedural   requirements:   administrative
exhaustion and timely filing.  No action can be filed against the
United States "unless the claimant shall have first presented the
claim to the appropriate Federal agency and his claim shall
have been finally denied by the agency."  28 U.S.C. § 2675(a).
The agency then has six months to resolve an administrative
claim, after which the agency's silence may "be deemed a final
denial of the claim."  *Id.*  All claims are then subject to the
general limitations rule that they are "barred unless the
complaint is filed within six years after the right of action first
accrues."  *Id.* § 2401(a).[7]  For FTCA and Patriot Act claims
only, the action is also "barred unless it is presented in writing
to the appropriate Federal agency within two years after such
claim accrues or unless action is begun within six months after
. . . final denial of the claim by the agency."  *Id.*  § 2401(b);
*accord* 18 U.S.C. § 2712(b)(2).

---

[7] These FTCA procedures apply with equal force to the Patriot
Act.  *See* 18 U.S.C. § 2712(b)(1) (requiring "[a]ny action . . . under
this section" to follow the agency presentment "procedures of the
Federal Tort Claims Act").

18

Properly construed, any claim against the United States must, in effect, first be presented to the Government no later than five years and six months from accrual; that is, six months before the six-year limitations deadline in 28 U.S.C. § 2401(a). For tort and Patriot Act claims, a plaintiff is subject to a stricter rule requiring timelier administrative presentment. If the plaintiff presents his claim to the agency within two years, he is treated like other claimants and benefits from the full six-year statute of limitations. But if the plaintiff presents his claim to the agency after two years, the limitations period for civil suit is shortened to six months after agency denial. The statute effectively imposes a penalty on a plaintiff who sits on his claim before presenting it to an agency.

Despite the plain text, in *Schuler v. United States* this court applied comments in the FTCA's legislative history to rewrite its deadline. 628 F.2d 199 (D.C. Cir. 1980). It worried that "[w]ere we to read the 'or' in the section as really intending the disjunctive, a claimant who filed a claim with the agency within two years would then be able to bring it to a District Court at any remote future time after the agency denied him relief." *Id.* at 201. But that result does not follow. A claimant would still be subject to § 2401(a), which bars *any* claim not brought within six years of accrual. The *Schuler* court thought that "relying on [§ 2401(a)] makes little sense" because it is a "general" limitation "superseded" by the "specific language of Section 2401(b)." *Id.* And notwithstanding § 2401(a) and (b) can operate jointly, the Court determined that "the legislative history of Section 2401(b) clearly shows that Congress intended a claimant to surmount both [§ 2401(b)] barriers." *Id.* at 202.

*Schuler* divined this congressional intent not from the statute but from a pair of committee reports. The committee reports describe § 2401(b) as requiring "a claimant [to] file a

19

claim in writing to the appropriate Federal agency within 2 years after the claim accrues, ***and*** to further require the filing of a court action within 6 months . . . of a final decision . . . by the agency." H.R. Rep. No. 89-1532, at 5 (1966) (emphasis added); *accord* S. Rep. No. 89-1327, at 8 (1966) (similarly using an "and"). *Schuler* engrafted the committee report's "and" onto the statutory "or," relying on its "common sense and the legislative history" and its belief that the FTCA was "not happily drafted." 628 F.2d at 201.

Three years later, the Second Circuit adopted our statutory misconstruction. It did so despite conceding that "[i]t is beyond dispute that 'or' generally is a disjunctive." *Willis v. United States*, 719 F.2d 608, 610 (2d Cir. 1983). Surveying the legislative history, the court declared it "beyond our ken" "[w]hy the draftsman chose to use 'or' in the bill, as distinguished from the crystal clear 'and' of the committee reports." *Id.* at 612. Relying on *Schuler*, *Willis* rewrote § 2401(b) to fit the statute to its legislative history. *Willis* acknowledged that it did not provide "a strictly literal reading" and that it could therefore "lead to an intercircuit conflict." *Id.* at 610, 613 n.3.

Later precedent of both the Supreme Court and this Court makes clear that the statute's plain language cannot be disregarded. In interpreting statutes, we begin with the "plain language" because it is "[t]he most reliable guide to congressional intent," *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006), and "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). "[L]egislative history is not the law" and insofar as it is ever a proper source for revealing congressional intent, it is only to *resolve* an ambiguity, not to *create* one by "muddy[ing] clear statutory language." *Azar v. Allina Health Servs.*, 587

20

U.S. 566, 579 (2019). This is particularly true "with respect to filing deadlines [when] a literal reading of Congress' words is generally the only proper reading of those words." *United States v. Locke*, 471 U.S. 84, 93 (1985).

There is no ambiguity in the meaning of "or." *Schuler* simply—and erroneously—thought that the Congress did not intend what it wrote. And as predicted, its disregard of the text eventually engendered a circuit split. *Compare Schuler*, 628 F.2d at 201 ("Were we to read the 'or' in the section as really intending the disjunctive, a claimant who filed a claim with the agency within two years would then be able to bring it to a District Court at any remote future time after the agency denied him relief") *with Ellison v. United States*, 531 F.3d 359, 363 (6th Cir. 2008) ("Had Congress used 'and' in writing this statute (or had we adopted 'and' in construing it), that would mean that a claim would be barred only if the plaintiff filed the action late in the agency *and* filed the action late in court.").[8]

*Schuler*'s misinterpretation violates basic principles of statutory construction and fair notice. Under *Schuler*'s approach, the meaning of § 2401(b) is the precise opposite of its text. Indeed, *Willis* acknowledged that its interpretation "may cause hardship to litigants" who rely on the law as

---

[8] *Ellison* created its own interpretative anomalies by inverting the logic of the statute. In an effort to reconcile *Schuler*'s (mistaken) belief that a plain text read would eliminate any judicial deadline with the disjunctive "or," the court read "forever barred . . . unless" (a) "or" (b) as "forever barred . . . if not" (a) "or" (b). *Id.* at 363. That is, the court interpreted § 2401(b) to forever bar claims if a plaintiff does not present the claim to an agency within two years or does not sue within six months of agency denial. That is not what the statute says. But *Ellison* at least recognized that it could not simply "transform[] 'or' into 'and'" to better align with purported legislative purpose. *Id.* at 363.

21

written.  719 F.2d at 613 n.3.  *But see Feliciano v. Dep't of Transp.*, 145 S.Ct. 1284, 1291 (2025) ("[T]hose whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages.").  That should not be the case, especially in the context of the FTCA, where claimants are often *pro se*.

Of course, *Schuler* remains binding on this panel until the Supreme Court or the *en banc* Court corrects it.  But its *stare decisis* effect applies only to the FTCA.  We have never interpreted the Patriot Act's statute of limitations and are therefore not bound to compound its error.  Although "*stare decisis* concerns may counsel against overruling" our erroneous FTCA precedent, there is "no reason whatsoever" to let that error spill over to a separate statute.  *Rose v. Rose*, 481 U.S. 619, 636 (1987) (O'Connor, J., concurring in part and concurring in the judgment).  "To be sure, where two statutes use similar language," courts "generally take this as a strong indication that they should be interpreted *pari passu*."  *Smith v. City of Jackson*, 544 U.S. 228, 260 (2005) (O'Connor, J., concurring in the judgment) (cleaned up); *see* Maj. Op. 24–25 (relying on this rationale).  But nothing in *Schuler* "provides any reason to extend its holding to the" Patriot Act as "the decision in [*Schuler*] was not based on any analysis of [the FTCA's] actual language.  Rather, the *ratio decidendi* was the statute's [legislative history]."  *Smith*, 544 U.S. at 261–62.

As should be plain, the legislative history of statute A has no bearing on the meaning of statute B.  The committee reports that *Schuler* thought key are doubly irrelevant: once because they are unenacted legislative history and, again, because they are the legislative history of a different statute.  "[L]egislative history can not justify reading a statute to mean the opposite of what it says" or "turn[ing] a clear text on its head."  *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 985 (7th Cir. 2008).  And it

22

certainly cannot do so if it tells the legislative history of another statute.

There is no dispute that Page filed his Patriot Act claim within six months of agency denial and within six years of claim accrual. *See* Maj. Op. 25. That should be the end of the matter.

### 2. *Page's Timeliness*

Even under what I believe is the majority's mistaken statutory construction, Page's Patriot Act claim is timely. The Patriot Act authorizes a suit against the United States for a willful violation of certain FISA provisions. Section 106(a) of FISA—the only provision Page relies on—in turn provides that "[n]o information acquired from an electronic surveillance pursuant to [FISA] may be used or disclosed by Federal officers or employees except for lawful purposes." 50 U.S.C. § 1806(a). My colleagues believe that Page knew or should have known of the Government's use or disclosure of FISA-derived information as of the April 2017 *Washington Post* article, a theory I address more fully *infra*.[9] For now, I note my belief that nothing in the *Post* article would give Page the requisite notice of his injury to establish that his claim accrued more than two years before it was administratively presented.

The majority also points to Page's statements in a May 22, 2017 letter to the House Permanent Select Committee on Intelligence. Maj. Op. 27. Unlike the *Washington Post* report, the May 2017 letter is not incorporated into Page's complaint. The Government requested that the district court take judicial notice of the letter under Fed. R. Evid. 201(b), a request the majority now apparently grants. The Government skates on thin ice when it asks the Court to resolve an affirmative defense

---

[9] *See* discussion II.C.

23

on a motion to dismiss based on facts outside the record.  As we have repeatedly stated, affirmative defenses may be resolved on a Rule 12(b)(6) motion based only on "the face of the complaint."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).  Should the Government urge the court to "consider matters outside the pleadings," the Court must "convert[] the motion into one for summary judgment and afford[] all parties 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'"  *Gordon v. Nat'l Youth Work All.*, 675 F.2d 356, 360 (D.C. Cir. 1982) (quoting Fed. R. Civ. P. 12(b)).

The majority concludes that the May 2017 letter reflects Page's belief that the Government "leaked his identity and revealed classified information regarding [the FISA warrants] . . . documented in the *Washington Post* article."  Maj. Op. 27.  The first claim goes to Page's belief that the Government revealed his previously anonymized identity as a result of *United States v. Buryakov*, No. 15-cr-73, 2016 WL 4417889 (S.D.N.Y. May 19, 2016).   In that case, the FBI filed documents indicating that the defendant, a Russian intelligence agent, discussed the attempted recruiting of "Male-1" as an intelligence asset.  Two news outlets later reported that "Male-1" was Carter Page.  *Testimony of Carter Page Before the H. Permanent Select Comm. on Intel.*, 115th Cong. 16 nn. 31–32 (2017), https://perma.cc/74C9-RWZ9.  The second claim goes to Page's belief that the Government leaked the existence of the FISA surveillance to the Washington Post.[10]   Neither

_____

[10]  The Government, for its part, draws a different inference.  It relies on the May 2017 letter and other evidence extrinsic to the complaint as indicia that Page suspected numerous "errors and omissions in the FISA applications," including "about the so-called Steele dossier."  Gov't Br. 16–17.  In other words, the Government's evidentiary support goes to Page's *knowledge about the lawfulness* of the surveillance.  But as the Government itself argues elsewhere,

24

pertains to Page's Patriot Act claim, which instead focuses on the Government's use of FISA-obtained information in the application renewal process. Even considering the May 2017 letter—which I do not believe we should—it helps the Government not at all, as nothing in the letter indicates Page's awareness of his Patriot Act claim more than two years before his administrative filing.

### 3.    *The Merits*

Although I believe that Page's Patriot Act claim is timely, I also believe he has forfeited it. Recall, FISA § 1806(a) provides that "[n]o information acquired from an electronic surveillance pursuant to [FISA] may be used or disclosed by Federal officers or employees except for lawful purposes." 50 U.S.C. § 1806(a). In district court, Page argued that the Government "violated the PATRIOT Act because [it] knowingly used the unlawfully obtained" FISA information in its renewal applications. *Page v. Comey*, 628 F. Supp. 3d 103, 134 (D.D.C. 2022). As the district court correctly explained, Page mistakenly conflated §§ 1806(a) and 1809(a); that is, Page alleged that the Government disclosed information that was "*acquired* through unauthorized surveillance" when his Patriot Act claim requires that "FISA information [be] used or disclosed . . . *for an unlawful purpose*." *Id.* at 134–35. On appeal, Page now alleges that the "FISA-acquired information was" put to the "unlawful end of misleading the FISC." Blue Br. 81 (internal alterations omitted). His theory works like this. The Justice Department lacked probable cause when it obtained

---

Page's claim focuses on the use or disclosure of FISA information for an unlawful purpose. Nothing in the Washington Post's reporting, the May 2017 letter or the Government's other evidence supports a claim that the Government *misused* the information it acquired.

25

at least the third and fourth FISA warrants. These warrants nevertheless issued because of the Government's duplicity during the application process. And because FISA-derived information was used to support the flawed probable cause finding, that information was put to an unlawful purpose. *Id.* at 81–82. The argument is both forfeited and meritless. An appellant "forfeits an argument by failing to press it in district court." *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019). Page's complaint does not assert the legal theory that he now advances on appeal. His district court briefs do not touch on the argument. And the district court did not pass on its merits.

Were the argument preserved, Page's Patriot Act claim would fail on the merits. As Page himself asserts, FISA-acquired information was put to a quintessentially lawful purpose: disclosure to the FISC. Page argues that because the totality of the evidence did not support probable cause, the Government's use of FISA evidence to obtain a warrant was itself an unlawful purpose. But the Government's duty under FISA is to disclose its evidence to the FISC judges. Granted, the Government cannot "mislead [the FISC] by including [false] information . . . or . . . omit[ting] material information." Blue Br. 82. But the FISA information submitted to the FISC did neither. Page's challenge is not to the Government's lawful use of FISA information but to its unlawful omission of non-FISA information. He does not allege that the Government (as opposed to the individual defendants) used FISA-derived information outside the warrant renewal process. He does not allege that using FISA-derived information to apply for a warrant constitutes an unlawful purpose. He does not allege that the Government manipulated, altered or in any way obfuscated the contents of the FISA-derived information. What he alleges is that the Government should have included additional information alongside the FISA-derived

26

information, which would have led the FISC to deny the Government's warrant renewal applications. In other words, his grievance is not with the Government's "*use* of the collected information" but with its "collection of the information itself." *Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 853 (9th Cir. 2012) (explaining that such claims must be brought against individual defendants under FISA rather than against the Government through the Patriot Act). I therefore agree with the majority that Page's Patriot Act claim fails but not based on untimeliness.

## C.    FISA Section 1809(a)(2)

Finally, I do not join the majority's holding that Page's § 1809(a)(2) claim is untimely. I also believe that Page has stated a plausible § 1809(a)(2) claim and would therefore reverse the district court's dismissal of this claim.

### 1.    *The Statute of Limitations*

Page's two FISA claims allege two legally distinct injuries that can accrue at different times. Recall, Page pleaded two claims under FISA. First, he alleged that the individual defendants "intentionally engage[d] in [unauthorized] electronic surveillance under color of law." 50 U.S.C. § 1809(a)(1). The injury that gives rise to this claim is the act of surveillance. Second, he alleged that the individual defendants "disclose[d] or use[d] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through [unauthorized] electronic surveillance." *Id.* § 1809(a)(2). The injury that gives rise to this claim is not the act of surveillance but the disclosure or use of information obtained through surveillance.

27

The majority devotes only minimal attention to explaining why Page's § 1809(a)(2) claim is time-barred.  In its view:

> The [*Washington Post*] article [] reported that the FBI had renewed the initial warrant "more than once," JA097, thereby informing readers, including Page, that the FBI had submitted multiple warrant renewal applications.  FISA requires warrant renewal applications to describe information gathered from previous surveillance . . . . The statute's command plus the *Post* report of repeated renewals sufficed to put Page on notice[.]

Maj. Op. 19–20.  With respect, I believe that recitation misreads the statute, the record and the procedural posture.  The majority ascribes to Page a comprehensive knowledge of FISA's provisions.  But nothing in the Washington Post's reporting would alert Page—or any reasonable reader—to the Government's use or disclosure of FISA-derived information.  My colleagues' rejection of Page's § 1809(a)(2) claim is particularly glaring at the motion to dismiss stage, when our duty is to "assume the truth of [Page's] factual allegations and draw all reasonable inferences in h[is] favor."  *Mills*, 105 F.4th at 395.

The *Washington Post* article quotes unnamed Government officials as asserting that the FISA applications to surveil Page were "renewed more than once by the FISA court."  JA97.  Page's § 1809(a)(2) claim turns, in part, on his assertion that the Government used or disclosed FISA-derived information in its three surveillance renewal applications.  Page does not know this for certain—nor do we, as the partially declassified renewal applications retain vast redactions—but he suggests that it is likely because FISA requires renewal applications to

28

contain "a statement of the facts concerning all previous applications that have been made . . . and the action taken on each previous application."   50 U.S.C. § 1804(a)(8).   My colleagues thus conclude that once Page read the *Post* article and learned that the surveillance warrants had been renewed, he was aware of his § 1809(a)(2) injury per his own theory.[11] Again, with respect, I believe that conclusion does not follow.

Under the discovery rule, a plaintiff's claim accrues "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Petrella*, 572 U.S. at 670 n.4 (internal quotations omitted).   In

---

[11]   The majority also relies on Page's statements in a May 22, 2017 letter to the House Permanent Select Committee on Intelligence.  Maj. Op. 20.  In addition to my concerns noted *supra* II.B.2., this evidence is patently forfeited and likely waived.  The Government—but not the individual defendants—raised the letter before us.  *Compare* Gov't Br. 16–18 *with* Red Br. 54–55.  Because it is the defendants' burden to prove their affirmative defense and because a statute of limitations defense is subject to ordinary rules of forfeiture and waiver, *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008), Page's congressional testimony cannot support the individual defendants' limitations defense.  The majority offers no justification for its use of the letter other than noting that a court may take judicial notice of matters not subject to reasonable dispute.  Maj. Op. 20–21 n.5.  But judicial notice does not allow us to venture outside the four corners of the complaint on a motion to dismiss to rely on evidence the defendants themselves forfeited.  And this evidence is more than forfeited.  At oral argument, counsel for the individual defendants was asked why he had not raised Page's public statements made between April and November 2017; counsel disclaimed any reliance on these statements. *See* Oral Arg. Tr. 52:15–53:11.  Counsel's "intentional relinquishment" of any reliance on the May 2017 letter constitutes a waiver. *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004).

29

other words, accrual may occur through actual or constructive knowledge. Both bases should fail at this stage.

Section 1804(a) requires the Government to disclose "all previous [FISA] applications" and, in the case of surveillance extensions, "a summary statement of the foreign intelligence information obtained . . . or a reasonable explanation of *the failure to obtain such information*." 50 U.S.C. § 1804(a)(8), (11) (emphasis added). In other words, the statute plainly contemplates that a renewal application may not disclose FISA-derived information. For example, if the Government tries but fails to install a bugging device on a target's phone within the statutorily prescribed deadline, *see id.* § 1805(d), it could renew its application without disclosing or using "information obtained under color of law by electronic surveillance." *Id.* § 1809(a)(2).

To conclude that Page had actual knowledge of his injury at the time of the *Washington Post* article, we must infer that Page (i) read the one line in the entire article that discussed renewal applications, (ii) read the FISA statute, (iii) found the precise portion of the statute addressing applications to the FISC and (iv) ascertained from the text's oblique language that the Government used FISA-derived information in its warrant reauthorization requests. That is one inferential leap too many, especially at the dismissal stage. Page is a layman—not a lawyer—and the entire FISA process occurs behind closed doors.[12] Even now, Page can only speculate about the contents

_____

[12] My colleagues gesture at Page's "multiple advanced degrees" as somehow justifying their stringent treatment of his claim. Maj. Op. 19. They do not explain how Page's resume provides any insight into the ins and outs of FISA. But even taking their point on its own terms, no expert could discern from the "public information" available as of April 2017 that a viable § 1809(a)(2) lay against the

30

of the FISA renewal applications because they have been only partially declassified.  The evidentiary vacuum existing even now should not allow us to hold, as a matter of law, that Page possessed actual knowledge of his injury from a single newspaper article necessarily bereft of detail.  And, again, what Page "knew and when []he knew it, in the context of a statute of limitations defense, are questions of fact for the jury." *Goldman v. Bequai*, 19 F.3d 666, 672 (D.C. Cir. 1994) (internal alterations omitted) (quoting *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1484 (D.C. Cir. 1989)).

If the majority instead means to suggest that Page had inquiry notice of his § 1809(a)(2) injury, I believe that conclusion is also premature at the dismissal stage.  Whether a plaintiff exercising "reasonable diligence should have known of a cause of action is a question of fact for the jury." *Klein v. Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015).  Indeed, the district court thought it so *unlikely* that the individual defendants used FISA-acquired information in their renewal applications that the court dismissed Page's § 1809(a)(2) claim on the merits.  *See Page*, 628 F. Supp. 3d at 129.

Finally, even if I were to credit that the *Post* article gave Page actual or constructive knowledge of his § 1809(a)(2) claim as it relates to the individual defendants' use of FISA-acquired information in renewal applications, that knowledge would apply only to the first of Page's two § 1809(a)(2) claims.  As further described *infra*,[13] Page separately alleges that FBI employees Peter Strzok and Lisa Page leaked FISA-acquired information to the Washington Post and to the New York

---

individual defendants.  *Id.*  As explained, a FISA warrant can be renewed without using or disclosing any FISA-derived information.

[13] *See* discussion II.C.3.

31

Times.  The majority gives no reason that the disclosure/use claim is untimely.  I believe there is none.

\*    \*    \*

The individual defendants assert—and the majority erroneously credits—that Page's § 1809(a)(2) claim accrued when the first word of the FBI's surveillance surfaced: April 11, 2017, the date the Washington Post disclosed that the Government had obtained a FISA warrant to surveil Page.  Page's second amended complaint alleges that he did not apprehend his injury until December 9, 2019—almost 32 months later—with the publication of the OIG's Report.

The majority disposes of this critical factual dispute with a lone sentence from the *Post* article, which quotes an anonymous Government official speaking off the record and alleging that the FISA warrant was renewed.  Never mind that the Government's official organs—the White House, the FBI and the Justice Department—all "declined to comment" to the Post.  JA96.  Never mind that the *Post* article catalogs "unsubstantiated claims about U.S. Surveillance" and quotes the former Director of National Intelligence as saying, "U.S. law enforcement agencies did not have any FISA orders to monitor the communications of Trump . . . or his campaign."  JA99.  And never mind that the *Post* report initially contained erroneous information that was later corrected.  *See* JA100 (updating the report to correct two factual errors in the initial publication).  The majority sweeps all this aside and concludes that no factfinder could conclude that Page possessed anything less than encyclopedic knowledge of the FISA renewal process—and oracular insight into the FBI's bases for seeking renewal—all from the lone *Post* article.  A jury—the traditional factfinders—will never be given the opportunity to adjudicate these contested facts because my colleagues conclude that

32

Page's complaint does not even *plausibly* assert that he was unaware that the Government used and or disclosed FISA-derived information about him.

As we have repeatedly held, "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint because statute of limitations issues often depend on contested questions of fact." *Momenian v. Davidson*, 878 F.3d 381, 387 (D.C. Cir. 2017) (quotation omitted); *see also Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971) ("[T]he complaint cannot be dismissed" under a 12(b)(6) statute of limitations defense "unless it appears *beyond doubt* that the plaintiff can prove *no* state of facts in support of his claim that would entitle him to relief.") (emphasis added). This record is riddled with doubts. Because the individual defendants have not come close to satisfying the "strict standard" at the motion-to-dismiss stage of demonstrating that Page's "claims are conclusively time-barred on the face of the complaint," I cannot join the majority holding. *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 787 (D.C. Cir. 2019).

## 2. *The FISA Warrant Renewal Allegations*

Turning to the merits, I believe that Page has stated a plausible violation of § 1809(a)(2) and would therefore reverse the district court's dismissal of this claim. Page's complaint alleges that the individual defendants "unlawfully . . . disclosed[] and used . . . the results of the surveillance on him," including through "leaks to the media, obtaining each subsequent renewal warrant, [and] obtaining additional surveillance and investigative information." JA70. The complaint adds that the defendants "used the information obtained from the issued FISA warrants to obtain each of the subsequent warrants as well as to . . . obtain or justify

33

additional investigative measures against Dr. Page . . . [and] to request investigative assistance from other law enforcement and intelligence agencies." JA70–71 (emphasis removed). Elsewhere, the complaint describes each of the individual defendants' roles in the Government's investigation, including their roles in obtaining FISA warrant renewals from the FISC. At the same time, Page fails to bridge the gap between these two allegations; that is, he does not explain how an individual defendant used the fruits of FISA surveillance in investigating or approving applications to the FISC. The district court treated this gap as a chasm into which all of Page's claims incurably fell. In my view, that unduly cabined view of the complaint was inappropriate at the pleading stage.

Instead, the district court was required to accept the validity of Page's factual allegations and "draw all reasonable inferences" from the complaint in Page's favor. *Mills*, 105 F.4th at 395. Those allegations and reasonable inferences tip Page's complaint over the plausibility line. For example, Page alleges that FBI Director James Comey personally signed the second and third FISA warrant applications and Deputy Director Andrew McCabe personally signed the fourth application. And Page alleges that information gathered from earlier FISA surveillance was included in each subsequent reauthorization application. In isolation, neither action links an individual defendant to a disclosure or use. But the Court must read "the allegations of the complaint as a whole." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011). That reading makes plain that the Director and the Deputy Director used or disclosed FISA-derived information when they separately sought warrant reauthorization from the FISC.

The district court rejected this reauthorization theory because, in its view, Page's complaint was a web of contradictions: the complaint alleged that surveillance

34

"produced 'no evidence at all'" that Page was a Russian agent, which "undercut[] his claim that its results were used to procure the renewal warrants." *Page*, 628 F. Supp. 3d at 129. I see no contradiction. Accepting the complaint's facts as true, the FBI captured some of Page's communications and informed the FISC of the contents of those communications, notwithstanding that the communications did not squarely peg Page as a Russian asset. FISA's *ex parte* procedures hold the Government to "a heightened duty of candor," *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, 411 F. Supp. 3d 333, 336 (FISC 2019), which means it must include all evidence—incriminating and mitigating—in its FISC applications. There is no basis to conclude, as the district court may have done, that the FISC would treat the absence of evidence as evidence of absence in reauthorizing surveillance of Page. And in any event, it was not the district court's role to assess the likelihood (assuming plausibility) of Page's underlying factual allegations. At the motion to dismiss stage, the plaintiff's job is to plead, not to prove.

This is particularly true in the context of FISA litigation, where "the necessary information lies within defendants' control" and so a plaintiff must resort to "pleadings on information and belief." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994). "Specific facts are not necessary" to clear the low bar of Rule 8(a)(2)—nor could such facts be proffered pre-discovery in all but the most extraordinary of FISA civil suits. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). At this stage in the litigation, it suffices that Page alleged that (i) FISA-derived information was used and disclosed in applying for FISA warrants, (ii) at least some of the individual defendants personally engaged in that use or disclosure through their involvement in the application process and (iii) at least some of these defendants knew or should have known that each earlier FISA application included material

35

omissions or falsehoods and, thus, the compiled information was tainted by an improper process. Granting Page "the benefit of all inferences that can be derived from" his allegations, *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012), they are more than sufficient to "nudge[] [Page's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### 3.  *The Media Leak Allegations*

Page's separate use-and-disclosure theory expressly directed at defendants Peter Strzok and Lisa Page survives for a similar reason. In their FBI employment, they allegedly conspired to produce a public narrative that Page was an agent of Russia through selective leaks of FISA information to the media. Their scheme led to the *Washington Post* story and, ultimately, to the cascade of events that have so despotically damaged Page's reputation. Page pursues his claims against these defendants down two paths. The first lacks merit but the second alleges a viable § 1809(a)(2) claim.

Page first argues that "Strzok and Lisa Page gave [his] identity to the [Washington Post]," and that this identification alone constitutes a § 1809(a)(2) violation. Blue Br. 78–79. As the individual defendants note, however, Page does not "argue that defendants obtained his identity *by* electronic surveillance." Red Br. 49–50; *see* 50 U.S.C. § 1809(a)(2) (encompassing only intentional disclosure or use of "information obtained . . . by electronic surveillance"). They are correct; Page's complaint extensively documents the defendants' investigation into and targeting of him before any electronic surveillance commenced. Page therefore cannot prevail on his first argument.

Page separately alleges that Strzok and Lisa Page "leaked . . . the results of the" FISA surveillance "to media outlets,

36

including the New York Times [and] the Washington Post."
JA69–70. This theory has traction. If proven, it would
constitute a naked "intentional[] disclos[ure] or use[]." 50
U.S.C. § 1809(a)(2). If proven, it would mean that those two
jumped-up civil servants—"neither servants nor civil," as
Churchill once described their antecedents—plotted to pervert
the law.

The district court discounted Page's allegations because
"[n]either the Times nor the Post article cited in the complaint
contains any mention of the fruits of Page's surveillance."
*Page*, 628 F. Supp. 3d at 129. That may be a strong argument
on summary judgment. But not at this stage when the district
court must accept Page's allegations as true and ask whether
they state a plausible claim for relief under the law. They do.

My colleagues commit the same error as the district court.
They conclude that Page plausibly alleges that Strzok and Lisa
Page "leaked to the *Washington Post* and the *New York Times*
the existence of and putative bases for FISA warrants to surveil
him" but not "that [Lisa] Page or Strzok leaked the FISA
warrants' results." Maj. Op. 22. This is so because the former
was "confirmed by the OIG Report" yet the latter rests on a
purportedly "naked assumption." *Id.* at 22–23. With respect,
our role at this stage is not to dissect the record in search of
rigorous proof. If Page's allegations support a reasonable
inference that the defendants leaked the FISA warrants, that
ends the matter. In my view, the allegations support such an
inference. Two leading papers of record spread across their
front pages details of the Government's surveillance of Page. I
do not see how the majority can find it implausible that Strzok
and Lisa Page leaked information obtained from that
surveillance to the media—especially when my colleagues
acknowledge that these leakers *did* unlawfully disclose the
existence of and bases for the surveillance. Nor do I see how

37

any plaintiff could ever jump the majority's pleading hurdle absent some form of pre-suit discovery. But for the fortuity of the OIG Report, Page's entire complaint would necessarily have been pleaded exclusively on information and belief—or, to use my colleagues' words, on "naked assumption[s]."

It is irrelevant that neither media article describes the fruits of the surveillance. Both articles name Carter Page. They reveal that he was the target of FISA surveillance. And on Page's telling, the surveillance had yet to uncover any information whatsoever to link him to Russia as its agent. It is at least plausible to conclude that the reporters were leaked some portion of Page's communications and chose to focus their coverage on the existence of the surveillance rather than on the substance of what the surveillance produced. As alleged, Strzok and Lisa Page were the sources of these leaks. And as alleged, Strzok and Lisa Page knew or had reason to know that the information was obtained through improperly authorized surveillance. At summary judgment, the absence of evidence of leaked surveillance contents—as opposed to the fact of surveillance itself—could prove dispositive. For now, however, the Court must accept the complaint's allegations as true and, on that basis, the district court erred in dismissing Page's § 1809(a)(2) claim.

## III. CONCLUSION

FISA's grand bargain was struck after the public learned of an array of intelligence scandals involving the Executive's rampant and lawless spying on American citizens. The enacting Congress aimed to subject the President's unbridled surveillance authority to the oversight of the other two branches and, in exchange, surveillance was allowed to take place away from the public eye. At the core of this bargain

38

were FISA's warrant procedures. Yet, as this case makes shockingly clear, those procedures have proven inadequate.

From start to finish, the FISA process was marred by governmental omissions and commissions that led a pliant court to authorize surveillance on an American citizen. FISA's requirements may sometimes prove difficult to satisfy but disregarding them is the gateway to naked violations of our civil liberties. I take some solace in the knowledge that the Government's egregious conduct roused the Congress to action. In response to this very case, it amended FISA to increase oversight and impose new penalties on individuals who crash FISA's guardrails. *See* Reforming Intelligence and Securing America Act, Pub. L. No. 118-49, 138 Stat. 862 (2024). Alas, this is cold comfort to Page. Nevertheless, I believe that Page's first FISA claim is untimely and his Patriot Act claim is both forfeited and fails on the merits. I therefore join my colleagues in affirming the dismissal of those claims but I would give Page his day in court on his claim brought pursuant to 50 U.S.C. § 1809(a)(2). With regard to that claim, I respectfully dissent.